# EXHIBIT A

DocuSign Envelope ID: ADF40B57-420B-4799-9AB3-3B5910387850

## The Litigation Practice Group PC - Affiliate Agreement

THIS AGREEMENT (the "Agreement") is made and effective as of the 17th day of August, 2022 by and between The Litigation Practice Group PC ("LPG") and **New Horizon Finance LLC** (hereinafter "Affiliate").

RECITALS:

LPG is in the business of providing a package debtor's rights services in the form of debt validation, consultation, and litigation defense through a network of attorneys licensed to practice law in all 50 states and the District of Columbia.  The legal services offered include:

- Removal of invalid debts through correspondence directly with the three credit bureaus;
- Validation of consumer debts through correspondence including disputes with original creditors, validation demands to third party debt collectors and assignees, and disputes with all three credit bureaus;
- Defense of collection actions initiated by original creditors or third party assignees;
- Negotiation of advantageous settlements of consumer debts both pre and post litigation;
- Education of clients regarding federal laws applicable to consumer debt and credit reporting, and consultation regarding risk mitigation and litigation defense through its network of attorneys across the country.

Each of these services is offered without regard to the identity of the creditor or third-party debt collector or assignee.  LPG reviews all client files prior to the execution of the client's legal services agreement with the appropriate law firm, and maintains oversight through its administrative services over all file placements.

Affiliate owns and operates a system of generating leads consisting of consumers interested in the legal services offered by LPG.  Affiliate, acting in accordance with direction from LPG, shall obtain the names of Consumers and will market in a lawful manner, complying with the restrictions of the jurisdiction in which the consumer resides.  For consumers interested in utilizing LPG's services, Affiliate will assist LPG in having consumers execute an approved legal services agreement with a law firm to which LPG provides administrative support services, at which point consumers will become clients of that law firm, and that law firm will be exclusively responsible for and liable for the representation of consumers in the context of the provision of legal services.  Nothing in this Agreement nor in the eventual legal services agreement shall restrict Affiliate from offering any other service of any kind to consumer, including credit repair or debt relief programs.  Nor is Affiliate restricted from marketing on behalf of credit repair or debt relief entities, including but not limited to other law firms.  LPG and Affiliate hereby agree that any and all prior agreements entered into by LPG and Affiliate or any law firm to which LPG provides administrative support services and Affiliate are null and void and unenforceable, and this Agreement shall become the operative agreement for all files previously placed through the use of LPG's administrative support services.

Affiliate is being retained by LPG to provide marketing and customer service functions only.  All payments made to Affiliate are for services actually rendered, and do not constitute a revenue or fee sharing agreement.  The method used to determine the value of the services rendered by Affiliate to LPG were

1



EXHIBIT A
Page 22

DocuSign Envelope ID: ADF40B57-420B-4799-9AB3-3B5910387850

selected by both parties based upon industry standard and effective valuation, and not for any other purpose.

LPG and Affiliate hereby agree to the following:

1.      Each Party shall be solely responsible for bearing its own costs and expenses incurred in performing its responsibilities under this Agreement, including all tariffs, filings, licensing and/or other fees.

2.      Affiliate shall comply with state and federal laws in communicating with consumers regarding LPG, any law firm utilized by LPG, or any of the programs of LPG or the assigned law firm.

3.      Both LPG and the law firm it utilizes shall comply with all state and federal laws in performing its obligations under the legal services agreement entered into between LPG and the consumers referred by Affiliate.

4.      If requested by LPG, Affiliate shall provide a copy of all marketing materials to LPG upon receiving a request from LPG.  Affiliate shall endeavor to provide such materials within 10 business days of such request, but may provide such materials in any time frame that is commercially reasonable.

5.      Affiliate agrees to keep any and all documents or communications between itself and LPG confidential pursuant to the provisions set forth below, and shall not share of disclose such documents to any party with prior, express written consent.

6.      Affiliate shall be entitled to receive the following as full and complete compensation for its services to LPG: LPG shall pay 65% per file for each file that Affiliate places with LPG, not counting the monthly maintenance fee of $96.38, which LPG shall retain to cover administrative costs for each file.  LPG shall calculate the amount of each file, apply the above-identified percentage fee, and remit the same to Affiliate pursuant to an agreed-upon schedule not to exceed one remittance per seven (7) calendar days. If any consumer cancels LPG's services, or demands a refund for payment for such services, or both, then LPG shall be solely responsive for such cost and Affiliate shall not have to share such expense.  LPG has exclusive discretion to grant or deny a requested refund or cancellation.  Finally, LPG may treat a consumer's failure to remit payment in a timely manner as a cancellation of the legal services agreement executed by consumer with LPG, and has sole discretion to make such determination.

7.      LPG shall bear all expenses related to the services it offers to consumers, and Affiliate shall bear all expenses related to its marketing of the same except as is set forth in this Paragraph.  Neither LPG nor Affiliate shall be required to pay the expenses of the other.

8.      LPG reserves all rights with regard to rejection or cancellation of a consumer, but will do so only in accordance with the recommendation of the law firm utilized in providing such service, and only subject to the applicable state bar rules for such representation.

9.      This agreement shall continue to operate and bind LPG and Affiliate for a period of twelve (12) months from the date of execution of this Agreement.  At that time, this Agreement will automatically renew until either party sends written notice of cancellation of this Agreement, which shall be effective



EXHIBIT A

Page 23

30 days after LPG or Affiliate postmarks or emails a cancellation letter stating the intent of that party to terminate this Agreement. If such cancellation letter is sent by either party, it shall be effective 30 days from the date of postmark or email, and shall terminate this Agreement and release either party from the obligations contained herein.

10.     If either party shall default under this Agreement, defined as a failure to comply with any of the obligations set forth above, the Agreement shall terminate following notice of default and a cure period of 30 days from the date postmarked on the notice of default. The notice of default must state with specificity the act of default alleged.

11.     Upon termination of this Agreement for any reason whatsoever, LPG and Affiliate will refrain from making any disparaging or negative comment, remark, statement, or implication, whether written or oral.

12.     The confidential information of LPG or Affiliate shall include information regarding contracts, customer or client lists or information, hardware, software, screens, specifications, designs, plans, drawings, data, prototypes, discoveries, research, developments, methods, processes, procedures, improvements, 'Know-how', compilations, market research, marketing techniques and plans, marketing materials, business plans and strategies, documents, scripts, guidelines, price lists, pricing policies and financial information or other business and/or technical information and materials, in oral, demonstrative, written, graphic or machine-readable form, which is unpublished, not available to the general public or trade, and which is maintained as confidential and proprietary information by the disclosing party for regulatory, customer relations, and/or competitive reasons. Neither LPG nor Affiliate may disclose the confidential information of the other with the express written consent of the other. A failure to abide by this confidentiality term shall entitle the party whose confidential information was compromised to a reasonable sum not less than $50,000.00, nor more than $200,000.00. The disclosure of information in connection with a judicial proceeding shall not constitute a violation of this term. The parties agree to notify the other if any inadvertent disclosure of information occurs within 48 hours of becoming aware of such disclosure. The parties agree to work together in good faith to remediate any disclosure of confidential information. A party whose confidential information is disclosed shall be entitled to injunctive relief in any court of competent jurisdiction.

13.     If, after the passage of six months of the date of this Agreement, Affiliate fails, in any one calendar month, to have at least fifty (50) active consumers, LPG shall withhold 20% of the fees due to Affiliate for said month in an escrow account. Such fees shall be held in escrow until, in a single calendar month, Affiliate has fifty (50) or more active consumers, at which point, within five (5) business days of the end of such calendar month, LPG shall transfer the balance of such escrow account to Affiliate and retain nothing in such escrow account. If Affiliate shall cease operations for any reason, or this Agreement shall terminate for any reason, Affiliate will continue to receive fees due to it under this Agreement until all active consumers have completed or withdrawn from the program, at which point any remaining amounts being held in escrow shall be released to Affiliate in full.

14.     Affiliate agrees not to use the name LPG or any law firm in any advertising, publicity release, or sales presentation designed to promote Affiliate's service, unless LPG provides prior written consent to such specific use.



DocuSign Envelope ID: ADF40B57-420B-4799-9AB3-3B5910387850

15.    Any fees incurred by LPG in connection with a customer's Non-Sufficient Funds ("NSF") fee shall be borne exclusively by LPG.

16.    This Agreement may not be assigned or transferred without the prior written consent of the other. This Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors and assigns.

17.    In the event of a breach, the prevailing party shall be entitled to reasonable attorneys' fees and collection costs, including all fees and costs on appeal.

18.    This Agreement contains the entire Agreement between the Parties, and shall not be modified, amended or supplemented, or any rights therein waived, unless specifically agreed upon in writing by LPG and Affiliate.

**The Litigation Practice Group PC**



**By: Daniel S. March, Managing Shareholder**

**New Horizon Finance LLC**



By:  Caleb Wickman

Title: Owner

DocuSign Envelope ID: ADF40B57-420B-4799-9AB3-3B5910387850

### Electronic Funds Transfer Authorization

This Electronic Funds Transfer (EFT) authorization is for use in connection with the foregoing Agreement, and permits LPG to transfer any and all amounts due to **New Horizon Finance LLC** ("Affiliate") under the foregoing Agreement by EFT.  By signing below, Affiliate hereby authorizes LPG to initiate EFT transfers at its discretion, with all fees and costs incurred by Affiliate in connection with such transfer to be borne by Affiliate, while all fees and costs incurred by LPG in connection with such transfer to be borne by LPG.

Account Holder Signature: _____ Date: _____

By:  **Caleb Wickman**

Title:  Owner

Account Owner Name: New Horizon Finance LLC

Social Security Number / FEIN Number associated with account listed below: ▮▮▮▮▮▮▮

Address: 8101 Biscayne Blvd #506

City: Miami, FL 33138

Bank Name: Chase

Routing Number: ▮▮▮▮▮▮▮▮▮▮▮▮

Account Number: ▮▮▮▮▮▮

Account type :  Checking

5

# EXHIBIT B

DocuSign Envelope ID: 253A2CB7-70F6-4GBC-8F71-746A8BC43F87

**ACCOUNTS RECEIVABLE PURCHASE AGREEMENT**

This ACCOUNTS RECEIVABLE PURCHASE AGREEMENT (this "**Agreement**") is made as of August 31, 2022  (the "**Agreement Date**"), by and between OHP – LPG, LP (the "**Buyer**"), and  New Horizon Financial (the    "**Seller**",
and together with the Buyer, the **"Parties"**).

**RECITALS**

WHEREAS, in the regular course of business, the Seller originates account receivables from Litigation Practice Group LLC ("**LPG**") in connection with client on-boarding services provided by the Seller to LPG and its affiliates;

WHEREAS, the account receivables represent an obligation of various clients to pay Seller for services that Seller previously provided, but which LPG shall provide from the date of execution of this Agreement;

Whereas, Purchaser desires to purchase, and Seller desires to sell to Purchaser, all right, title and interest to the payments owing to Seller from the client files of the Consumers listed on Addendum A (the "**Client Files**").

WHEREAS, the Seller desires to sell, assign, transfer, and deliver to the Buyer, and the Buyer desires to purchase, acquire, and accept from the Seller, certain of these account receivables (the "**Purchased Accounts**").

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, the Parties, intending to be legally bound, agree as follows:

**ARTICLE 1.**
**DEFINITIONS**

Section 1.1    Certain Definitions.  Certain defined terms used in this Agreement are set forth on **Exhibit A**.

**ARTICLE 2.**
**ASSIGNMENT AND TRANSFER AND CONSIDERATION**

Section 2.1    Assignment of the Purchased Accounts to the Buyer.  Upon execution of this Agreement and subject to the terms and conditions set forth herein, the Seller shall sell, assign, transfer, and deliver, and the Buyer shall purchase, acquire, and accept from the Seller, all of the Seller's right, title, and interest in and to the Purchased Accounts set forth on the spreadsheet attached to this Agreement, free and clear of any Liens.  Other than the Purchased Accounts, the Buyer shall not purchase or acquire any other assets of the Seller (collectively, the "**Excluded Assets**").

Section 2.2    No Assumption of Liabilities.  The Buyer shall not assume any Liabilities of the Seller of any kind, whether known or unknown, contingent, matured, or otherwise, whether currently existing or hereinafter created (collectively, the "**Excluded Liabilities**").

Section 2.3    Payment of Purchase Price.  Buyer shall pay $12,404.83 (the "**Purchase Price**") by wire transfer in accordance with the wire transfer instructions set forth in **Schedule 2.3** (the "**Wire Instructions**") in exchange for the receivable on the 15 files identified on the attached spreadsheet.

**ARTICLE 3.**
**REPRESENTATIONS AND WARRANTIES OF THE SELLER**

The Seller represents and warrants to the Buyer, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 3.1    <u>Organization; Good Standing</u>.  The Seller is a Limited Liability Company duly organized, validly existing, and in good standing under the Laws of the State of Delaware and is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of the Business requires such qualification, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, results of operations, financial condition, or assets of the Seller.

Section 3.2    Affiliate shall compy with state and federal laws in performing (a) its operations associated with the transaction contemplated herein, and (b) its obligations under this Agreement and any other agreement associated herewith, including communicating with consumers and/or potential consumers regarding LPG or any of its or LPG's programs.

Section 3.3    LPG shall comply with state and federal laws in performing (a) its operations associated with the transaction contemplated herein, (b) its obligations under the Agreement, and (c) the legal services agreement entered into between LPG and consumers and Affiliates.

Section 3.4    Each of LPG and Affiliate are in compliance in all material respects with any federal, state, local or foreign law (including common law), statute, code ordinance, rule, regulation or other requirement ("**Law**") applicable to its business or operations.  Neither LPG nor Affiliate have received any written or other notice or been charged with the violation of any Laws. To the knowledge of LPG and Affiliate, neither is under investigation with respect to the violation of any Laws and, to the knowledge of LPG and Affiliate, there are no facts or circumstances which could form the basis for any such violation. LPG and Affiliate currently have all material approvals, authorizations, consents, licenses, permits or certificates which are required for the operation of the business as presently conducted ("**Permits**"). Neither LPG nor Affiliate (i) are in default or violation (and no event has occurred which, with notice or lapse of time or both, would constitute a default or violation) of any term, condition or provision of the certificate of organization of the relevant party, and (ii) are in default or violation (and no event has occurred which, with notice or the lapse of time or both, would constitute a default or violation) in any material respect of any term, condition or provision of any Permit, to which the business is subject or by which its properties or assets are bound, and to the knowledge of the LPG and Affiliate, there are no facts or circumstances which could form the basis for any such default or violation.

Section 3.5    <u>Power and Authority</u>.  The Seller has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Seller, and the consummation by the Seller of the transactions contemplated hereby and thereby, have been duly approved by the Seller, and no further action is required on the part of the Seller to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Seller and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Seller, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other Laws affecting enforcement

DocuSign Envelope ID: 258A2CB7-70F6-49BG-8F71-716A8BC43F87

of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 3.6    Title to, and Sufficiency of, the Purchased Accounts.  The Seller has and shall convey to the Buyer, at the Closing, good, valid, transferable, and marketable title to, or valid leasehold interests in, all of the Purchased Accounts, free and clear of all Liens.

Section 3.7    Consents.  The Seller is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of, any Governmental Body or Third Party, including a party to any assigned contract, in connection with the execution, delivery, and performance by the Seller of this Agreement or any of the Transaction Agreements to which it is a party or the consummation of the transactions contemplated hereby and thereby.

Section 3.8    No Conflicts. The execution and delivery by the Seller of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of any obligation, or loss of any benefit, under: (a) any provision of the Organizational Documents of the Seller; (b) any contract to which the Seller is party, including, without limitation, any assigned contract; or (c) any Law or order applicable to the Seller or any of the Purchased Accounts.

Section 3.9    Compliance with Laws.  The Seller has materially complied, and is now materially complying, with all Laws applicable to the ownership and use of the Purchased Accounts.

Section 3.10    Legal Proceedings.  There is no Action of any nature pending or, to the Knowledge of the Seller, threatened against or by the Seller: (a) relating to or affecting the Purchased Accounts or (b) that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement and the Transaction Agreements.  No event has occurred or circumstance exists that may give rise to, or serve as a basis for, any such Action.

Section 3.11    Condition of Purchased Accounts.  Each Purchased Account shall have received no less than one processed payment.

Section 3.12    Confidentiality.  Seller agrees and acknowledges that all Purchased Accounts, the pricing, and all terms set forth in this Agreement are confidential (together, the "**Confidential Information**").  Seller will at all times keep the  Confidential Information in confidence and trust.  Seller will not, without the prior written consent of an authorized officer of Buyer, (A) copy, use or disclose any Confidential Information, (B) deliver or disclose any Confidential Information to any person or entity outside the Buyer, or (C) use the Confidential Information for Seller's own use or use it to the detriment of Buyer.  Notwithstanding the foregoing, Seller may, without consent, use the Confidential Information and disclose and deliver same to Seller's employees or agents, if applicable, who have a need to know, provided such employees or agents have entered into written agreements approved by Buyer and containing provisions at least as restrictive as these provisions.  Seller agrees that violation of this Section 3.9.  The Parties agree that the disclosure of the Confidential Information in violation of this Agreement may cause the Buyer irreparable harm and that any breach or threatened breach by the Seller entitles Buyer to seek injunctive relief, in addition to any other legal or equitable remedies available to it, in any court of competent jurisdiction.

EXHIBIT B

DocuSign Envelope ID: 258A2CB7-70F6-49BC-8F71-716A8BC43F87

## ARTICLE 4.
### REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Seller, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 4.1    <u>Organization; Good Standing</u>.  The Buyer is a limited liability company, duly organized, validly existing, and in good standing under the Laws of the State of Florida.

Section 4.2    <u>Power and Authority</u>.  The Buyer has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Buyer, and the consummation by the Buyer of the transactions contemplated hereby and thereby, have been duly approved by the Buyer, and no further action is required on the part of the Buyer to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Buyer and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Buyer, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 4.3    <u>No Conflicts</u>.  The execution and delivery by the Buyer of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of, any obligation, or loss of any benefit under: (a) any provision of the Buyer's Organizational Documents; (b) any contract to which the Buyer is party, other than the Buyer Representation Agreement; or (c) any Law applicable to the Buyer.

Section 4.4    <u>Sufficient Funds</u>.  The Buyer has, and will have, sufficient funds available to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement and the Transaction Agreements.

## ARTICLE 5.
### COVENANTS

Section 5.1    <u>Appropriate Actions</u>.

(a)    <u>General</u>.  Each of the Parties shall use commercially reasonable efforts to take all actions necessary to consummate the transactions contemplated by this Agreement as soon as reasonably practicable after the execution of this Agreement, including taking all actions necessary to comply promptly with all applicable Laws that may be imposed on it or any of its Affiliates with respect to the Closing.

## ARTICLE 6.
### CLOSING

Section 6.1    <u>Closing</u>.  The closing of the transactions contemplated by this Agreement (the "**Closing**") will take place upon the execution and delivery of this Agreement or at such other time, date, and place as the Parties may agree in writing.  The date on which the Closing occurs is hereinafter referred to as the "**Closing Date**."

DocuSign Envelope ID: 258A2CB7-70F6-49BC-8F71-716A8BC43F87

The Parties agree that the Closing may take place by the electronic exchange of executed counterpart documents and the electronic transfer of funds.

Section 6.2      <u>Closing Deliverables of the Seller</u>.  At or prior to the Closing, Seller shall deliver to Buyer any of the following if requested by Buyer:  (i) a bill of sale and assignment and assumption agreement substantially in the form attached hereto as **<u>Exhibit B</u>** (the "**Bill of Sale and Assignment and Assumption Agreement**"), duly executed by the Seller, effecting the transfer and assignment to, and assumption by, the Buyer of the Purchased Accounts; and (ii) such other customary instruments of transfer, assumption, filings, or documents, in form and substance reasonably satisfactory to the Buyer, as may be required to give effect to this Agreement.

Section 6.3      <u>Closing Deliverables of the Buyer</u>.  At or prior to the Closing, the Seller shall have received the following: (i) the Upfront Cash Payment; and (ii) if requested pursuant to <u>Section 6.2</u>, the Bill of Sale and Assignment and Assumption Agreement, duly executed by the Buyer.

Section 6.4      <u>Indemnification by the Seller</u>.  Subject to the limitations set forth in this <u>Article 6</u>, the Seller agrees to indemnify and hold harmless the Buyer, including its shareholders, members, directors, managers, officers, employees, Affiliates, and agents (each, a "**Buyer Indemnified Party**" and, collectively, the "**Buyer Indemnified Parties**"), against all claims, losses, Liabilities, damages, deficiencies, diminutions in value, costs, interest, awards, judgments, penalties, and expenses, including reasonable out-of-pocket attorneys' and consultants' fees and expenses and including any such reasonable expenses incurred in connection with investigating, defending against, or settling any of the foregoing (each, a "**Loss**" and, collectively, the "**Losses**") paid, suffered, incurred, sustained, or accrued by any Buyer Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Seller contained in this Agreement, (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Seller pursuant to this Agreement, (c) any Excluded Asset or any Excluded Liability, or (d) Affiliate's actions or omissions in their business operations.  This indemnity provision is not limited to third party claims against Purchaser.  This indemnity provision shall surve the termination of the Agreement.

Section 6.5      <u>Indemnification by LPG</u>.  Subject to the limitations set forth in this <u>Article 6</u>, LPG agrees to indemnify and hold harmless the **Buyer Indemnified Parties** against all **Losses** paid, suffered, incurred, sustained, or accrued by any Buyer Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of LPG in this Agreement, (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the LPG pursuant to this Agreement, (c) any Excluded Asset or any Excluded Liability, or (d) LPG's actions or omissions in their business operations.  This indemnity provision is not limited to third party claims against Purchaser.  This indemnity provision shall surve the termination of the Agreement.

Section 6.6      <u>Indemnification by the Buyer</u>.  Subject to the limitations set forth in this <u>Article 6</u>, the Buyer agrees to indemnify and hold harmless the Seller, including its Affiliates and agents (each, a "**Seller Indemnified Party**" and, collectively, the "**Seller Indemnified Parties**"), against all Losses paid, suffered, incurred, sustained, or accrued by any Seller Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Buyer contained in this Agreement; (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Buyer pursuant to this Agreement; (c) any event or occurance related to the Purchased Accounts or Buyer occurring after the Closing; or (d) resulting from any omissions or misstatements made by Buyer to investors or potential investors.

Section 6.7      <u>Indemnification Procedures</u>.

(a)     <u>No Restraints</u>. Promptly following receipt by an Indemnified Party of notice by a Third Party (including any Governmental Body) of any complaint, dispute, or claim or the commencement of any audit, investigation, Action or proceeding with respect to which such Indemnified Party may be entitled to indemnification pursuant hereto (a "**Third-party Claim**"), such Indemnified Party shall provide written notice thereof to the Indemnifying Party, <u>provided</u>, <u>however</u>, that the failure to so notify the Indemnifying Party shall relieve the Indemnifying Party from Liability hereunder with respect to such Third-party Claim only if, and only to the extent that, such failure to so notify the Indemnifying Party results in the forfeiture by the Indemnifying Party of rights and defenses otherwise available to the Indemnifying Party with respect to such Third-party Claim. The Indemnifying Party shall have the right, upon written notice delivered to the Indemnified Party within twenty days thereafter assuming full responsibility for any Losses resulting from such Third-party Claim, to assume the defense of such Third-party Claim, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the fees and disbursements of such counsel; <u>provided</u>, <u>however</u>, if the Indemnifying Party declines or fails to assume the defense of such Third-party Claim on the terms provided above or to employ counsel reasonably satisfactory to the Indemnified Party, in either case within such twenty day period, then any Losses shall include the reasonable fees and disbursements of counsel for the Indemnified Party as incurred. In any Third-party Claim for which indemnification is being sought hereunder the Indemnified Party or the Indemnifying Party, whichever is not assuming the defense of such Third-party Claim, shall have the right to participate in such matter and to retain its own counsel at such Party's own expense. The Indemnifying Party or the Indemnified Party (as the case may be) shall at all times use reasonable efforts to keep the Indemnifying Party or Indemnified Party (as the case may be) reasonably apprised of the status of the defense of any matter, the defense of which it is maintaining, and to cooperate in good faith with each other with respect to the defense of any such matter.

(b)     No Indemnified Party may settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder without the prior written consent of the Indemnifying Party (which may not be unreasonably withheld or delayed), unless (i) the Indemnifying Party fails to assume and maintain the defense of such Third-party Claim or (ii) such settlement, compromise, or consent includes an unconditional release of the Indemnifying Party and its officers, directors, employees and Affiliates from all Liability arising out of, or related to, such Third-party Claim. An Indemnifying Party may not, without the prior written consent of the Indemnified Party, settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder unless such settlement, compromise, or consent (A) includes an unconditional release of the Indemnified Party and its officers, directors, employees, and Affiliates from all Liability arising out of, or related to, such Third-party Claim, (B) does not contain any admission or statement suggesting any wrongdoing or Liability on behalf of the Indemnified Party, and (C) does not contain any equitable order, judgment, or term that in any manner affects, restrains, or interferes with the business of the Indemnified Party or any of the Indemnified Party's Affiliates.

(c)     If an Indemnified Party claims a right to payment pursuant hereto with respect to any matter not involving a Third-party Claim (a "**Direct Claim**"), such Indemnified Party shall send written notice of such claim to the appropriate Indemnifying Party (each, a "**Notice of Claim**"). Such Notice of Claim shall specify the basis for such Direct Claim. The failure by any Indemnified Party so to notify the Indemnifying Party shall not relieve the Indemnifying Party from any Liability that it may have to such Indemnified Party with respect to any Direct Claim made pursuant to this <u>Section 6.6(c)</u>. If the Indemnifying Party does not notify the Indemnified Party within thirty days following its receipt of such Notice of Claim that the Indemnifying Party disputes its Liability to the Indemnified Party under this <u>Article 6</u> or the amount thereof, the Direct Claim specified by the Indemnified Party in such Notice of Claim shall be conclusively deemed a Liability of the Indemnifying Party under this <u>Article 6</u>, and the Indemnifying Party shall pay the amount of such Liability to the Indemnified Party on demand or, in the case of any Notice of Claim in which the amount of the Direct Claim (or any portion of the Direct Claim) is estimated, on such later date when the amount of such Direct Claim (or such portion of such Direct Claim) becomes finally determined. In the event that the Indemnifying Party has timely disputed its Liability with respect

to such Direct Claim as provided above, as promptly as possible, such Indemnified Party and the appropriate Indemnifying Party shall establish the merits and amount of such Direct Claim (by mutual agreement, litigation, arbitration or otherwise) and, within five business days following the final determination of the merits and amount of such Direct Claim, the Indemnifying Party shall pay to the Indemnified Party an amount equal to such Direct Claim as determined hereunder.

## ARTICLE 7.
## MISCELLANEOUS

Section 7.1    Entire Agreement; Amendment.    This Agreement and the Transaction Agreements (including the exhibits hereto and thereto and the documents referred to therein) constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they related in any way to the subject matter hereof.  This Agreement may be amended with the written consent of each of the Parties or any successor thereto by execution of an instrument in writing.

Section 7.2    Waivers.    The rights and remedies of the Parties to this Agreement are cumulative and not alternative.  To the maximum extent permitted by applicable Law: (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Parties; (b) no waiver that may be given by a Party will be applicable except in the specific instance for which it is given; and (c) no notice to, or demand on, one Party will be deemed to be a waiver of any obligation of such Party or of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the Transaction Agreements.

Section 7.3    Notices.    All notices and other communications required or permitted hereunder shall be made to the address of a Party listed on the signature page to this Agreement and shall be (a) in writing, (b) effective when given, and (c), in any event, deemed to be given upon receipt or, if earlier: (i) upon delivery, if delivered by hand; (ii) two business days after deposit with FedEx Express or similar recognized international overnight courier service, freight prepaid; or (iii) one business day after facsimile or electronic mail transmission. A Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties advance written notice pursuant to the provisions above.

Section 7.4    Successors and Assigns.    This Agreement shall be binding upon, and inure to the benefit of, the Parties named herein and their respective successors and permitted assigns.  This Agreement and any rights or obligations of a Party hereunder may be assigned by a Party or an Affiliate of such Party without consent of the other Parties.  This Agreement will be binding upon any assignee of any Party.  No assignment shall have the effect of relieving any Party to this Agreement of any of its obligations hereunder.

Section 7.5    Public Disclosure.    Except as may be required by Law, the Seller shall not issue any statement or communication to any Third Party (other than its respective agents) regarding the subject matter of this Agreement or the transactions contemplated hereby, including, if applicable, the termination of this Agreement and the reasons therefor, without the prior written consent of the Buyer.

Section 7.6    Expenses and Fees.    Whether or not the Closing occurs, all fees and expenses incurred in connection with this transactions contemplated by this Agreement, including all legal, accounting, financial advisory, consulting and all other fees and expenses of Third Parties incurred by a Party in connection with the negotiation and effectuation of the terms and conditions of this Agreement and the transactions contemplated hereby, shall be the obligation of the respective Party incurring such fees and expenses.  In the event of a breach,

DocuSign Envelope ID: 258A2CB7-70F6-49BC-8F71-746A8BC43F87

the party who prevails in any court proceeding shall be entitled to reasonable attorneys' fees and collection costs, including all fees and costs on appeal.

Section 7.7    <u>Specific Performance</u>.  The Parties agree that irreparable damage would occur if any provision of this Agreement was not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled hereunder, at Law or in equity.

<u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

Section 7.8    <u>Governing Law</u>.  This Agreement shall, in all respects, be construed in accordance with, and governed by, the Laws of the State of California without regard to conflict of Laws principles<u>Severability</u>.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction<u>Construction</u>.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

Section 7.9    <u>Non Disparagement</u> - Upon termination of this Agreement for any reason whatsoever, LPG and Affiliate will refrain, and will instruct their affiliates, officers, directors, employees, contractors and agents to refrain, from making any disparaging or negative comment, remark, statement, or implication, whether written or oral, about any Party to this Agreement.

DocuSign Envelope ID: 253A2CB7-70F6-4GB6-9F71-716A8BC43F87

Case 8:24-ap-01017-SC    Doc 10-1    Filed 03/28/24    Entered 03/28/24 13:37:36    Desc
                    Exhibit to Amended Complaint    Page 16 of 196

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Agreement Date.

**BUYER:**

OHP – LPG, LP
By: Old Hickory GP, LLC, its general partner

By: _____
        Name: Adam Blum
        Title: Manager

**SELLER:**  New Horizon Financial

By: _____
        Name:  Caleb Wickman
        Title:   Owner

**APPROVAL OF ASSIGNMENT**

        The assignment of the Purchased Accounts set forth in this Agreement is hereby approved, and with respect to the Purchased Accounts, the Buyer shall have all rights of Buyer as set forth in this agreement.

**The Litigation Practice Group P.C.**

By: _____
        Name: Daniel S. March
        Title: Managing Shareholder

*[Signature Page to Accounts Receivable Purchase Agreement]*

EXHIBIT B
Page 36

DocuSign Envelope ID: 253A2CB7-70F6-49BC-8F71-716A8BC43F87

**EXHIBIT A**

**DEFINITIONS**

As used in this Agreement, the following terms have the following meanings (terms defined in the singular to have a correlative meaning when used in the plural and vice versa).

(a)    "**Action**" shall mean any civil, criminal, or administrative action, claim, suit, demand, charge, citation, reexamination, opposition, interference, decree, injunction, mediation, hearing, notice of violation, demand letter, litigation, proceeding, labor dispute, arbitral action, governmental or other audit, inquiry, criminal prosecution, investigation, unfair labor practice charge, or complaint.

(b)    "**Agreement**" shall have the meaning set forth in the preamble to this Agreement.

(c)    "**Agreement Date**" shall have the meaning set forth in the preamble to this Agreement.

(d)    "**Affiliate**" shall mean (i) with respect to any non-natural Person, any Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person and (ii), with respect to any individual, (A) family members of such individual, by blood, adoption, or marriage, (B) such individual's spouse or ex-spouse and (C) any Person that is directly or indirectly under the control of any of the foregoing individuals.  For purposes of this definition, "control" (including with correlative meanings, the terms "controlling," "controlled by," and under "common control with") means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

(e)    "**Bill of Sale and Assignment and Assumption Agreement**" shall have the meaning set forth in Section 6.2.

(f)    "**Business**" shall mean the business of the Seller as conducted on the Agreement Date.

(g)    "**Buyer**" shall have the meaning set forth in the preamble to this Agreement.

(h)    "**Buyer Indemnified Parties**" shall have the meaning set forth in Section 6.4.

(i)    "**Client Files**" shall have the meaning set forth in the Recitals.

(i)    "**Closing**" shall have the meaning set forth in Section 6.1.

(j)    "**Closing Date**" shall have the meaning set forth in Section 6.1.

(k)    "**Direct Claim**" shall have the meaning set forth in Section 6.6(c).

(l)    "**Excluded Assets**" shall have the meaning set forth in Section 2.1.

(m)    "**Excluded Liabilities**" shall have the meaning set forth in Section 2.2.

(n)    "**Governmental Body**" shall mean any: (i) nation, province, state, county, city, town, village, district, or other jurisdiction of any nature; (ii) federal, provincial, state, local, municipal, foreign, or other government; (iii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); (iv) multi-national organization or body; or (v) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

DocuSign Envelope ID: 253A2CB7-70F6-4GBC-8F71-716A8BC43F87

(o)    "**Indebtedness**" means, without duplication and with respect to the Seller, all: (i) indebtedness for borrowed money; (ii) obligations for the deferred purchase price of property or services, (iii) long or short-term obligations evidenced by notes, bonds, debentures or other similar instruments; (iv) obligations under any interest rate, currency swap, or other hedging agreement or arrangement; (v) capital lease obligations; (vi) reimbursement obligations under any letter of credit, banker's acceptance or similar credit transactions; (vii) guarantees made by the Seller on behalf of any third party in respect of obligations of the kind referred to in the foregoing clauses (i) through (vi); and (viii) any unpaid interest, prepayment penalties, premiums, costs and fees that would arise or become due as a result of the prepayment of any of the obligations referred to in the foregoing clauses (i) through (vii).

(p)    "**Indemnified Party**" shall mean a Buyer Indemnified Party or a Seller Indemnified Party, as the case may be, making a claim for indemnification under Article 6.

(q)    "**Indemnifying Party**" shall mean a Party against whom a claim for indemnification is asserted under Article 6.

(r)    "**Knowledge**" shall mean, with respect to the Seller, the actual or constructive knowledge of all facts relevant to this transaction and the transacting parties, after due inquiry.

(s)    "**Law**" shall have the meaning set forth in Article 3.

(t)    "**Liabilities**" shall mean any direct or indirect liability, Indebtedness, obligation, commitment, expense, claim, deficiency, guaranty, or endorsement of, or by, any Person of any type, known or unknown, and whether accrued, absolute, contingent, matured, unmatured, determined or undeterminable, on- or off-balance sheet, or other.

(u)    "**Lien**" shall mean any mortgage, pledge, lien, charge, claim, security interest, adverse claims of ownership or use, restrictions on transfer, defect of title, or other encumbrance of any sort.

(v)    "**Losses**" shall have the meaning set forth in Section 6.4.

(w)    "**Notice of Claim**" shall have the meaning set forth in Section 6.6(c).

(x)    "**Organizational Documents**" shall mean, with respect to a Person, the charter, bylaws, limited liability company agreement, and other organizational documents of such Person, in each case, as amended.

(y)    "**Party**" or "**Parties**" shall have the meaning set forth in the preamble to this Agreement.

(z)    "**Permits**" shall have the meaning set forth in Article 3.

(aa)    "**Permitted Liens**" shall mean (i) Liens for Taxes not yet delinquent or being contested in good faith by appropriate proceedings, (ii) statutory Liens (including materialmen's, warehousemen's, mechanic's, repairmen's, landlord's, and other similar Liens) arising in the ordinary course of business securing payments not yet delinquent or being contested in good faith by appropriate proceedings, and (iii) restrictive covenants, easements, and defects, imperfections or irregularities of title, if any, of a nature that do not materially and adversely affect the assets or properties subject thereto.

(bb)    "**Person**" shall mean any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, Governmental Body, or other entity.

DocuSign Envelope ID: 253A2CB7-70F6-49B8-8F71-746A8BC43F87

(cc)     "**Purchase Price**" shall have the meaning set forth in <u>Section 2.3</u>.

(dd)     "**Purchased Accounts**" shall have the meaning set forth in the Recitals.

(ee)     "**Seller**" shall have the meaning set forth in the preamble to this Agreement.

(ff)     "**Seller Indemnified Parties**" shall have the meaning set forth in <u>Section 6.5</u>.

(gg)     "**Tax**" or "**Taxes**" shall mean any U.S. federal, state, local or non-U.S. income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, escheat, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

(hh)     "**Tax Returns**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(ii)     "**Third Party**" or "**Third Parties**" shall mean any Person other than the Parties or their respective Affiliates.

(jj)     "**Third-party Claim**" shall have the meaning set forth in <u>Section 6.6(a)</u>.

(kk)     "**Transaction Agreements**" shall mean the Bill of Sale and Assignment and Assumption Agreement, and each other agreement, instrument, and/or certificate contemplated by this Agreement or such other agreements to be executed in connection with the transactions contemplated hereby or thereby.

(ll)     "**Upfront Cash Payment**" shall have the meaning set forth in <u>Section 2.3</u>.

(mm)     "**Wire Instructions**" shall have the meaning set forth in <u>Section 2.3</u>.

DocuSign Envelope ID: 253A2CB7-70E6-4CBC-8F71-746A8BC43F87

**EXHIBIT B**

**FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

THIS BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this **"Agreement"**), is made by and between OHP – LPG, LP (the "**Buyer**"), and New Horizon Financial (the "**Seller**").  Each of the Seller and the Buyer are sometimes referred to herein, individually, as a "**Party**" and, collectively, as the "**Parties.**"

WHEREAS, the Buyer and the Seller have entered into that certain Accounts Receivable Purchase Agreement, of even date herewith (the "**Purchase Agreement**"), pursuant to which the Seller has agreed to sell, assign, transfer, and deliver to the Buyer, and the Buyer has agreed to purchase, acquire, and accept from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.      Defined Terms.  Capitalized terms used but not otherwise defined in this Agreement shall have the meanings assigned to such terms in the Purchase Agreement.

2.      Sale of Purchased Accounts; Assignment.  The Seller hereby sells, assigns, transfers, and delivers to the Buyer, and the Buyer hereby purchases, acquires, and accepts from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

3.      Further Assurances.  Each of the Parties agrees, from time to time, at the request of the any other Party, to execute and deliver such other instruments of conveyance, power of attorney, sale, transfer, or assignment and take such other actions as such other Party may reasonably request in order to more effectively consummate the transactions contemplated by this Agreement.

4.      Terms of the Purchase Agreement.  This Agreement is intended to evidence the consummation of the transactions contemplated by the Purchase Agreement and is subject to the terms and conditions set forth in the Purchase Agreement.   The terms of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants, agreements, and indemnities relating to the Purchased Accounts are incorporated herein by this reference.  The Parties acknowledge and agree that the representations, warranties, covenants, agreements, and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein.  In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

5.      Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

*[Remainder of page intentionally left blank.]*

Accounts Receivable Purchase Agreement
Exhibit B – Bill of Sale

**EXHIBIT B**
Page 40

DocuSign Envelope ID: 258A2CB7-70E6-4CBC-8F71-746A8BC43F87

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.


**BUYER:**

OHP – LPG, LP
By: Old Hickory GP, LLC, its general partner

By: _____
       Name:  Adam Blum
       Title:  Manager


**SELLER:**  New Horizon Financial


By: _____
       Name:  Caleb Wickman
       Title:  Owner

DocuSign Envelope ID: 253A2CB7-70E6-46BC-8F71-716A8BC43F87

Case 8:24-ap-01017-SC    Doc 10-1    Filed 03/28/24    Entered 03/28/24 13:37:36    Desc
Exhibit to Amended Complaint    Page 22 of 196

**Schedule 2.3**
**Wire Instructions**

**Account Holder Name:**   NEW HORIZON FINANCE LLC

**Address:** 8101 Biscayne Blvd #506

**Routing Number:** ███████

**Account Number:** ███████

# EXHIBIT C

EXHIBIT C
Page 43

DocuSign Envelope ID: 80181E37-C618-4551-8350-06348A4E360A

## ACCOUNTS RECEIVABLE PURCHASE AGREEMENT

This ACCOUNTS RECEIVABLE PURCHASE AGREEMENT (this "**Agreement**") is made as of September 14, 2022 (the "**Agreement Date**"), by and between PurchaseCo80, LLC (the "**Buyer**"), and New Horizon Finance LLC (the "**Seller**", and together with the Buyer, the **"Parties")**.

### RECITALS

WHEREAS, in the regular course of business, the Seller originates account receivables from Litigation Practice Group LLC ("**LPG**") in connection with client on-boarding services provided by the Seller to LPG and its affiliates;

WHEREAS, the account receivables represent an obligation of various clients to pay Seller for services that Seller previously provided, but which LPG shall provide from the date of execution of this Agreement;

Whereas, Purchaser desires to purchase, and Seller desires to sell to Purchaser, all right, title and interest to the payments owing to Seller from the client files of the Consumers listed on Addendum A (the "**Client Files**").

WHEREAS, the Seller desires to sell, assign, transfer, and deliver to the Buyer, and the Buyer desires to purchase, acquire, and accept from the Seller, certain of these account receivables (the "**Purchased Accounts**").

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, the Parties, intending to be legally bound, agree as follows:

### ARTICLE 1.
### DEFINITIONS

Section 1.1        Certain Definitions.  Certain defined terms used in this Agreement are set forth on **Exhibit A**.

### ARTICLE 2.
### ASSIGNMENT AND TRANSFER AND CONSIDERATION

Section 2.1        Assignment of the Purchased Accounts to the Buyer.  Upon execution of this Agreement and subject to the terms and conditions set forth herein, the Seller shall sell, assign, transfer, and deliver, and the Buyer shall purchase, acquire, and accept from the Seller, all the Seller's right, title, and interest in and to the Purchased Accounts set forth on the spreadsheet attached to this Agreement, free and clear of any Liens.  Other than the Purchased Accounts, the Buyer shall not purchase or acquire any other assets of the Seller (collectively, the "**Excluded Assets**").

Section 2.2        No Assumption of Liabilities.  The Buyer shall not assume any Liabilities of the Seller of any kind, whether known or unknown, contingent, matured, or otherwise, whether currently existing or hereinafter created (collectively, the "**Excluded Liabilities**").

Section 2.3        Payment of Purchase Price.  Buyer shall pay $39,886.54 (the "**Purchase Price**") by wire transfer in accordance with the wire transfer instructions set forth in **Schedule 2.3** (the "**Wire Instructions**") in exchange for the receivable on the 45 files identified on the attached spreadsheet.

EXHIBIT C

Page 44

DocuSign Envelope ID: 80181E37-0618-4551-8350-063484453A0A

## ARTICLE 3.
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Buyer, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 3.1   <u>Organization; Good Standing</u>.  The Seller is a Limited Liability Company duly organized, validly existing, and in good standing under the Laws of the State of Delaware and is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of the Business requires such qualification, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, results of operations, financial condition, or assets of the Seller.

Section 3.2   Affiliate shall company with state and federal laws in performing (a) its operations associated with the transaction contemplated herein, and (b) its obligations under this Agreement and any other agreement associated herewith, including communicating with consumers and/or potential consumers regarding LPG or any of its or LPG's programs.

Section 3.3   LPG shall comply with state and federal laws in performing (a) its operations associated with the transaction contemplated herein, (b) its obligations under the Agreement, and (c) the legal services agreement entered into between LPG and consumers and Affiliates.

Section 3.4   Each of LPG and Affiliate are in compliance in all material respects with any federal, state, local or foreign law (including common law), statute, code ordinance, rule, regulation or other requirement ("**Law**") applicable to its business or operations.  Neither LPG nor Affiliate have received any written or other notice or been charged with the violation of any Laws. To the knowledge of LPG and Affiliate, neither is under investigation with respect to the violation of any Laws and, to the knowledge of LPG and Affiliate, there are no facts or circumstances which could form the basis for any such violation. LPG and Affiliate currently have all material approvals, authorizations, consents, licenses, permits, or certificates which are required for the operation of the business as presently conducted ("**Permits**"). Neither LPG nor Affiliate (i) are in default or violation (and no event has occurred which, with notice or lapse of time or both, would constitute a default or violation) of any term, condition or provision of the certificate of organization of the relevant party, and (ii) are in default or violation (and no event has occurred which, with notice or the lapse of time or both, would constitute a default or violation) in any material respect of any term, condition or provision of any Permit, to which the business is subject or by which its properties or assets are bound, and to the knowledge of the LPG and Affiliate, there are no facts or circumstances which could form the basis for any such default or violation.

Section 3.5   <u>Power and Authority</u>. The Seller has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Seller, and the consummation by the Seller of the transactions contemplated hereby and thereby, have been duly approved by the Seller, and no further action is required on the part of the Seller to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Seller and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Seller, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other Laws affecting enforcement

EXHIBIT C
Page 45

DocuSign Envelope ID: 80181E37-0618-4551-8350-06348445260A

of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 3.6    Title to, and Sufficiency of, the Purchased Accounts.  The Seller has and shall convey to the Buyer, at the Closing, good, valid, transferable, and marketable title to, or valid leasehold interests in, all the Purchased Accounts, free and clear of all Liens.

Section 3.7    Consents.  The Seller is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of, any Governmental Body or Third Party, including a party to any assigned contract, in connection with the execution, delivery, and performance by the Seller of this Agreement or any of the Transaction Agreements to which it is a party or the consummation of the transactions contemplated hereby and thereby.

Section 3.8    No Conflicts. The execution and delivery by the Seller of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of any obligation, or loss of any benefit, under: (a) any provision of the Organizational Documents of the Seller; (b) any contract to which the Seller is party, including, without limitation, any assigned contract; or (c) any Law or order applicable to the Seller or any of the Purchased Accounts.

Section 3.9    Compliance with Laws.  The Seller has materially complied, and is now materially complying, with all Laws applicable to the ownership and use of the Purchased Accounts.

Section 3.10    Legal Proceedings.  There is no Action of any nature pending or, to the Knowledge of the Seller, threatened against or by the Seller: (a) relating to or affecting the Purchased Accounts or (b) that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement and the Transaction Agreements.  No event has occurred, or circumstance exists that may give rise to, or serve as a basis for, any such Action.

Section 3.11    Condition of Purchased Accounts.  Each Purchased Account shall have received no less than one processed payment.

Section 3.12    Confidentiality. Seller agrees and acknowledges that all Purchased Accounts, the pricing, and all terms set forth in this Agreement are confidential (together, the "**Confidential Information**").  Seller will at all times keep the  Confidential Information in confidence and trust.  Seller will not, without the prior written consent of an authorized officer of Buyer, (A) copy, use or disclose any Confidential Information, (B) deliver or disclose any Confidential Information to any person or entity outside the Buyer, or (C) use the Confidential Information for Seller's own use or use it to the detriment of Buyer.  Notwithstanding the foregoing, Seller may, without consent, use the Confidential Information and disclose and deliver same to Seller's employees or agents, if applicable, who have a need to know, provided such employees or agents have entered into written agreements approved by Buyer and containing provisions at least as restrictive as these provisions.  Seller agrees that violation of this Section 3.9.  The Parties agree that the disclosure of the Confidential Information in violation of this Agreement may cause the Buyer irreparable harm and that any breach or threatened breach by the Seller entitles Buyer to seek injunctive relief, in addition to any other legal or equitable remedies available to it, in any court of competent jurisdiction.

EXHIBIT C
Page 46

DocuSign Envelope ID: 80191E37-0618-4551-8350-06348A4E360A

## ARTICLE 4.
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Seller, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 4.1    <u>Organization; Good Standing</u>. The Buyer is a limited liability company, duly organized, validly existing, and in good standing under the Laws of the State of Florida.

Section 4.2    <u>Power and Authority</u>. The Buyer has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder. The execution and delivery of this Agreement and the Transaction Agreements by the Buyer, and the consummation by the Buyer of the transactions contemplated hereby and thereby, have been duly approved by the Buyer, and no further action is required on the part of the Buyer to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby. This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Buyer and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Buyer, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 4.3    <u>No Conflicts</u>. The execution and delivery by the Buyer of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of, any obligation, or loss of any benefit under: (a) any provision of the Buyer's Organizational Documents; (b) any contract to which the Buyer is party, other than the Buyer Representation Agreement; or (c) any Law applicable to the Buyer.

Section 4.4    <u>Sufficient Funds</u>. The Buyer has, and will have, sufficient funds available to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement and the Transaction Agreements.

## ARTICLE 5.
## COVENANTS

Section 5.1    <u>Appropriate Actions</u>.

(a)    <u>General</u>. Each of the Parties shall use commercially reasonable efforts to take all actions necessary to consummate the transactions contemplated by this Agreement as soon as reasonably practicable after the execution of this Agreement, including taking all actions necessary to comply promptly with all applicable Laws that may be imposed on it or any of its Affiliates with respect to the Closing.

## ARTICLE 6.
## CLOSING

Section 6.1    <u>Closing</u>. The closing of the transactions contemplated by this Agreement (the "**Closing**") will take place upon the execution and delivery of this Agreement or at such other time, date, and place as the Parties may agree in writing. The date on which the Closing occurs is hereinafter referred to as the "**Closing Date**."

EXHIBIT C
Page 47

DocuSign Envelope ID: 80181E37-0618-4551-8350-063484A4E280A

The Parties agree that the Closing may take place by the electronic exchange of executed counterpart documents and the electronic transfer of funds.

Section 6.2    <u>Closing Deliverables of the Seller</u>.  At or prior to the Closing, Seller shall deliver to Buyer any of the following if requested by Buyer: (i) a bill of sale and assignment and assumption agreement substantially in the form attached hereto as <u>**Exhibit B**</u> (the "**Bill of Sale and Assignment and Assumption Agreement**"), duly executed by the Seller, effecting the transfer and assignment to, and assumption by, the Buyer of the Purchased Accounts; and (ii) such other customary instruments of transfer, assumption, filings, or documents, in form and substance reasonably satisfactory to the Buyer, as may be required to give effect to this Agreement.

Section 6.3    <u>Closing Deliverables of the Buyer</u>.  At or prior to the Closing, the Seller shall have received the following: (i) the Upfront Cash Payment; and (ii) if requested pursuant to <u>Section 6.2</u>, the Bill of Sale and Assignment and Assumption Agreement, duly executed by the Buyer.

Section 6.4    <u>Indemnification by the Seller</u>.  Subject to the limitations set forth in this <u>Article 6</u>, the Seller agrees to indemnify and hold harmless the Buyer, including its shareholders, members, directors, managers, officers, employees, Affiliates, and agents (each, a "**Buyer Indemnified Party**" and, collectively, the "**Buyer Indemnified Parties**"), against all claims, losses, Liabilities, damages, deficiencies, diminutions in value, costs, interest, awards, judgments, penalties, and expenses, including reasonable out-of-pocket attorneys' and consultants' fees and expenses and including any such reasonable expenses incurred in connection with investigating, defending against, or settling any of the foregoing (each, a "**Loss**" and, collectively, the "**Losses**") paid, suffered, incurred, sustained, or accrued by any Buyer Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Seller contained in this Agreement, (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Seller pursuant to this Agreement, (c) any Excluded Asset or any Excluded Liability, or (d) Affiliate's actions or omissions in their business operations.  This indemnity provision is not limited to third party claims against Purchaser.  This indemnity provision shall survive the termination of the Agreement.

Section 6.5    <u>Indemnification by LPG</u>.  Subject to the limitations set forth in this <u>Article 6</u>, LPG agrees to indemnify and hold harmless the **Buyer Indemnified Parties** against all **Losses** paid, suffered, incurred, sustained, or accrued by any Buyer Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of LPG in this Agreement, (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the LPG pursuant to this Agreement, (c) any Excluded Asset or any Excluded Liability, or (d) LPG's actions or omissions in their business operations.  This indemnity provision is not limited to third party claims against Purchaser.  This indemnity provision shall survive the termination of the Agreement.

Section 6.6    <u>Indemnification by the Buyer</u>.  Subject to the limitations set forth in this <u>Article 6</u>, the Buyer agrees to indemnify and hold harmless the Seller, including its Affiliates and agents (each, a "**Seller Indemnified Party**" and, collectively, the "**Seller Indemnified Parties**"), against all Losses paid, suffered, incurred, sustained, or accrued by any Seller Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Buyer contained in this Agreement; (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Buyer pursuant to this Agreement; (c) any event or occurrence related to the Purchased Accounts or Buyer occurring after the Closing; or (d) resulting from any omissions or misstatements made by Buyer to investors or potential investors.

Section 6.7    <u>Indemnification Procedures</u>.

EXHIBIT C
Page 48

DocuSign Envelope ID: 80181E37-0618-4551-8360-0634844E260A

(a)      **No Restraints**.  Promptly following receipt by an Indemnified Party of notice by a Third Party (including any Governmental Body) of any complaint, dispute, or claim or the commencement of any audit, investigation, Action or proceeding with respect to which such Indemnified Party may be entitled to indemnification pursuant hereto (a "**Third-party Claim**"), such Indemnified Party shall provide written notice thereof to the Indemnifying Party, <u>provided</u>, <u>however</u>, that the failure to so notify the Indemnifying Party shall relieve the Indemnifying Party from Liability hereunder with respect to such Third-party Claim only if, and only to the extent that, such failure to so notify the Indemnifying Party results in the forfeiture by the Indemnifying Party of rights and defenses otherwise available to the Indemnifying Party with respect to such Third-party Claim.  The Indemnifying Party shall have the right, upon written notice delivered to the Indemnified Party within twenty days thereafter assuming full responsibility for any Losses resulting from such Third-party Claim, to assume the defense of such Third-party Claim, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the fees and disbursements of such counsel; <u>provided</u>, <u>however</u>, if the Indemnifying Party declines or fails to assume the defense of such Third-party Claim on the terms provided above or to employ counsel reasonably satisfactory to the Indemnified Party, in either case within such twenty day period, then any Losses shall include the reasonable fees and disbursements of counsel for the Indemnified Party as incurred.  In any Third-party Claim for which indemnification is being sought hereunder the Indemnified Party or the Indemnifying Party, whichever is not assuming the defense of such Third-party Claim, shall have the right to participate in such matter and to retain its own counsel at such Party's own expense.  The Indemnifying Party or the Indemnified Party (as the case may be) shall, at all times use reasonable efforts to keep the Indemnifying Party or Indemnified Party (as the case may be) reasonably apprised of the status of the defense of any matter, the defense of which it is maintaining, and to cooperate in good faith with each other with respect to the defense of any such matter.

(b)      No Indemnified Party may settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder without the prior written consent of the Indemnifying Party (which may not be unreasonably withheld or delayed), unless (i) the Indemnifying Party fails to assume and maintain the defense of such Third-party Claim or (ii) such settlement, compromise, or consent includes an unconditional release of the Indemnifying Party and its officers, directors, employees and Affiliates from all Liability arising out of, or related to, such Third-party Claim.  An Indemnifying Party may not, without the prior written consent of the Indemnified Party, settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder unless such settlement, compromise, or consent (A) includes an unconditional release of the Indemnified Party and its officers, directors, employees, and Affiliates from all Liability arising out of, or related to, such Third-party Claim, (B) does not contain any admission or statement suggesting any wrongdoing or Liability on behalf of the Indemnified Party, and (C) does not contain any equitable order, judgment, or term that in any manner affects, restrains, or interferes with the business of the Indemnified Party or any of the Indemnified Party's Affiliates.

(c)      If an Indemnified Party claims a right to payment pursuant hereto with respect to any matter not involving a Third-party Claim (a "**Direct Claim**"), such Indemnified Party shall send written notice of such claim to the appropriate Indemnifying Party (each, a "**Notice of Claim**").  Such Notice of Claim shall specify the basis for such Direct Claim.  The failure by any Indemnified Party so to notify the Indemnifying Party shall not relieve the Indemnifying Party from any Liability that it may have to such Indemnified Party with respect to any Direct Claim made pursuant to this <u>Section 6.6(c)</u>.  If the Indemnifying Party does not notify the Indemnified Party within thirty days following its receipt of such Notice of Claim that the Indemnifying Party disputes its Liability to the Indemnified Party under this <u>Article 6</u> or the amount thereof, the Direct Claim specified by the Indemnified Party in such Notice of Claim shall be conclusively deemed a Liability of the Indemnifying Party under this <u>Article 6</u>, and the Indemnifying Party shall pay the amount of such Liability to the Indemnified Party on demand or, in the case of any Notice of Claim in which the amount of the Direct Claim (or any portion of the Direct Claim) is estimated, on such later date when the amount of such Direct Claim (or such portion of such Direct Claim) becomes finally determined.  In the event that the Indemnifying Party has timely disputed its Liability with respect

EXHIBIT C
Page 49

DocuSign Envelope ID: 80181E37-C618-4551-8350-0634844E3A0A

to such Direct Claim as provided above, as promptly as possible, such Indemnified Party and the appropriate Indemnifying Party shall establish the merits and amount of such Direct Claim (by mutual agreement, litigation, arbitration or otherwise) and, within five business days following the final determination of the merits and amount of such Direct Claim, the Indemnifying Party shall pay to the Indemnified Party an amount equal to such Direct Claim as determined hereunder.

**ARTICLE 7.**
**MISCELLANEOUS**

Section 7.1  <u>Entire Agreement; Amendment</u>. This Agreement and the Transaction Agreements (including the exhibits hereto and thereto and the documents referred to therein) constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they related in any way to the subject matter hereof.  This Agreement may be amended with the written consent of each of the Parties or any successor thereto by execution of an instrument in writing.

Section 7.2  <u>Waivers</u>.  The rights and remedies of the Parties to this Agreement are cumulative and not alternative.  To the maximum extent permitted by applicable Law: (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Parties; (b) no waiver that may be given by a Party will be applicable except in the specific instance for which it is given; and (c) no notice to, or demand on, one Party will be deemed to be a waiver of any obligation of such Party or of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the Transaction Agreements.

Section 7.3  <u>Notices</u>. All notices and other communications required or permitted hereunder shall be made to the address of a Party listed on the signature page to this Agreement and shall be (a) in writing, (b) effective when given, and (c), in any event, deemed to be given upon receipt or, if earlier: (i) upon delivery, if delivered by hand; (ii) two business days after deposit with FedEx Express or similar recognized international overnight courier service, freight prepaid; or (iii) one business day after facsimile or electronic mail transmission. A Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties advance written notice pursuant to the provisions above.

Section 7.4  <u>Successors and Assigns</u>.  This Agreement shall be binding upon, and inure to the benefit of, the Parties named herein and their respective successors and permitted assigns.  This Agreement and any rights or obligations of a Party hereunder may be assigned by a Party or an Affiliate of such Party without consent of the other Parties.  This Agreement will be binding upon any assignee of any Party.  No assignment shall have the effect of relieving any Party to this Agreement of any of its obligations hereunder.

Section 7.5  <u>Public Disclosure</u>.  Except as may be required by Law, the Seller shall not issue any statement or communication to any Third Party (other than its respective agents) regarding the subject matter of this Agreement or the transactions contemplated hereby, including, if applicable, the termination of this Agreement and the reasons therefor, without the prior written consent of the Buyer.

Section 7.6  <u>Expenses and Fees</u>. Whether or not the Closing occurs, all fees and expenses incurred in connection with these transactions contemplated by this Agreement, including all legal, accounting, financial advisory, consulting and all other fees and expenses of Third Parties incurred by a Party in connection with the negotiation and effectuation of the terms and conditions of this Agreement and the transactions contemplated hereby, shall be the obligation of the respective Party incurring such fees and expenses.  In the event of a breach,

EXHIBIT C
Page 50

DocuSign Envelope ID: 80181E37-0618-4551-8350-063484AE380A

the party who prevails in any court proceeding shall be entitled to reasonable attorneys' fees and collection costs, including all fees and costs on appeal.

Section 7.7    <u>Specific Performance</u>. The Parties agree that irreparable damage would occur if any provision of this Agreement was not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled hereunder, at Law or in equity.

<u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

Section 7.8    <u>Governing Law</u>.  This Agreement shall, in all respects, be construed in accordance with, and governed by, the Laws of the State of California without regard to conflict of Laws.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

Section 7.9    Non Disparagement - Upon termination of this Agreement for any reason whatsoever,  LPG and Affiliate will refrain, and will instruct their affiliates, officers, directors, employees, contractors and agents to refrain, from making any disparaging or negative comment, remark, statement, or implication, whether written or oral, about any Party to this Agreement.

DocuSign Envelope ID: 80181E37-C618-4551-8350-063484453A0A

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Agreement Date.

**BUYER:**

By: PurchaseCo80, LLC

By: The Litigation Practice Group, P.C., its manager

By: _____
Name: Dan March
Title: Managing Shareholder

By: OHP - LPG, LP, its controlling shareholder

By: _____
Name: Adam Blum
Title: Manager of the General Partner

**SELLER:** New Horizon Finance LLC

By: _____
Name: Caleb Wickman
Title: Owner

**APPROVAL OF ASSIGNMENT**

The assignment of the Purchased Accounts set forth in this Agreement is hereby approved, and with respect to the Purchased Accounts, the Buyer shall have all rights of Buyer as set forth in this agreement.

**The Litigation Practice Group P.C.**

By: _____
Name: Daniel S. March
Title: Managing Shareholder

*[Signature Page to Accounts Receivable Purchase Agreement]*

**EXHIBIT C**
Page 52

DocuSign Envelope ID: 80191E37-9618-4551-8350-06348A4E2A0A

**EXHIBIT A**

**DEFINITIONS**

As used in this Agreement, the following terms have the following meanings (terms defined in the singular to have a correlative meaning when used in the plural and vice versa).

(a)    "**Action**" shall mean any civil, criminal, or administrative action, claim, suit, demand, charge, citation, reexamination, opposition, interference, decree, injunction, mediation, hearing, notice of violation, demand letter, litigation, proceeding, labor dispute, arbitral action, governmental or other audit, inquiry, criminal prosecution, investigation, unfair labor practice charge, or complaint.

(b)    "**Agreement**" shall have the meaning set forth in the preamble to this Agreement.

(c)    "**Agreement Date**" shall have the meaning set forth in the preamble to this Agreement.

(d)    "**Affiliate**" shall mean (i) with respect to any non-natural Person, any Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person and (ii), with respect to any individual, (A) family members of such individual, by blood, adoption, or marriage, (B) such individual's spouse or ex-spouse and (C) any Person that is directly or indirectly under the control of any of the foregoing individuals.  For purposes of this definition, "control" (including with correlative meanings, the terms "controlling," "controlled by," and under "common control with") means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

(e)    "**Bill of Sale and Assignment and Assumption Agreement**" shall have the meaning set forth in Section 6.2.

(f)    "**Business**" shall mean the business of the Seller as conducted on the Agreement Date.

(g)    "**Buyer**" shall have the meaning set forth in the preamble to this Agreement.

(h)    "**Buyer Indemnified Parties**" shall have the meaning set forth in Section 6.4.

(i)    "**Client Files**" shall have the meaning set forth in the Recitals.

(i)    "**Closing**" shall have the meaning set forth in Section 6.1.

(j)    "**Closing Date**" shall have the meaning set forth in Section 6.1.

(k)    "**Direct Claim**" shall have the meaning set forth in Section 6.6(c).

(l)    "**Excluded Assets**" shall have the meaning set forth in Section 2.1.

(m)    "**Excluded Liabilities**" shall have the meaning set forth in Section 2.2.

(n)    "**Governmental Body**" shall mean any: (i) nation, province, state, county, city, town, village, district, or other jurisdiction of any nature; (ii) federal, provincial, state, local, municipal, foreign, or other government; (iii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); (iv) multi-national organization or body; or (v) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

EXHIBIT C

Page 53

DocuSign Envelope ID: 80181E37-0618-4551-8350-0634844E3A0A

(o)    "**Indebtedness**" means, without duplication and with respect to the Seller, all: (i) indebtedness for borrowed money; (ii) obligations for the deferred purchase price of property or services, (iii) long or short-term obligations evidenced by notes, bonds, debentures or other similar instruments; (iv) obligations under any interest rate, currency swap, or other hedging agreement or arrangement; (v) capital lease obligations; (vi) reimbursement obligations under any letter of credit, banker's acceptance or similar credit transactions; (vii) guarantees made by the Seller on behalf of any third party in respect of obligations of the kind referred to in the foregoing clauses (i) through (vi); and (viii) any unpaid interest, prepayment penalties, premiums, costs and fees that would arise or become due as a result of the prepayment of any of the obligations referred to in the foregoing clauses (i) through (vii).

(p)    "**Indemnified Party**" shall mean a Buyer Indemnified Party or a Seller Indemnified Party, as the case may be, making a claim for indemnification under Article 6.

(q)    "**Indemnifying Party**" shall mean a Party against whom a claim for indemnification is asserted under Article 6.

(r)    "**Knowledge**" shall mean, with respect to the Seller, the actual or constructive knowledge of all facts relevant to this transaction and the transacting parties, after due inquiry.

(s)    "**Law**" shall have the meaning set forth in Article 3.

(t)    "**Liabilities**" shall mean any direct or indirect liability, Indebtedness, obligation, commitment, expense, claim, deficiency, guaranty, or endorsement of, or by, any Person of any type, known or unknown, and whether accrued, absolute, contingent, matured, unmatured, determined or undeterminable, on- or off-balance sheet, or other.

(u)    "**Lien**" shall mean any mortgage, pledge, lien, charge, claim, security interest, adverse claims of ownership or use, restrictions on transfer, defect of title, or other encumbrance of any sort.

(v)    "**Losses**" shall have the meaning set forth in Section 6.4.

(w)    "**Notice of Claim**" shall have the meaning set forth in Section 6.6(c).

(x)    "**Organizational Documents**" shall mean, with respect to a Person, the charter, bylaws, limited liability company agreement, and other organizational documents of such Person, in each case, as amended.

(y)    "**Party**" or "**Parties**" shall have the meaning set forth in the preamble to this Agreement.

(z)    "**Permits**" shall have the meaning set forth in Article 3.

(aa)    "**Permitted Liens**" shall mean (i) Liens for Taxes not yet delinquent or being contested in good faith by appropriate proceedings, (ii) statutory Liens (including materialmen's, warehousemen's, mechanic's, repairmen's, landlord's, and other similar Liens) arising in the ordinary course of business securing payments not yet delinquent or being contested in good faith by appropriate proceedings, and (iii) restrictive covenants, easements, and defects, imperfections or irregularities of title, if any, of a nature that do not materially and adversely affect the assets or properties subject thereto.

(bb)    "**Person**" shall mean any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, Governmental Body, or other entity.

EXHIBIT C
Page 54

DocuSign Envelope ID: 80191E37-0618-4551-8350-0634844E360A

(cc)    "**Purchase Price**" shall have the meaning set forth in <u>Section 2.3</u>.

(dd)    "**Purchased Accounts**" shall have the meaning set forth in the Recitals.

(ee)    "**Seller**" shall have the meaning set forth in the preamble to this Agreement.

(ff)    "**Seller Indemnified Parties**" shall have the meaning set forth in <u>Section 6.5</u>.

(gg)    "**Tax**" or "**Taxes**" shall mean any U.S. federal, state, local or non-U.S. income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, escheat, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

(hh)    "**Tax Returns**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(ii)    "**Third Party**" or "**Third Parties**" shall mean any Person other than the Parties or their respective Affiliates.

(jj)    "**Third-party Claim**" shall have the meaning set forth in <u>Section 6.6(a)</u>.

(kk)    "**Transaction Agreements**" shall mean the Bill of Sale and Assignment and Assumption Agreement, and each other agreement, instrument, and/or certificate contemplated by this Agreement or such other agreements to be executed in connection with the transactions contemplated hereby or thereby.

(ll)    "**Upfront Cash Payment**" shall have the meaning set forth in <u>Section 2.3</u>.

(mm)    "**Wire Instructions**" shall have the meaning set forth in <u>Section 2.3</u>.

EXHIBIT C
Page 55

DocuSign Envelope ID: 80181E37-C618-4551-8350-06348A45360A

### EXHIBIT B

**FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

THIS BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this **"Agreement"**), is made by and between PurchaseCo80, LLC (the "**Buyer**"), and New Horizon Finance LLC (the "**Seller**"). Each of the Seller and the Buyer are sometimes referred to herein, individually, as a "**Party**" and, collectively, as the "**Parties**."

WHEREAS, the Buyer and the Seller have entered into that certain Accounts Receivable Purchase Agreement, of even date herewith (the "**Purchase Agreement**"), pursuant to which the Seller has agreed to sell, assign, transfer, and deliver to the Buyer, and the Buyer has agreed to purchase, acquire, and accept from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.    <u>Defined Terms</u>.  Capitalized terms used but not otherwise defined in this Agreement shall have the meanings assigned to such terms in the Purchase Agreement.

2.    <u>Sale of Purchased Accounts; Assignment</u>.  The Seller hereby sells, assigns, transfers, and delivers to the Buyer, and the Buyer hereby purchases, acquires, and accepts from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

3.    <u>Further Assurances</u>.  Each of the Parties agrees, from time to time, at the request of the any other Party, to execute and deliver such other instruments of conveyance, power of attorney, sale, transfer, or assignment and take such other actions as such other Party may reasonably request, in order to more effectively consummate the transactions contemplated by this Agreement.

4.    <u>Terms of the Purchase Agreement</u>.  This Agreement is intended to evidence the consummation of the transactions contemplated by the Purchase Agreement and is subject to the terms and conditions set forth in the Purchase Agreement. The terms of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants, agreements, and indemnities relating to the Purchased Accounts are incorporated herein by this reference. The Parties acknowledge and agree that the representations, warranties, covenants, agreements, and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein.  In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

5.    <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

*[Remainder of page intentionally left blank.]*

EXHIBIT C
Page 56

DocuSign Envelope ID: 80181E37-C618-4551-83E0-063484E280A

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**BUYER:**

By: PurchaseCo80, LLC

By: The Litigation Practice Group, P.C., its Manager

By: _____
Name: Dan March
Title: Managing Shareholder

By: OHP - LPG, LP, its controlling shareholder

By: _____
Name: Adam Blum
Title: Manager of the General
Partner

**SELLER:** New Horizon Finance LLC

By: _____
Name: Caleb Wickman
Title:    Owner

Accounts Receivable Purchase Agreement

EXHIBIT C
Page 57

**Schedule 2.3**
**Wire Instructions**

**Account Holder Name: New Horizon Finance LLC**

**Address: 8101 Biscayne Blvd, #506 Miami, FL 33138**

**Routing Number:** ███████

**Account Number:** ████████

# EXHIBIT D

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (the "***Agreement***") is entered into effective as of September 22, 2022 (the "***Effective Date***") by and among New Horizon Finance LLC, a Delaware corporation ("***Seller***"), and PurchaseCo80, LLC, a Delaware limited liability company ("***Buyer***"). Each of Seller, LPG (defined below), and Buyer may also be referred to herein individually as a "***Party***" and collectively as the "***Parties***."

### RECITALS:

A.      Seller is engaged in the origination of accounts receivables from Litigation Practice Group, PC, a California professional corporation ("***LPG***"), representing an obligation of clients to pay Seller for services previously provided by Seller, in which LPG shall provide beginning on the Effective Date.

B.      Seller desires to sell to Buyer all right, title, and interest to the payments owing to Seller from the accounts listed on <u>Schedule 1.1</u>, and Buyer desires to purchase such right, title, and interest, all on the terms and subject to the conditions contained herein (the "***Transaction***").

### AGREEMENT:

NOW, THEREFORE, in consideration of the foregoing, the mutual covenants of the Parties set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties do hereby mutually agree as follows:

## ARTICLE I
## PURCHASE AND SALE

1.1      <u>Sale of Assets</u>.  Subject to the terms and conditions of this Agreement, Seller will sell, convey, transfer and assign to Buyer, free and clear of any and all liabilities, pledges, mortgages, security interests, liens, charges, obligations, claims and other encumbrances whatsoever, whether absolute, accrued, contingent or otherwise, (collectively, "***Liens***"), and Buyer will purchase and acquire from Seller, all right, title and interest of Seller in and to the accounts receivable of Seller listed on <u>Schedule 1.1</u> (the "***Acquired Assets***").

1.2      <u>No Assumption of Liabilities</u>.  Seller hereby acknowledges and agrees that Buyer is not, in connection with this transaction or otherwise, assuming any expense, obligation, responsibility or liability of any nature whatsoever (including, without limitation, accrued, absolute, contingent or otherwise) of Seller, including, but not limited to, liabilities incurred in the ordinary course of business and existing as of the Effective Date or otherwise relating to Seller or LPG's operation of its business prior to the Closing, and all of such expenses, obligations, responsibilities and liabilities have been and are retained in all respects by Seller and LPG (collectively, the "***Unassumed Liabilities***").

## ARTICLE II
## PURCHASE PRICE AND PAYMENT

2.1      <u>Payment of Purchase Price</u>.

(a)      The aggregate purchase price for the Acquired Assets will be $27,480.06  (the "***Purchase Price***").

(b)    At Closing, Buyer will pay Seller by wire transfer, in the instructions listed on <u>Schedule 2.1</u>, an amount (the "***Cash Payment***") equal to the Purchase Price.

2.2    <u>Acknowledgement of Adequacy of Purchase Price</u>.  The Parties acknowledge that the Purchase Price (i) equals or exceeds the fair market value of the Acquired Assets, and (ii) constitutes reasonably equivalent value in exchange for the Acquired Assets.

2.3    <u>Allocation of Purchase Price</u>.  The Purchase Price will be allocated among the Acquired Assets in accordance with the requirements of Section 1060 of the Internal Revenue Code of 1986, as amended, based upon the residual method, valuing all identified assets, determining the amount to be allocated based upon the contract price, assigning to respective classes of assets—Class III – Market to Market Assets & Accounts Receivable—and adjusting for specific transaction costs, in a manner to be agreed upon by the Parties thirty (30) days following the Closing.  After the Closing, the Parties will make consistent use of the allocation, fair market value, and useful lives so agreed upon for all tax purposes and in all tax returns with the IRS in respect thereof.  The Parties hereby covenant and agree not to take a position on any tax return, including Form 8594, before any governmental agency charged with the collection of an income tax, or in any judicial proceeding that is in any way inconsistent with the allocation so agreed upon. In the event that the Parties are unable to agree on the allocation described above, then the Parties hereby agree to attend mediation and participate therein in good faith prior to taking any other action provided herein or by applicable law to enforce this Agreement.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller and LPG represent and warrant to Buyer, as of the Effective Date and as of the Closing Date, as follows:

3.1    <u>Seller Organization; Affiliation of LPG</u>.  Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of  DE, and has the requisite power to carry on the operations of the business of Seller as now conducted. With respect to Seller, LPG directly or indirectly (including through one or more intermediaries), controls, is controlled by, or is under common control with, Seller. For purposes of this <u>Section 3.1</u>, "<u>control</u>," when used with respect to Seller, shall mean the power, direct or indirect, to direct or cause the direction of the management and policies of Seller, whether through ownership of voting securities or partnership or other ownership interests, by contract or otherwise; and the terms "<u>controlling</u>" and "<u>controlled</u>" shall have correlative meanings.

3.2    <u>LPG Organization</u>.  LPG is a professional corporation duly organized, validly existing and in good standing under the laws of the State of California, and has the requisite power to carry on the operations of the business of LPG as now conducted.

3.3    <u>Authority</u>.  Seller and LPG have the power and authority to execute, deliver and perform all of their obligations, covenants and agreements contained in this Agreement and all documents, instruments and other writings to be executed and/or delivered by them pursuant to this Agreement.

3.4    <u>Enforceability</u>.  This Agreement constitutes, and the other documents to be executed and delivered by Seller hereunder will constitute when executed and delivered by them, (assuming the due authorization, execution and delivery by the other parties hereto and thereto) legal, valid and binding obligations of Seller and LPG enforceable against them in accordance with their respective terms.

3.5    <u>Title to Assets; Encumbrances</u>.  Seller has good, valid and indefeasible title to all of the Acquired Assets.  All of the Acquired Assets are free and clear of any Lien.

3.6 <u>Litigation</u>.  There is no litigation or proceeding, in law or in equity, and there are no proceedings before any commission or other administrative authority, pending or threatened, against Seller or LPG with respect to the consummation of the Transaction or the Acquired Assets.

3.7 <u>Books and Records</u>.  The books of account and other records of Seller with respect to its operations and the Acquired Assets are current, complete and correct and have been maintained in accordance with sound business practices.

3.8 <u>Third Party Consents; Licenses</u>.  No third party (including, without limitation, governmental authorities) consents, licenses or permits are required in connection with the operation of the business of Seller, or the sale of the Acquired Assets pursuant to this Agreement.

3.9 <u>No Violation</u>.  The execution, delivery and performance of this Agreement by Seller and the consummation of the Transaction: (i) do not conflict with and will not conflict with, or result in or will result in a breach of, or constitute or will constitute a default (or an event which, with or without notice or lapse of time, or both, would constitute a default) under, any of the terms, conditions or provisions of any material agreement, instrument or obligation to which Seller or LPG is a party or by which any of them is bound; and (ii) do not violate and will not violate, in any material respect, any order, writ, injunction, decree, statute, rule of regulation applicable to Seller or LPG.

3.10 <u>Legal Violations</u>.  Seller and LPG are in full compliance with all applicable laws, ordinances and governmental regulations and the uses and operations that the business of Seller is conducting are in full compliance with all applicable laws, ordinances and governmental regulations, including the creation and collection of the Acquired Assets.  Seller has not received any notice from any governmental or quasi-governmental authority having jurisdiction over them asserting that they are in violation of any applicable financial laws, ordinances or regulations, or any legal or other requirements.

3.11 <u>Accounts Receivable</u>.  The Acquired Assets: (a) have arisen from bona fide transactions entered into by Seller involving the sale of goods or the rendering of services in the ordinary course of business consistent with past practice; (b) constitute only valid, undisputed claims of Seller not subject to claims of set-off or other defenses or counterclaims other than normal cash discounts accrued in the ordinary course of business consistent with past practice; (c) were created in accordance with all applicable laws and professional ethics pursuant to a validly existing and enforceable engagement letter for services between Seller and the accounts listed on <u>Schedule 1.1</u>; and (d) Seller has received at least one (1) payment in full from all accounts listed on <u>Schedule 1.1</u>.

3.12 <u>Taxes</u>.  Seller and LPG have filed all returns of income taxes required to be filed by it and all returns of other taxes required to be filed by it and has paid or provided for all taxes shown to be due on such returns (whether or not shown on or reportable on such returns) and with respect to any period prior to the Effective Date.  All such returns and reports filed are true, correct and complete in all material respects.

3.13 <u>No Material Adverse Change</u>.  There has not been any material adverse change in the business, operations, properties, prospects, assets, or condition of Seller or LPG, and no event has occurred or circumstance exists that may result in such a material adverse change.

3.14 <u>Right of First Offer</u>.    Seller and LPG grant to the Buyer a right of first offer to purchase any cash flow stream representing an interest in customer payments for debt validation services owned now, or later acquired by, Seller. Seller shall present Buyer with a written list of cash flows for consideration to be sold by Seller, which shall be presented to Buyer without price markups and on the same terms as originally presented by LPG. Buyer shall have five (5) days after receipt of such list to accept or decline purchase of such cash flows. Should Buyer decline any presented cash flow stream, it may be sold to third-parties for a

DocuSign Envelope ID: 219CFC40-8847-45D1-96C7-06DB1589F36D

period of thirty (30) days on identical economic terms as were presented to Buyer. After the thirty (30)-day period or upon any change in economic terms of the offering, the Buyer's rights under this Section 3.14 shall be renewed as to such cash flow.

3.15    <u>Disclosure</u>.  Seller has provided Buyer with all the information Buyer has requested for deciding whether to acquire the Acquired Assets.  No representation or warranty of Seller contained in this Agreement contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained herein or therein not misleading in light of the circumstances under which they were made.

# ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller, as of the Effective Date and as of the Closing Date, as follows:

4.1    <u>Organization</u>.  Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware.

4.2    <u>Authority</u>.  Buyer has the requisite power and authority to execute, deliver and perform all of its obligations, covenants and agreements contained in this Agreement and all documents, instruments and other writings to be executed and/or delivered by Buyer pursuant to this Agreement.

4.3    <u>Enforceability.</u>  This Agreement constitutes, and the other documents to be executed and delivered by Buyer hereunder will constitute when executed and delivered by Buyer, (assuming the due authorization, execution and delivery by the other parties hereto and thereto) legal, valid and binding obligations of Buyer enforceable against it in accordance with their respective terms.

# ARTICLE V
## PRE-CLOSING COVENANTS

5.1    <u>General</u>.  Between the Effective Date and the Closing Date each of the Parties will use its reasonable best efforts to take all action and to do all things necessary in order to consummate and make effective the Transaction (including satisfaction, but not waiver, of the closing conditions set forth in this Agreement), including, without limitation, compliance with and observance of the terms and conditions set forth in this Article V.

5.2    <u>Notices and Consents</u>.  Seller and LPG will make or give, as the case may be, any filings or notices to third parties, and they will use their reasonable best efforts to obtain any third-party consents required or otherwise necessary to be obtained by them in connection with the consummation of the Transaction.

5.3    <u>Preservation of Business</u>.  Seller will keep the Acquired Assets and its business substantially intact, including its present operations, working conditions, and relationships with lessors, licensors, suppliers, customers, and employees.

5.4    <u>Notice of Developments</u>.  Each Party will give prompt written notice to the other Party of any material adverse development causing a breach of any of its own representations and warranties in Articles III and Article IV hereof; *provided, however*, that no such disclosure will be deemed to amend or supplement the Schedules attached hereto or to prevent or cure any misrepresentation, breach of warranty, or breach of covenant by such Party.

EXHIBIT D
Page 63

5.5     Exclusivity.  Seller or LPG will not: (i) solicit, initiate, or encourage the submission of any proposal or offer from any third party relating to the acquisition of the Acquired Assets, or (ii) participate in any discussions or negotiations regarding, furnish any information with respect to, assist or participate in, or facilitate in any manner any effort or attempt by any third party to do or seek any of the foregoing.

## ARTICLE VI
## CONDITIONS TO CLOSING; CLOSING

6.1     Conditions Precedent to Obligations of Buyer.  Unless otherwise waived by Buyer, the obligations of Buyer to consummate the Transaction pursuant to this Agreement are subject to satisfaction of the following conditions precedent on or before the Closing Date:

(a)     the representations and warranties of Seller set forth in this Agreement shall be true and correct at and as of the Closing Date;

(b)     Seller and LPG shall have performed and complied with all of their respective covenants hereunder through the Closing;

(c)     Buyer shall be satisfied, in its sole discretion, with the results of its due diligence investigation into the Acquired Assets and the operations of Seller;

(d)     Seller shall have executed, acknowledged (where appropriate) and delivered all documents and instruments required hereunder to be delivered by them at or prior to Closing, including, but not limited to, the documents set forth in Section 6.4; and

(e)     there shall not have been, since the Effective Date, any material adverse change in the businesses, operations, properties, prospects, assets, or condition of Seller or LPG.

6.2     Conditions Precedent to Obligations of Seller.  Unless otherwise waived by Seller, the obligations of Seller to consummate the Transaction pursuant to this Agreement are subject to satisfaction of the following conditions precedent on or before the Closing Date:

(a)     the representations and warranties of Buyer set forth in this Agreement shall be true and correct at and as of the Closing Date;

(b)     Buyer shall have performed and complied with all of its covenants under this Agreement through the Closing; and

(c)     Buyer shall have executed, acknowledged (where appropriate) and delivered all documents and instruments required hereunder to be delivered by it at or prior to Closing, including, but not limited to, the documents set forth in Section 6.5.

6.3     Closing.  Upon the terms and subject to the satisfaction of the conditions contained in this Agreement, the closing of the Transaction (the "***Closing***") will take place upon the execution and delivery of this Agreement and the documents listed in Section 6.4; or at such other date and place as the Parties may determine (the "***Closing Date***").

6.4     Closing Deliveries of Seller.  At the Closing, Seller will deliver to Buyer: (i) a bill of sale, assignment and assumption agreement, conveying all of the Acquired Assets, duly executed by Seller substantially in the form listed in Schedule 6.4; and (ii) such other documents as Buyer may reasonably request for the purpose of facilitating the consummation or performance of the Transaction.

EXHIBIT D
Page 64

DocuSign Envelope ID: 219CEC40-8847-45P1-96C7-06DB1589F36D

Case 8:24-ap-01017-SC    Doc 10-1    Filed 03/28/24    Entered 03/28/24 13:37:36    Desc
Exhibit to Amended Complaint    Page 45 of 196

6.5    Closing Deliveries of Buyer.  At the Closing, Buyer will deliver to Seller: (i) the Cash Payment; (ii) the bill of sale, assignment and assumption agreement described in Section 6.4, duly executed by Buyer substantially in the form listed in Schedule 6.4; and (iii) such other documents as Seller may reasonably request for the purpose of facilitating the consummation or performance of the Transaction.

## ARTICLE VII
## POST-CLOSING COVENANTS

7.1    Confidentiality.

(a)    Seller agrees not to disclose or permit the disclosure of any of the terms of this Agreement or of any other confidential, non-public or proprietary information relating to the Buyer or the business of the Buyer or any subsidiary thereof (collectively, "***Confidential Information***"); provided that such disclosure may be made (a) to any person who is a member, partner, officer, investor, director or employee, directly or indirectly, of Seller or counsel to, or accountants of, Seller solely for their use and on a need-to-know basis, (b) with the prior consent of the Buyer, (c) subject to the next paragraph, pursuant to a subpoena or order issued by a court, arbitrator or governmental body, agency or official, or (d) to any governmental or regulatory authority, body or agency pursuant to applicable laws, rules or regulations as reasonably determined by the Seller.

(b)    In the event that Seller shall receive a request to disclose any Confidential Information under a subpoena or order or examination, Seller shall to the extent legally practicable (a) promptly notify Buyer, (b) consult with Buyer on the advisability of taking steps to resist or narrow such request, and (c) if disclosure is required or deemed advisable, cooperate with Buyer in any attempt it may make to obtain an order or other assurance that confidential treatment will be accorded the Confidential Information that is disclosed.

(c)    Notwithstanding the preceding two paragraphs of this Section 7.1, neither the Seller nor LPG shall issue or publish any information about the formation or existence of the Buyer without the approval of Buyer.

7.2    Payment of All Taxes Resulting From Sale of Acquired Assets.  Seller will pay in a timely manner all taxes assessed by any taxing authority resulting from or payable in connection with the sale of the Acquired Assets pursuant to this Agreement.

7.3    Joint Post-Closing Covenant of the Parties.  The Parties jointly covenant and agree that, from and after the Closing, they will each use commercially reasonable efforts to cooperate with each other in connection with any action, suit, proceeding, investigation or audit of the other relating to (i) the preparation of an audit of any tax return of Seller for all periods prior to or including the Closing, and (ii) any audit of Buyer and/or any audit of Seller with respect to the sales, transfer and similar taxes imposed by the laws of any state or political subdivision thereof, relating to the Transaction.  In furtherance hereof, the Parties further covenant and agree to promptly respond to all reasonable inquiries related to such matters and to provide, to the extent reasonably possible, substantiation of transactions and to make available and furnish appropriate documents and personnel in connection therewith.   All costs and expenses incurred in connection with this Section 7.3 will be borne by Seller and LPG.

7.4    Customer and Other Business Relationships.  After the Closing, Seller will cooperate with Buyer, in its efforts to continue and maintain for the benefit of Buyer those business relationships of Seller existing prior to the Closing and relating to the Acquired Assets as operated by Buyer after the Closing, including relationships with lessors, employees, regulatory authorities, licensors, customers, suppliers and others. Seller will not take any action that would tend to diminish the value of the Acquired Assets after the Closing

DocuSign Envelope ID: 219CFC40-8847-45D1-96C7-06DB1589536D

or that would interfere with the business as operated by Buyer after the Closing, including disparaging the name or business of Buyer.

7.5    Fees and Expenses.  Except as otherwise expressly provided herein, each Party hereto will pay its own legal, accounting and other fees, costs and expenses incurred by such Party in connection with the negotiation of this Agreement and the consummation of the Transaction.

7.6    Substitution of LPG. Buyer, in its sole discretion, may appoint an alternate servicer for the Acquired Assets to substitute for LPG.

7.7    Further Assurances.  After the Closing Date, the Parties will cooperate reasonably with each other and with their respective representatives in connection with any steps required to be taken as part of their respective obligations under this Agreement, and will (i) furnish upon request to each other such further information, (ii) execute and deliver to each other such other documents, and (iii) do such other acts and things, all as the other party may reasonably request for the purpose of carrying out the intent of this Agreement and the Transaction.

## ARTICLE VIII
## SURVIVAL; INDEMNIFICATION

8.1    Representations and Warranties to Survive.  The representations and warranties made by the Parties in this Agreement will survive the execution and delivery of this Agreement until this Agreement is terminated by a mutual written instrument executed by the Parties.

8.2    Indemnification by Seller and LPG.  Seller and LPG will indemnify and hold harmless Buyer and its members, managers, officers, employees and agents from, against, and in respect of, any loss, liability, claim, demand, or expenses, including, without limitation, reasonable attorneys' fees and expenses (all of the foregoing, collectively, "*Losses*") arising out of or resulting from any of the following:

(a)    Any inaccuracy in or breach of any representation or warranty of Seller or LPG in this Agreement or any other agreement or document executed and delivered by Seller pursuant to this Agreement;

(b)    Any breach of or failure to fulfill any agreement or covenant of Seller or LPG under this Agreement or under any other agreement or document executed and delivered by Seller or LPG pursuant to this Agreement;

(c)    any Tax claim asserted against Buyer with respect to any taxes relating to the Acquired Assets or the operations of Seller or LPG's business attributable to periods prior to the Closing; and

(d)    Any and all actions, suits, proceedings, demands, assessments, judgments, reasonable and necessary costs and legal and other expenses incident to any of the foregoing.

8.3    Indemnification by Buyer.  Buyer will indemnify and hold harmless Seller from, against, and in respect of, any Losses arising out of or resulting from any of the following:

(a)    Any inaccuracy in or breach of any representation or warranty of Buyer in this Agreement or any other agreement or document executed and delivered by Buyer pursuant to this Agreement;

(b)    Any breach of or failure to fulfill any agreement or covenant of Buyer under this Agreement or under any other agreement or document executed and delivered by Buyer pursuant to this Agreement; and

EXHIBIT D
Page 66

DocuSign Envelope ID: 219CFC40-8847-45P1-9EC7-06DB1589F36D

(c)      Any and all actions, suits, proceedings, demands, assessments, judgments, reasonable and necessary costs and legal and other expenses incident to any of the foregoing.

All costs and expenses incurred in connection with this Section 8.3 will be reimbursed to Buyer by Seller and LPG.

8.4      Indemnity Procedures.  In case any claim, demand or action will be brought by any third party against a Party entitled to indemnity under this Article VIII, such Party will promptly notify the other Party from whom indemnity is sought in writing and the indemnifying Party will assume the defense thereof, including the employment of counsel.  In addition, in case a Party will become aware of any facts which might result in any such claim, demand or action, such Party will promptly notify the other Party who would be obligated to provide indemnity hereunder with respect to such claim, demand or action, and such other Party will have the right to take such action as it or they may deem appropriate to resolve such matter.  Seller, on the one hand, and Buyer, on the other hand, will each make available to the indemnifying Party any non-privileged documents, materials and information in its possession that may be necessary to the defense of any such claim, demand or action.  The indemnified Party will have the right to employ separate counsel in any such action and to participate in the defense thereof, but the fees and expenses of such counsel will be at the expense of such indemnified Party, unless the employment of such counsel has been specifically authorized in writing by the indemnifying Party or unless the indemnifying Party fails to assume and diligently pursue the defense as required above.  The indemnifying Party will not be liable for any settlement of any action effected without its written consent, but if settled with the written consent of the indemnifying Party or if there will be a final judgment for the plaintiff in any such action, the indemnifying Party will indemnify and hold harmless the indemnified Party from and against any loss or liability by reason of such settlement or judgment.  Notwithstanding anything herein to the contrary, the indemnifying Party will not, without the written consent of the indemnified Party, settle or compromise any such action or claim or consent to the entry of any judgment in respect of any such action or claim which does not include as an unconditional term thereof the giving by the claimant to the indemnified Party of an unconditional release from all liability with respect to such action or claim.

## ARTICLE IX
## MISCELLANEOUS

9.1      Notices.  All notices and other communications under this Agreement must be in writing and will be deemed to have been duly given if delivered personally, sent by facsimile or mailed, by certified mail, return receipt requested, first-class postage prepaid, to the Parties at the addresses listed on the signature page(s) of this Agreement or such other addresses as will be furnished by like notice by such Party.  All notices and other communications required or permitted under this Agreement that are addressed as provided in this Section 9.1 will (i) if delivered personally, be deemed given upon delivery, (ii) if delivered by facsimile, be deemed delivered when confirmed, and (iii) if delivered by mail in the manner described above, be deemed given upon receipt.

9.2      Expenses.  Except as otherwise provided in this Agreement, all legal and other costs and expenses incurred in connection with this Agreement and the Transaction will be paid by the Seller and LPG. Any costs and expenses incurred by Buyer in connection with this Agreement and the transaction will be reimbursed by Seller and LPG.

9.3      Successors and Assigns.  This Agreement will not be assignable by Seller or LPG without the prior written consent of the Buyer.  This Agreement may be assigned by Buyer in its sole discretion. This Agreement will inure to the benefit of and be binding upon the Parties, and their successors and permitted assigns.

EXHIBIT D
Page 67

DocuSign Envelope ID: 219CFC40-8B47-45D1-9EC7-06DB1589F36D

9.4     Entire Agreement; Amendment; Waiver.    This Agreement and the other instruments and agreements referred to herein embody the entire agreement of the Parties with respect to the subject matter hereof and supersede all prior agreements.  This Agreement may be amended, and any provision hereof waived, but only in writing signed by the Party against whom such amendment or waiver is sought to be enforced.  A waiver on one occasion will not be deemed to be a waiver of the same or any other breach on a future occasion.

9.5     Severability.  Any term or provision of this Agreement which is held to be invalid or unenforceable will be ineffective only to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Agreement.  If any restriction or limitation in this Agreement is found by a court of competent jurisdiction to be unreasonable, onerous or unduly restrictive, such restriction or limitation will remain effective to the maximum extent permissible within reasonable bounds.

9.6     Captions.  The captions herein are inserted for convenience or reference only will be ignored in the construction or interpretation hereof.

9.7     Submission to Jurisdiction. To the extent a dispute is not resolved in arbitration as set forth in Section 9.9 (the "**Arbitration Agreement**"), the Parties hereby agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, whether in contract, tort or otherwise, shall be brought in the United States District Court for the Western District of Texas, Austin Division. Each of the Parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding that is brought in any such court has been brought in an inconvenient form. Service of process, summons, notice or other document by registered mail to the address set forth in Section 9.9 shall be effective service of process for any suit, action or other proceeding brought in any such court.

9.8     WAIVER OF JURY TRIAL; ARBITRATION.

(a)     EACH PARTY HERETO HEREBY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

(b)     Binding Arbitration.

(i)                         This Section 9.9(b) shall be referred to as the "**Arbitration Agreement**." Upon demand of any Party, whether made before or after institution of any judicial proceeding, any dispute, claim or controversy arising out of, connected with or relating to this Agreement ("**Disputes**")[1], between or among the Parties hereto, related third parties, and the Parties' respective employees, agents, representatives, affiliates, beneficiaries, related entities and assigns, shall be resolved by binding arbitration as provided herein.  Institution of a judicial proceeding by a party does not waive the right of that party to

---

[1]        The following is not covered under this Arbitration Agreement: disputes or any portion thereof that an applicable federal statute expressly states cannot be arbitrated or cannot be the subject of a pre-dispute arbitration agreement.

demand arbitration hereunder. This Arbitration Agreement is intended to be as broad as legally permissible. Disputes may include, but are not limited to, tort claims, counterclaims, claims arising from ancillary Agreements or related-party agreements executed in the future, disputes as to whether a matter is subject to arbitration, or claims concerning any aspect of the past, present or future relationships arising out of or connected with this Agreement. The Arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute relating to the validity, scope, applicability, enforceability, or waiver of this Arbitration Agreement including, but not limited to, any claim that all or any part of this Arbitration Agreement is void or voidable. The obligation to arbitrate any Dispute will survive the satisfaction in full of all obligations under this Agreement and the termination of this Agreement, any Ancillary Agreements, and/or any Related-Party Agreement for any reason. The parties hereto do not waive any applicable federal or state substantive law except as provided herein. A judgment upon the award may be entered in any court having jurisdiction.

(ii)                              This Arbitration Agreement is governed by the FAA (9 U.S.C. § 1 et seq.). Unless otherwise agreed in writing by the parties, and notwithstanding any conflicting choice of law provision in any of the agreements between the Parties, Delaware law shall control the interpretation, application, and enforcement of this Agreement; provided, however, the Federal Arbitration Act will be applied to the Arbitration Agreement. In reaching any determination or award, the Arbitrator shall apply the substantive laws of the State of Delaware and the applicable laws of the United States of America, without giving effect to any principles of conflict of laws under the laws of the State of Delaware, to all Disputes covered by this Arbitration Agreement. Any arbitration proceeding shall be conducted by the American Arbitration Association (the "AAA"), or such other administrator as the parties shall mutually agree upon. Any arbitration proceeding shall be conducted in accordance with the AAA Commercial Arbitration Rules, including the AAA Emergency Procedures for Protection,  unless the claim or counterclaim is at least one million dollars ($1,000,000) exclusive of claimed interest, arbitration fees and costs, in which case the AAA's optional procedures for large, complex commercial disputes shall also apply (the commercial dispute resolution procedures and the optional procedures for large, complex commercial disputes to be referred to, as applicable, as the "***Arbitration Rules***"). Any arbitration shall proceed in a location in Austin, Texas selected by the AAA. The expedited procedures set forth in Sections E-1 through E-10, et seq. of the Arbitration Rules shall be applicable to claims of less than one million dollars ($1,000,000). All applicable statutes of limitations shall apply to any Dispute. Either party may file dispositive motions, including without limitation a motion for summary judgment, and the Arbitrator(s) will apply the standards governing such motions under the Federal Rules of Civil Procedure. Each Party may take the deposition of four individual fact witnesses and any expert witness designated by another Party. Each Party also may propound requests for production of documents and ten (10) interrogatory requests to the other Party. And, each Party shall have the right to subpoena witnesses and documents for discovery or the arbitration hearing, including testimony and documents relevant to the case from third parties, in accordance with any applicable state or federal law (including, without limitation, pursuant to California Code of Civil Procedure § 1283.05). Additional discovery may be conducted by mutual stipulation, and the Arbitrator(s) will have exclusive authority to entertain requests for additional discovery, and to grant or deny such requests, based on the Arbitrator(s)'s determination whether additional discovery is warranted by the circumstances of a particular case. If there is any inconsistency between the terms hereof and the Arbitration Rules, the terms and procedures set forth herein shall control. Subject to applicable law as determined by the Arbitrator(s), any party who fails or refuses to submit to arbitration following a demand by any other Party shall bear all costs and expenses incurred by such other Party in compelling arbitration of any Dispute. Notwithstanding anything in the foregoing to the contrary, any arbitration proceeding demanded hereunder shall begin within ninety (90) days of the appointment of the Arbitrator(s) and shall be concluded within one hundred and twenty (120) days after such appointment, unless otherwise mutually agreed in writing by the Parties. These time limitations may not be extended unless a Party hereto shows cause for extension and then such extension shall not exceed a total of sixty (60) days, unless otherwise mutually agreed in writing by the Parties.

EXHIBIT D

Page 69

DocuSign Envelope ID: 219CFC40-8B47-45D1-96C7-06DB1589536D

(iii)                Any arbitration proceeding in which the amount in controversy is five million dollars ($5,000,000) or less will be decided by a single arbitrator who shall not render an award of greater than five million dollars ($5,000,000) (the "Arbitrator").  Any dispute in which the amount in controversy exceeds five million dollars ($5,000,000) shall be decided by majority vote of a panel of three arbitrators (the "Arbitrators").

(iv)                The Arbitrator(s) must have at least ten (10) years of relevant legal experience as an attorney or a judge and be knowledgeable in the subject matter of the dispute.  The Parties shall select the Arbitrator(s) by mutual agreement.  If the Parties are unable to mutually select an arbitrator, the Arbitrator(s) shall be selected as follows:

(a)        To the extent the arbitration is conducted by a single arbitrator (as set forth above), AAA will give each party a list of nine (9) arbitrators (who are subject to the qualifications listed above) drawn from its panel of arbitrators. Each Party will have ten (10) calendar days to strike all names on the list it deems unacceptable. If only one common name remains on the lists of all Parties, that individual will be designated as the Arbitrator. If more than one common name remains on the lists of all Parties, the Parties will strike names alternately from the list of common names by telephone conference administered by AAA, with the claimant to strike first until only one remains. If no common name remains on the lists of all parties, AAA will furnish an additional list of nine (9) arbitrators from which the Parties will strike alternately by telephone conference administered by AAA, with the claimant to strike first, until only one name remains. That person will be designated as the Arbitrator. If the individual selected cannot serve, AAA will issue another list of nine (9) arbitrators and repeat the alternate striking selection process.

(b)        To the extent the arbitration is conducted by a panel of three arbitrators (as set forth above), AAA will give each Party a list of twenty-seven (27) arbitrators (who are subject to the qualifications listed above) drawn from its panel of arbitrators. Each Party will have ten (10) calendar days to strike all names on the list it deems unacceptable. Any common names remaining will be designated as the Arbitrators.  To the extent more than three common names remains on the lists of all parties, the Parties will strike names alternately from the list of common names by telephone conference administered by AAA, with the claimant to strike first until only three remain. If less than three common names remain on the lists of all Parties, AAA will furnish an additional list of arbitrators (9 for each arbitrator that remains to be selected) from which the Parties will strike alternately by telephone conference administered by AAA, with the claimant to strike first, until the number of arbitrators needed to comprise the three-arbitrator panel remain. Those persons will be designated as the Arbitrators. If any individual selected cannot serve, AAA will issue another list of nine (9) arbitrators and repeat the alternate striking selection process.

(v)                Notwithstanding the preceding binding arbitration provisions, the Parties hereto preserve, without diminution, certain remedies that such persons may employ or exercise freely, either alone, in conjunction with or during a Dispute.  Each such person shall have and hereby reserves the right to proceed in any court of proper jurisdiction or by self-help to exercise or prosecute the following remedies, as applicable:  (A) all rights to foreclose against any real or personal property or other security by exercising a power of sale granted in any agreement or under applicable law or by judicial foreclosure and sale, including a proceeding to confirm the sale, (B) all rights of self-help including peaceful occupation of property and collection of rents, set off, and peaceful possession of property, (C) obtaining provisional

EXHIBIT D

Page 70

DocuSign Envelope ID: 219CFC40-8847-45D1-9EC7-06DB1589F36D

or ancillary remedies including injunctive relief, sequestration, garnishment, attachment, appointment of receiver and in filing an involuntary bankruptcy proceeding, and (D) when applicable, a judgment by confession of judgment. Preservation of these remedies does not limit the power of an arbitrator to grant similar remedies that may be requested by a party in a Dispute.

(vi)                          The Parties agree there will be no right or authority for any dispute to be brought, heard or arbitrated as a class, collective and/or consolidated action (the "Class Action Waiver"). Nor shall any Arbitrator have the authority to hear or arbitrate any such dispute, regardless of any other language in this Arbitration Agreement, or any provision of any of the rules or procedures of the AAA that might otherwise apply including, without limitation, the AAA Supplemental Rules for Class Action Arbitration. Notwithstanding the broad delegation to the Arbitrator(s) to resolve arbitrability disputes, no Arbitrator shall have the right to interpret the extent, applicability and/or enforceability of this Class Action Waiver; rather, any issue or dispute as to whether this Agreement permits such class, collective and/or consolidated action arbitration shall be resolved and/or interpreted solely by a court of competent jurisdiction. This Class Action Waiver shall be severable from this Arbitration Agreement if there is a final judicial determination that the Class Action Waiver is invalid, unenforceable, unconscionable, void or voidable. In such instances, the class or collective action must be litigated in court—not in arbitration.

(vii)                          Other than as set forth in the Class Action Waiver, if any provision of this Arbitration Agreement is adjudged to be invalid, unenforceable, unconscionable, void or voidable, in whole or in part, such adjudication will not affect the validity of the rest of the Arbitration Agreement; all remaining provisions will remain in effect.

9.9      Drafting. Each of the Parties acknowledges that it was actively involved in the negotiation and drafting of this Agreement and that no law or rule of construction will be raised or used in which the provisions of this Agreement will be construed in favor or against any Party because one Party is deemed to be the author thereof.

9.10     Counterparts. This Agreement, and any amendments hereto, may be executed by facsimile signature and in multiple counterparts, each of which will be deemed an original but all of which together will constitute one and the same instrument.

[Remainder of Page Intentionally Left Blank]

- 12 -

DocuSign Envelope ID: 219CFC40-8647-45D1-95C7-06DB1589536D

Case 8:24-ap-01017-SC    Doc 10-1    Filed 03/28/24    Entered 03/28/24 13:37:36    Desc
Exhibit to Amended Complaint    Page 52 of 196

IN WITNESS WHEREOF, this Agreement has been executed on behalf of each of the Parties as of the Effective Date set forth above.

**SELLER:**

New Horizon Finance I, LLC, a Delaware corporation

By: _Caleb Wickman_
Name: Caleb Wickman
Title: Owner

Address of Seller:

8101 Biscayne Blvd, Suite 506
Miami, FL 33138

**BUYER:**

PURCHASECO80, LLC, a Delaware limited liability company

By:    Litigation Practice Group, PC, its manager

      By: _Daniel S March_
          Daniel S. March, *Managing Shareholder*

By:    OHP – LPG, LP, member

      By:    Old Hickory Fund I GP, LLC, its general partner

          By: _Adam Blum_
            Adam C. Blum, *Manager*

**ACKNOWLEDGED AND AGREED TO:**

**LPG:**

Litigation Practice Group, PC, a California professional corporation

By: _Daniel S March_
    Daniel S. March, *Managing Shareholder*

SIGNATURE PAGE
TO
ASSET PURCHASE AGREEMENT

EXHIBIT D
Page 72

DocuSign Envelope ID: 216CFC40-8647-45D1-96C7-06DB1589F36D

<u>Schedule 1.1</u>

**Accounts Receivable**

See attached

<u>Schedule 2.1</u>

**Wiring Instructions**

**Account Holder Name: New Horizon Finance LLC**

**Address: 8101 Biscayne Blvd, #506 Miami, FL 33138**

**Routing Number:** ████████

**Account Number:** ████████

Case 8:24-ap-01017-SC    Doc 10-1    Filed 03/28/24    Entered 03/28/24 13:37:36    Desc
Exhibit to Amended Complaint    Page 55 of 196

DocuSign Envelope ID: 219CFC40-8847-45P1-9BC7-0EDB1589F36D

<u>Schedule 6.4</u>

**Form of Bill of Sale, Assignment and Assumption Agreement**

This Bill of Sale and Assignment and Assumption Agreement (the "**Bill of Sale**"), effective as of September 22, 2022 (the "**Effective Date**"), is by and between New Horizon Finance LLC, a Delaware corporation ("**Seller**"), and PurchaseCo80, LLC, a Delaware limited liability company ("**Buyer**").

**WHEREAS**, Seller and Buyer have entered into a certain Asset Purchase Agreement, dated as of September 22, 2022 (the "**Purchase Agreement**"), pursuant to which, among other things, Seller has agreed to assign all of its rights, title and interests in, and Buyer has agreed to assume all of Seller's rights, interest, and title under, the Acquired Assets (as defined in the Purchase Agreement).

**NOW, THEREFORE**, in consideration of the mutual covenants, terms, and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    <u>Definitions</u>. All capitalized terms used in this Bill of Sale but not otherwise defined herein are given the meanings set forth in the Purchase Agreement.

2.    <u>Assignment and Assumption</u>. Seller hereby sells, assigns, grants, conveys and transfers to Buyer all of Seller's right, title and interest in and to the Acquired Assets. Buyer hereby accepts such assignment and assumes all of Seller's rights, title, and interest, free of any liens under the Acquired Assets accruing on and after the Effective Date.

3.    <u>Terms of the Purchase Agreement</u>. The terms of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants, agreements and indemnities relating to the Acquired Assets are incorporated herein by this reference. The parties hereto acknowledge and agree that the representations, warranties, covenants, agreements and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

4.    <u>Governing Law</u>. This Bill of Sale shall be governed by and construed in accordance with the internal laws of the State of Texas without giving effect to any choice or conflict of law provision or rule.

5.    <u>Counterparts</u>. This Bill of Sale may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Bill of Sale delivered by facsimile, email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Bill of Sale.

[*Signature page follows.*]

DocuSign Envelope ID: 219CFC40-8647-45D1-96C7-06DB1589F36D

Case 8:24-ap-01017-SC    Doc 10-1    Filed 03/28/24    Entered 03/28/24 13:37:36    Desc
Exhibit to Amended Complaint    Page 56 of 196

IN WITNESS WHEREOF, this Bill of Sale has been executed on behalf of each of the Parties as of the Effective Date set forth above.

**SELLER:**

New Horizon Finance, LLC, a Delaware corporation

By: _Caleb Wickman_

Name: Caleb Wickman

Title: Owner

**BUYER:**

PURCHASECO80, LLC, a Delaware limited liability company

By:    Litigation Practice Group, PC, its manager

By: _Daniel S March_

Daniel S. March, *Managing Shareholder*

By:    OHP – LPG, LP, member

By:    Old Hickory Fund I GP, LLC, its general partner

By: _Adam Blum_

Adam C. Blum, *Manager*

SCHEDULE 6.4
FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT

# EXHIBIT E

DocuSign Envelope ID: BA8D3011-5881-4FAA-82FC-7843BDE889E5

## ACCOUNTS RECEIVABLE PURCHASE AGREEMENT

This ACCOUNTS RECEIVABLE PURCHASE AGREEMENT (this "**Agreement**") is made as of October 6, 2022 (the "**Agreement Date**"), by and between Marich Bein LLC (collectively the "**Buyer**"), and New Horizon Finance LLC (the "**Seller" or "LPG"**, and together with the Buyer, the **"Parties"**), and The Litigation Practice Group PC ("LPG").

## RECITALS

WHEREAS, in the regular course of business, the Seller originates account receivables from **LPG** in connection with client on-boarding services provided by the Seller to LPG and its affiliates;

WHEREAS, the account receivables represent an obligation of various clients to pay Seller for services that Seller previously provided, but which LPG shall provide from the date of execution of this Agreement;

WHEREAS, the Seller desires to sell, assign, transfer, and deliver to the Buyer, and the Buyer desires to purchase, acquire, and accept from the Seller, certain of these account receivables (the "**Purchased Accounts**").

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, the Parties, intending to be legally bound, agree as follows:

## ARTICLE 1.
## DEFINITIONS

Section 1.1    Certain Definitions.  Certain defined terms used in this Agreement are set forth on **Exhibit A**.

## ARTICLE 2.
## ASSIGNMENT AND TRANSFER AND CONSIDERATION

Section 2.1    Assignment of the Purchased Accounts to the Buyer.  Upon execution of this Agreement and subject to the terms and conditions set forth herein, the Seller shall sell, assign, transfer, and deliver, and the Buyer shall purchase, acquire, and accept from the Seller, all of the Seller's right, title, and interest in and to the Purchased Accounts set forth on the spreadsheet attached to this Agreement, free and clear of any Liens.  Other than the Purchased Accounts, the Buyer shall not purchase or acquire any other assets of the Seller (collectively, the "**Excluded Assets**").

Section 2.2    No Assumption of Liabilities.  The Buyer shall not assume any Liabilities of the Seller of any kind, whether known or unknown, contingent, matured, or otherwise, whether currently existing or hereinafter created (collectively, the "**Excluded Liabilities**").

Section 2.3    Payment of Purchase Price.  Buyer shall pay $153,121.53 (total purchase price) for the Purchased Accounts (the "**Purchase Price**") by wire transfer of immediately available funds in accordance with the wire transfer instructions set forth in **Schedule 2.3** (the "**Wire Instructions**").  The Purchased Accounts are set forth on the attached spreadsheet.

Section 2.4    Guarantee of LPG.  If any file acquired by buyer shall fail to make a first payment, LPG will replace the file and bear any cost associated with such replacement.  The replacement file shall yield no less than the receivable of the failed file.  In addition, if any any calendar month a total of less than 80% of files make a cleared payment, LPG shall replace any non-performing files in such month so that the performance of the file

DocuSign Envelope ID: BA8D3011-588D-4FAA-82FC-7843BDE89DE5

package as a whole equals 80%. This guarantee shall continue until the completion of the 24th month following execution of this agreement.

## ARTICLE 3.
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Buyer, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 3.1    Organization; Good Standing.  The Seller is a Limited Liability Company duly organized, validly existing, and in good standing under the Laws of the State of Delaware and is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of the Business requires such qualification, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, results of operations, financial condition, or assets of the Seller.

Section 3.2    Power and Authority.  The Seller has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Seller, and the consummation by the Seller of the transactions contemplated hereby and thereby, have been duly approved by the Seller, and no further action is required on the part of the Seller to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Seller and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Seller, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 3.3    Title to, and Sufficiency of, the Purchased Accounts.  The Seller has and shall convey to the Buyer, at the Closing, good, valid, transferable, and marketable title to, or valid leasehold interests in, all of the Purchased Accounts, free and clear of all Liens.

Section 3.4    Consents.  The Seller is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of, any Governmental Body or Third Party, including a party to any assigned contract, in connection with the execution, delivery, and performance by the Seller of this Agreement or any of the Transaction Agreements to which it is a party or the consummation of the transactions contemplated hereby and thereby.

Section 3.5    No Conflicts. The execution and delivery by the Seller of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of any obligation, or loss of any benefit, under: (a) any provision of the Organizational Documents of the Seller; (b) any contract to which the Seller is party, including, without limitation, any assigned contract; or (c) any Law or order applicable to the Seller or any of the Purchased Accounts.

DocuSign Envelope ID: BA8D3011-5881-4FAA-82FC-7843BDE889E5

Section 3.6    <u>Compliance with Laws</u>.  The Seller has materially complied, and is now materially complying, with all Laws applicable to the ownership and use of the Purchased Accounts.

Section 3.7    <u>Legal Proceedings</u>.  There is no Action of any nature pending or, to the Knowledge of the Seller, threatened against or by the Seller: (a) relating to or affecting the Purchased Accounts or (b) that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement and the Transaction Agreements.  No event has occurred or circumstance exists that may give rise to, or serve as a basis for, any such Action.

Section 3.8    <u>Condition of Purchased Accounts</u>.  Each Purchased Account shall have received no less than one processed payment.

Section 3.9    <u>Confidentiality</u>.  Seller agrees and acknowledges that all Purchased Accounts, the pricing, and all terms set forth in this Agreement are confidential (together, the "**Confidential Information**").  Seller will at all times keep the  Confidential Information in confidence and trust.  Seller will not, without the prior written consent of an authorized officer of Buyer, (A) copy, use or disclose any Confidential Information, (B) deliver or disclose any Confidential Information to any person or entity outside the Buyer, or (C) use the Confidential Information for Seller's own use or use it to the detriment of Buyer.  Notwithstanding the foregoing, Seller may, without consent, use the Confidential Information and disclose and deliver same to Seller's employees or agents, if applicable, who have a need to know, provided such employees or agents have entered into written agreements approved by Buyer and containing provisions at least as restrictive as these provisions.  Seller agrees that violation of this Section 3.9.  The Parties agree that the disclosure of the Confidential Information in violation of this Agreement may cause the Buyer irreparable harm and that any breach or threatened breach by the Seller entitles Buyer to seek injunctive relief, in addition to any other legal or equitable remedies available to it, in any court of competent jurisdiction.

## ARTICLE 4.
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Seller, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 4.1    <u>Organization; Good Standing</u>.  The Buyer is a limited liability company, duly organized, validly existing, and in good standing under the Laws of the State of Florida.

Section 4.2    <u>Power and Authority</u>.  The Buyer has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Buyer, and the consummation by the Buyer of the transactions contemplated hereby and thereby, have been duly approved by the Buyer, and no further action is required on the part of the Buyer to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Buyer and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Buyer, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

DocuSign Envelope ID: BA8D3011-588A-4FAA-82FC-7843BDE899E5

Section 4.3    <u>No Conflicts</u>.  The execution and delivery by the Buyer of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of, any obligation, or loss of any benefit under: (a) any provision of the Buyer's Organizational Documents; (b) any contract to which the Buyer is party, other than the Buyer Representation Agreement; or (c) any Law applicable to the Buyer.

Section 4.4    <u>Sufficient Funds</u>.  The Buyer has, and will have, sufficient funds available to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement and the Transaction Agreements.

## ARTICLE 5.
## COVENANTS

Section 5.1    <u>Appropriate Actions</u>.

(a)    <u>General</u>.  Each of the Parties shall use commercially reasonable efforts to take all actions necessary to consummate the transactions contemplated by this Agreement as soon as reasonably practicable after the execution of this Agreement, including taking all actions necessary to comply promptly with all applicable Laws that may be imposed on it or any of its Affiliates with respect to the Closing.

## ARTICLE 6.
## CLOSING

Section 6.1    <u>Closing</u>.  The closing of the transactions contemplated by this Agreement (the "**Closing**") will take place upon the execution and delivery of this Agreement or at such other time, date, and place as the Parties may agree in writing.  The date on which the Closing occurs is hereinafter referred to as the "**Closing Date**." The Parties agree that the Closing may take place by the electronic exchange of executed counterpart documents and the electronic transfer of funds.

Section 6.2    <u>Closing Deliverables of the Seller</u>.  At or prior to the Closing, Seller shall deliver to Buyer any of the following if requested by Buyer:  (i) a bill of sale and assignment and assumption agreement substantially in the form attached hereto as **<u>Exhibit B</u>** (the "**Bill of Sale and Assignment and Assumption Agreement**"), duly executed by the Seller, effecting the transfer and assignment to, and assumption by, the Buyer of the Purchased Accounts; and (ii) such other customary instruments of transfer, assumption, filings, or documents, in form and substance reasonably satisfactory to the Buyer, as may be required to give effect to this Agreement.

Section 6.3    <u>Closing Deliverables of the Buyer</u>.  At or prior to the Closing, the Seller shall have received the following: (i) the Upfront Cash Payment; and (ii) if requested pursuant to <u>Section 6.2</u>, the Bill of Sale and Assignment and Assumption Agreement, duly executed by the Buyer.

Section 6.4    <u>Indemnification by the Seller</u>.  Subject to the limitations set forth in this <u>Article 6</u>, the Seller agrees to indemnify and hold harmless the Buyer, including its shareholders, members, directors, managers, officers, employees, Affiliates, and agents (each, a "**Buyer Indemnified Party**" and, collectively, the "**Buyer Indemnified Parties**"), against all claims, losses, Liabilities, damages, deficiencies, diminutions in value, costs, interest, awards, judgments, penalties, and expenses, including reasonable out-of-pocket attorneys' and consultants' fees and expenses and including any such reasonable expenses incurred in connection with investigating, defending against, or settling any of the foregoing (each, a "**Loss**" and, collectively, the "**Losses**") paid, suffered, incurred, sustained, or accrued by any Buyer Indemnified Party, directly or indirectly, as a result of,

DocuSign Envelope ID: 8A8D3011-588A-4FAA-82FC-7843BDE889E5

arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Seller contained in this Agreement, (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Seller pursuant to this Agreement, (c) any Excluded Asset or any Excluded Liability.

Section 6.5    Indemnification by the Buyer.  Subject to the limitations set forth in this Article 6, the Buyer agrees to indemnify and hold harmless the Seller, including its Affiliates and agents (each, a "**Seller Indemnified Party**" and, collectively, the "**Seller Indemnified Parties**"), against all Losses paid, suffered, incurred, sustained, or accrued by any Seller Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Buyer contained in this Agreement; (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Buyer pursuant to this Agreement; (c) any event or occurance related to the Purchased Accounts or Buyer occurring after the Closing; or (d) resulting from any omissions or misstatements made by Buyer to investors or potential investors.

Section 6.6    Indemnification Procedures.

(a)    No Restraints.  Promptly following receipt by an Indemnified Party of notice by a Third Party (including any Governmental Body) of any complaint, dispute, or claim or the commencement of any audit, investigation, Action or proceeding with respect to which such Indemnified Party may be entitled to indemnification pursuant hereto (a "**Third-party Claim**"), such Indemnified Party shall provide written notice thereof to the Indemnifying Party, provided, however, that the failure to so notify the Indemnifying Party shall relieve the Indemnifying Party from Liability hereunder with respect to such Third-party Claim only if, and only to the extent that, such failure to so notify the Indemnifying Party results in the forfeiture by the Indemnifying Party of rights and defenses otherwise available to the Indemnifying Party with respect to such Third-party Claim.  The Indemnifying Party shall have the right, upon written notice delivered to the Indemnified Party within twenty days thereafter assuming full responsibility for any Losses resulting from such Third-party Claim, to assume the defense of such Third-party Claim, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the fees and disbursements of such counsel; provided, however, if the Indemnifying Party declines or fails to assume the defense of such Third-party Claim on the terms provided above or to employ counsel reasonably satisfactory to the Indemnified Party, in either case within such twenty day period, then any Losses shall include the reasonable fees and disbursements of counsel for the Indemnified Party as incurred.  In any Third-party Claim for which indemnification is being sought hereunder the Indemnified Party or the Indemnifying Party, whichever is not assuming the defense of such Third-party Claim, shall have the right to participate in such matter and to retain its own counsel at such Party's own expense.  The Indemnifying Party or the Indemnified Party (as the case may be) shall at all times use reasonable efforts to keep the Indemnifying Party or Indemnified Party (as the case may be) reasonably apprised of the status of the defense of any matter, the defense of which it is maintaining, and to cooperate in good faith with each other with respect to the defense of any such matter.

(b)    No Indemnified Party may settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder without the prior written consent of the Indemnifying Party (which may not be unreasonably withheld or delayed), unless (i) the Indemnifying Party fails to assume and maintain the defense of such Third-party Claim or (ii) such settlement, compromise, or consent includes an unconditional release of the Indemnifying Party and its officers, directors, employees and Affiliates from all Liability arising out of, or related to, such Third-party Claim.  An Indemnifying Party may not, without the prior written consent of the Indemnified Party, settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder unless such settlement, compromise, or consent (A) includes an unconditional release of the Indemnified Party and its officers, directors, employees, and Affiliates from all Liability arising out of, or related to, such Third-party

DocuSign Envelope ID: BA8D3011-5881-4FAA-82FC-7843BDE889E5

Claim, (B) does not contain any admission or statement suggesting any wrongdoing or Liability on behalf of the Indemnified Party, and (C) does not contain any equitable order, judgment, or term that in any manner affects, restrains, or interferes with the business of the Indemnified Party or any of the Indemnified Party's Affiliates.

(c)     If an Indemnified Party claims a right to payment pursuant hereto with respect to any matter not involving a Third-party Claim (a "**Direct Claim**"), such Indemnified Party shall send written notice of such claim to the appropriate Indemnifying Party (each, a "**Notice of Claim**").  Such Notice of Claim shall specify the basis for such Direct Claim.  The failure by any Indemnified Party so to notify the Indemnifying Party shall not relieve the Indemnifying Party from any Liability that it may have to such Indemnified Party with respect to any Direct Claim made pursuant to this Section 6.6(c).  If the Indemnifying Party does not notify the Indemnified Party within thirty days following its receipt of such Notice of Claim that the Indemnifying Party disputes its Liability to the Indemnified Party under this Article 6 or the amount thereof, the Direct Claim specified by the Indemnified Party in such Notice of Claim shall be conclusively deemed a Liability of the Indemnifying Party under this Article 6, and the Indemnifying Party shall pay the amount of such Liability to the Indemnified Party on demand or, in the case of any Notice of Claim in which the amount of the Direct Claim (or any portion of the Direct Claim) is estimated, on such later date when the amount of such Direct Claim (or such portion of such Direct Claim) becomes finally determined.  In the event that the Indemnifying Party has timely disputed its Liability with respect to such Direct Claim as provided above, as promptly as possible, such Indemnified Party and the appropriate Indemnifying Party shall establish the merits and amount of such Direct Claim (by mutual agreement, litigation, arbitration or otherwise) and, within five business days following the final determination of the merits and amount of such Direct Claim, the Indemnifying Party shall pay to the Indemnified Party an amount equal to such Direct Claim as determined hereunder.

## ARTICLE 7.
### MISCELLANEOUS

Section 7.1     Entire Agreement; Amendment.  This Agreement and the Transaction Agreements (including the exhibits hereto and thereto and the documents referred to therein) constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they related in any way to the subject matter hereof.  This Agreement may be amended with the written consent of each of the Parties or any successor thereto by execution of an instrument in writing.

Section 7.2     Waivers.  The rights and remedies of the Parties to this Agreement are cumulative and not alternative.  To the maximum extent permitted by applicable Law: (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Parties; (b) no waiver that may be given by a Party will be applicable except in the specific instance for which it is given; and (c) no notice to, or demand on, one Party will be deemed to be a waiver of any obligation of such Party or of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the Transaction Agreements.

Section 7.3     Notices.  All notices and other communications required or permitted hereunder shall be made to the address of a Party listed on the signature page to this Agreement and shall be (a) in writing, (b) effective when given, and (c), in any event, deemed to be given upon receipt or, if earlier: (i) upon delivery, if delivered by hand; (ii) two business days after deposit with FedEx Express or similar recognized international overnight courier service, freight prepaid; or (iii) one business day after facsimile or electronic mail transmission. A Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties advance written notice pursuant to the provisions above.

DocuSign Envelope ID: BA8D3011-5884-4FAA-82FC-7843BDE889E5

Section 7.4      <u>Successors and Assigns</u>.  This Agreement shall be binding upon, and inure to the benefit of, the Parties named herein and their respective successors and permitted assigns.  Neither this Agreement nor any rights or obligations of a Party hereunder shall be assigned by a Party (unless to an Affiliate of such Party) without the prior written consent of the other Parties.  This Agreement will be binding upon any permitted assignee of any Party.  No assignment shall have the effect of relieving any Party to this Agreement of any of its obligations hereunder.

Section 7.5      <u>Public Disclosure</u>.  Except as may be required by Law, the Seller shall not issue any statement or communication to any Third Party (other than its respective agents) regarding the subject matter of this Agreement or the transactions contemplated hereby, including, if applicable, the termination of this Agreement and the reasons therefor, without the prior written consent of the Buyer.

Section 7.6      <u>Expenses and Fees</u>.  Whether or not the Closing occurs, all fees and expenses incurred in connection with this transactions contemplated by this Agreement, including all legal, accounting, financial advisory, consulting and all other fees and expenses of Third Parties incurred by a Party in connection with the negotiation and effectuation of the terms and conditions of this Agreement and the transactions contemplated hereby, shall be the obligation of the respective Party incurring such fees and expenses.

Section 7.7      <u>Specific Performance</u>.  The Parties agree that irreparable damage would occur if any provision of this Agreement was not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled hereunder, at Law or in equity.

Section 7.8      <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

Section 7.9      <u>Governing Law</u>.  This Agreement shall, in all respects, be construed in accordance with, and governed by, the Laws of the State of California without regard to conflict of Laws principles.

Section 7.10      <u>Severability</u>.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

Section 7.11      <u>Construction</u>.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

DocuSign Envelope ID: BA8D3011-5884-4FAA-82FC-7843BDE889E5

Case 8:24-ap-01017-SC    Doc 10-1    Filed 03/28/24    Entered 03/28/24 13:37:36    Desc
          Exhibit to Amended Complaint    Page 65 of 196

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Agreement Date.

**BUYER:**

**Marich Bein LLC**


By: _____
　　　Name:
　　　Title:



**SELLER:**

**New Horizon Finance LLC**

By: _____Caleb Wickman_____
　　　Name: Caleb Wickman
　　　Title: Owner



**APPROVAL OF ASSIGNMENT AND GUARANTEE**

　　　The assignment of the Purchased Accounts set forth in this Agreement as well as the guarantee included therein is hereby approved, and with respect to the Purchased Accounts, the Buyer shall have all rights of Buyer as set forth in this agreement.


**The Litigation Practice Group P.C.**


By: _____Daniel S March_____
　　　Name: Daniel S. March
　　　Title: Managing Shareholder


By: _____Tony M Diab_____
　　　Name: Tony M. Diab


*[Signature Page to Accounts Receivable Purchase Agreement]*

EXHIBIT E
Page 85

DocuSign Envelope ID: BA8D3011-588A-4FAA-82FC-7843BDE89DE5

**EXHIBIT A**

**DEFINITIONS**

As used in this Agreement, the following terms have the following meanings (terms defined in the singular to have a correlative meaning when used in the plural and vice versa).

(a)    "**Action**" shall mean any civil, criminal, or administrative action, claim, suit, demand, charge, citation, reexamination, opposition, interference, decree, injunction, mediation, hearing, notice of violation, demand letter, litigation, proceeding, labor dispute, arbitral action, governmental or other audit, inquiry, criminal prosecution, investigation, unfair labor practice charge, or complaint.

(b)    "**Agreement**" shall have the meaning set forth in the preamble to this Agreement.

(c)    "**Agreement Date**" shall have the meaning set forth in the preamble to this Agreement.

(d)    "**Affiliate**" shall mean (i) with respect to any non-natural Person, any Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person and (ii), with respect to any individual, (A) family members of such individual, by blood, adoption, or marriage, (B) such individual's spouse or ex-spouse and (C) any Person that is directly or indirectly under the control of any of the foregoing individuals.  For purposes of this definition, "control" (including with correlative meanings, the terms "controlling," "controlled by," and under "common control with") means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

(e)    "**Bill of Sale and Assignment and Assumption Agreement**" shall have the meaning set forth in Section 6.2.

(f)    "**Business**" shall mean the business of the Seller as conducted on the Agreement Date.

(g)    "**Buyer**" shall have the meaning set forth in the preamble to this Agreement.

(h)    "**Buyer Indemnified Parties**" shall have the meaning set forth in Section 6.4.

(i)    "**Closing**" shall have the meaning set forth in Section 6.1.

(j)    "**Closing Date**" shall have the meaning set forth in Section 6.1.

(k)    "**Direct Claim**" shall have the meaning set forth in Section 6.6(c).

(l)    "**Excluded Assets**" shall have the meaning set forth in Section 2.1.

(m)    "**Excluded Liabilities**" shall have the meaning set forth in Section 2.2.

(n)    "**Governmental Body**" shall mean any: (i) nation, province, state, county, city, town, village, district, or other jurisdiction of any nature; (ii) federal, provincial, state, local, municipal, foreign, or other government; (iii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); (iv) multi-national organization or body; or (v) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

(o)      **"Indebtedness"** means, without duplication and with respect to the Seller, all: (i) indebtedness for borrowed money; (ii) obligations for the deferred purchase price of property or services, (iii) long or short-term obligations evidenced by notes, bonds, debentures or other similar instruments; (iv) obligations under any interest rate, currency swap, or other hedging agreement or arrangement; (v) capital lease obligations; (vi) reimbursement obligations under any letter of credit, banker's acceptance or similar credit transactions; (vii) guarantees made by the Seller on behalf of any third party in respect of obligations of the kind referred to in the foregoing clauses (i) through (vi); and (viii) any unpaid interest, prepayment penalties, premiums, costs and fees that would arise or become due as a result of the prepayment of any of the obligations referred to in the foregoing clauses (i) through (vii).

(p)      **"Indemnified Party"** shall mean a Buyer Indemnified Party or a Seller Indemnified Party, as the case may be, making a claim for indemnification under Article 6.

(q)      **"Indemnifying Party"** shall mean a Party against whom a claim for indemnification is asserted under Article 6.

(r)      **"Knowledge"** shall mean, with respect to the Seller, the actual or constructive knowledge of all facts relevant to this transaction and the transacting parties, after due inquiry.

(s)      **"Law"** shall mean any law, statute, ordinance, regulation, rule, code, notice requirement, court decision, or agency guideline, of any foreign, federal, state, or local Governmental Body.

(t)      **"Liabilities"** shall mean any direct or indirect liability, Indebtedness, obligation, commitment, expense, claim, deficiency, guaranty, or endorsement of, or by, any Person of any type, known or unknown, and whether accrued, absolute, contingent, matured, unmatured, determined or undeterminable, on- or off-balance sheet, or other.

(u)      **"Lien"** shall mean any mortgage, pledge, lien, charge, claim, security interest, adverse claims of ownership or use, restrictions on transfer, defect of title, or other encumbrance of any sort.

(v)      **"Losses"** shall have the meaning set forth in Section 6.4.

(w)      **"Notice of Claim"** shall have the meaning set forth in Section 6.6(c).

(x)      **"Organizational Documents"** shall mean, with respect to a Person, the charter, bylaws, limited liability company agreement, and other organizational documents of such Person, in each case, as amended.

(y)      **"Party"** or **"Parties"** shall have the meaning set forth in the preamble to this Agreement.

(z)      **"Permitted Liens"** shall mean (i) Liens for Taxes not yet delinquent or being contested in good faith by appropriate proceedings, (ii) statutory Liens (including materialmen's, warehousemen's, mechanic's, repairmen's, landlord's, and other similar Liens) arising in the ordinary course of business securing payments not yet delinquent or being contested in good faith by appropriate proceedings, and (iii) restrictive covenants, easements, and defects, imperfections or irregularities of title, if any, of a nature that do not materially and adversely affect the assets or properties subject thereto.

(aa)      **"Person"** shall mean any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, Governmental Body, or other entity.

DocuSign Envelope ID: BA8D3011-5881-4FAA-82FC-7843BDE80DE5

(bb)   "**Purchase Price**" shall have the meaning set forth in <u>Section 2.3</u>.

(cc)   "**Purchased Accounts**" shall have the meaning set forth in the Recitals.

(dd)   "**Seller**" shall have the meaning set forth in the preamble to this Agreement.

(ee)   "**Seller Indemnified Parties**" shall have the meaning set forth in <u>Section 6.5</u>.

(ff)   "**Tax**" or "**Taxes**" shall mean any U.S. federal, state, local or non-U.S. income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, escheat, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

(gg)   "**Tax Returns**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(hh)   "**Third Party**" or "**Third Parties**" shall mean any Person other than the Parties or their respective Affiliates.

(ii)   "**Third-party Claim**" shall have the meaning set forth in <u>Section 6.6(a)</u>.

(jj)   "**Transaction Agreements**" shall mean the Bill of Sale and Assignment and Assumption Agreement, and each other agreement, instrument, and/or certificate contemplated by this Agreement or such other agreements to be executed in connection with the transactions contemplated hereby or thereby.

(kk)   "**Upfront Cash Payment**" shall have the meaning set forth in <u>Section 2.3</u>.

(ll)   "**Wire Instructions**" shall have the meaning set forth in <u>Section 2.3</u>.

DocuSign Envelope ID: BA6D3011-5881-4FAA-82FC-7843BDE809E5

Case 8:24-ap-01017-SC    Doc 10-1   Filed 03/28/24   Entered 03/28/24 13:37:36    Desc
Exhibit to Amended Complaint    Page 69 of 196

### EXHIBIT B

**FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

THIS BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this **"Agreement"**), is made by and between **Buyer**, and **Seller**.  Each of the Seller and the Buyer are sometimes referred to herein, individually, as a **"Party"** and, collectively, as the **"Parties."**

WHEREAS, the Buyer and the Seller have entered into that certain Accounts Receivable Purchase Agreement, of even date herewith (the **"Purchase Agreement"**), pursuant to which the Seller has agreed to sell, assign, transfer, and deliver to the Buyer, and the Buyer has agreed to purchase, acquire, and accept from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.      <u>Defined Terms</u>.  Capitalized terms used but not otherwise defined in this Agreement shall have the meanings assigned to such terms in the Purchase Agreement.

2.      <u>Sale of Purchased Accounts; Assignment</u>.  The Seller hereby sells, assigns, transfers, and delivers to the Buyer, and the Buyer hereby purchases, acquires, and accepts from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

3.      <u>Further Assurances</u>.  Each of the Parties agrees, from time to time, at the request of the any other Party, to execute and deliver such other instruments of conveyance, power of attorney, sale, transfer, or assignment and take such other actions as such other Party may reasonably request in order to more effectively consummate the transactions contemplated by this Agreement.

4.      <u>Terms of the Purchase Agreement</u>.  This Agreement is intended to evidence the consummation of the transactions contemplated by the Purchase Agreement and is subject to the terms and conditions set forth in the Purchase Agreement.   The terms of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants, agreements, and indemnities relating to the Purchased Accounts are incorporated herein by this reference.  The Parties acknowledge and agree that the representations, warranties, covenants, agreements, and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein.  In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

5.      <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

*[Remainder of page intentionally left blank.]*

DocuSign Envelope ID: BA8D3011-588A-4FAA-82FC-7843BDE89DE5

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.


**BUYER:**

**Marich Bein LLC**


By: _____
       Name:
       Title:



**SELLER:**

**New Horizon Finance LLC**

                DocuSigned by:
By: _____
       Name: Caleb Wickman
       Title: Owner

Accounts Receivable Purchase Agreement

EXHIBIT E
Page 90

DocuSign Envelope ID: BA8D3011-5881-4FAA-82FC-7843BDE89DE5

**Schedule 2.3**
**Wire Instructions**

<u>**$153,121.53**</u>

**Account Holder Name: New Horizon Finance LLC**

**Address: 8101 Biscayne Blvd, #506 Miami, FL 33138**

**Routing Number:** ███████

**Account Number:** ███████

# EXHIBIT F

DocuSign Envelope ID: 485653A3-F4E7-4F52-8960-4F7EA9DD75ED

### ACCOUNTS RECEIVABLE PURCHASE AGREEMENT

This ACCOUNTS RECEIVABLE PURCHASE AGREEMENT (this "**Agreement**") is made as of November 7, 2022 (the "**Agreement Date**"), by and between The Litigation Practice Group PC (collectively the "**Buyer**"), New Horizon Finance LLC (the "**Seller" or "LPG"**, and together with the Buyer, the **"Parties"**), and The Litigation Practice Group PC ("LPG").

### RECITALS

WHEREAS, in the regular course of business, the Seller originates account receivables from **LPG** in connection with client on-boarding services provided by the Seller to LPG and its affiliates;

WHEREAS, the account receivables represent an obligation of various clients to pay Seller for services that Seller previously provided, but which LPG shall provide from the date of execution of this Agreement;

WHEREAS, the Seller desires to sell, assign, transfer, and deliver to the Buyer, and the Buyer desires to purchase, acquire, and accept from the Seller, certain of these account receivables (the "**Purchased Accounts**").

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, the Parties, intending to be legally bound, agree as follows:

### ARTICLE 1.
### DEFINITIONS

Section 1.1    Certain Definitions.  Certain defined terms used in this Agreement are set forth on **Exhibit A**.

### ARTICLE 2.
### ASSIGNMENT AND TRANSFER AND CONSIDERATION

Section 2.1    Assignment of the Purchased Accounts to the Buyer.  Upon execution of this Agreement and subject to the terms and conditions set forth herein, the Seller shall sell, assign, transfer, and deliver, and the Buyer shall purchase, acquire, and accept from the Seller, all of the Seller's right, title, and interest in and to the Purchased Accounts set forth on the spreadsheet attached to this Agreement, free and clear of any Liens.  Other than the Purchased Accounts, the Buyer shall not purchase or acquire any other assets of the Seller (collectively, the "**Excluded Assets**").

Section 2.2    No Assumption of Liabilities.  The Buyer shall not assume any Liabilities of the Seller of any kind, whether known or unknown, contingent, matured, or otherwise, whether currently existing or hereinafter created (collectively, the "**Excluded Liabilities**").

Section 2.3    Payment of Purchase Price.  Buyer shall pay $209,436.35 (total purchase price) for the Purchased Accounts (the "**Purchase Price**") by wire transfer of immediately available funds in accordance with the wire transfer instructions set forth in **Schedule 2.3** (the "**Wire Instructions**").  The Purchased Accounts are set forth on the attached spreadsheet.

Section 2.4    Guarantee of LPG.  If any file acquired by buyer shall fail to make a first payment, LPG will replace the file and bear any cost associated with such replacement.  The replacement file shall yield no less than the receivable of the failed file.  In addition, if any any calendar month a total of less than 80% of files make a cleared payment, LPG shall replace any non-performing files in such month so that the performance of the file

DocuSign Envelope ID: 3B5653A3-E457-4F52-8960-4F7EA9DD75ED

package as a whole equals 80%.  This guarantee shall continue until the completion of the 24th month following execution of this agreement.

## ARTICLE 3.
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Buyer, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 3.1     Organization; Good Standing.  The Seller is a Limited Liability Company duly organized, validly existing, and in good standing under the Laws of the State of Delaware and is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of the Business requires such qualification, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, results of operations, financial condition, or assets of the Seller.

Section 3.2     Power and Authority.  The Seller has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Seller, and the consummation by the Seller of the transactions contemplated hereby and thereby, have been duly approved by the Seller, and no further action is required on the part of the Seller to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Seller and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Seller, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 3.3     Title to, and Sufficiency of, the Purchased Accounts.  The Seller has and shall convey to the Buyer, at the Closing, good, valid, transferable, and marketable title to, or valid leasehold interests in, all of the Purchased Accounts, free and clear of all Liens.

Section 3.4     Consents.  The Seller is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of, any Governmental Body or Third Party, including a party to any assigned contract, in connection with the execution, delivery, and performance by the Seller of this Agreement or any of the Transaction Agreements to which it is a party or the consummation of the transactions contemplated hereby and thereby.

Section 3.5     No Conflicts. The execution and delivery by the Seller of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of any obligation, or loss of any benefit, under: (a) any provision of the Organizational Documents of the Seller; (b) any contract to which the Seller is party, including, without limitation, any assigned contract; or (c) any Law or order applicable to the Seller or any of the Purchased Accounts.

DocuSign Envelope ID: 1B5653A3-E457-4F52-8960-4F7EA9DD75ED

Section 3.6    <u>Compliance with Laws</u>.  The Seller has materially complied, and is now materially complying, with all Laws applicable to the ownership and use of the Purchased Accounts.

Section 3.7    <u>Legal Proceedings</u>.  There is no Action of any nature pending or, to the Knowledge of the Seller, threatened against or by the Seller: (a) relating to or affecting the Purchased Accounts or (b) that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement and the Transaction Agreements.  No event has occurred or circumstance exists that may give rise to, or serve as a basis for, any such Action.

Section 3.8    <u>Condition of Purchased Accounts</u>.  Each Purchased Account shall have received no less than one processed payment.

Section 3.9    <u>Confidentiality</u>. Seller agrees and acknowledges that all Purchased Accounts, the pricing, and all terms set forth in this Agreement are confidential (together, the "**Confidential Information**").  Seller will at all times keep the  Confidential Information in confidence and trust.  Seller will not, without the prior written consent of an authorized officer of Buyer, (A) copy, use or disclose any Confidential Information, (B) deliver or disclose any Confidential Information to any person or entity outside the Buyer, or (C) use the Confidential Information for Seller's own use or use it to the detriment of Buyer.  Notwithstanding the foregoing, Seller may, without consent, use the Confidential Information and disclose and deliver same to Seller's employees or agents, if applicable, who have a need to know, provided such employees or agents have entered into written agreements approved by Buyer and containing provisions at least as restrictive as these provisions.  Seller agrees that violation of this Section 3.9.  The Parties agree that the disclosure of the Confidential Information in violation of this Agreement may cause the Buyer irreparable harm and that any breach or threatened breach by the Seller entitles Buyer to seek injunctive relief, in addition to any other legal or equitable remedies available to it, in any court of competent jurisdiction.

**ARTICLE 4.**
**REPRESENTATIONS AND WARRANTIES OF THE BUYER**

The Buyer represents and warrants to the Seller, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 4.1    <u>Organization; Good Standing</u>.  The Buyer is a limited liability company, duly organized, validly existing, and in good standing under the Laws of the State of Florida.

Section 4.2    <u>Power and Authority</u>.  The Buyer has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Buyer, and the consummation by the Buyer of the transactions contemplated hereby and thereby, have been duly approved by the Buyer, and no further action is required on the part of the Buyer to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Buyer and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Buyer, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 4.3    <u>No Conflicts</u>.  The execution and delivery by the Buyer of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of, any obligation, or loss of any benefit under: (a) any provision of the Buyer's Organizational Documents; (b) any contract to which the Buyer is party, other than the Buyer Representation Agreement; or (c) any Law applicable to the Buyer.

Section 4.4    <u>Sufficient Funds</u>.  The Buyer has, and will have, sufficient funds available to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement and the Transaction Agreements.

## ARTICLE 5.
## COVENANTS

Section 5.1    <u>Appropriate Actions</u>.

(a)    <u>General</u>.  Each of the Parties shall use commercially reasonable efforts to take all actions necessary to consummate the transactions contemplated by this Agreement as soon as reasonably practicable after the execution of this Agreement, including taking all actions necessary to comply promptly with all applicable Laws that may be imposed on it or any of its Affiliates with respect to the Closing.

## ARTICLE 6.
## CLOSING

Section 6.1    <u>Closing</u>.  The closing of the transactions contemplated by this Agreement (the "**Closing**") will take place upon the execution and delivery of this Agreement or at such other time, date, and place as the Parties may agree in writing.  The date on which the Closing occurs is hereinafter referred to as the "**Closing Date**." The Parties agree that the Closing may take place by the electronic exchange of executed counterpart documents and the electronic transfer of funds.

Section 6.2    <u>Closing Deliverables of the Seller</u>.  At or prior to the Closing, Seller shall deliver to Buyer any of the following if requested by Buyer:  (i) a bill of sale and assignment and assumption agreement substantially in the form attached hereto as **<u>Exhibit B</u>** (the "**Bill of Sale and Assignment and Assumption Agreement**"), duly executed by the Seller, effecting the transfer and assignment to, and assumption by, the Buyer of the Purchased Accounts; and (ii) such other customary instruments of transfer, assumption, filings, or documents, in form and substance reasonably satisfactory to the Buyer, as may be required to give effect to this Agreement.

Section 6.3    <u>Closing Deliverables of the Buyer</u>.  At or prior to the Closing, the Seller shall have received the following: (i) the Upfront Cash Payment; and (ii) if requested pursuant to <u>Section 6.2</u>, the Bill of Sale and Assignment and Assumption Agreement, duly executed by the Buyer.

Section 6.4    <u>Indemnification by the Seller</u>.  Subject to the limitations set forth in this <u>Article 6</u>, the Seller agrees to indemnify and hold harmless the Buyer, including its shareholders, members, directors, managers, officers, employees, Affiliates, and agents (each, a "**Buyer Indemnified Party**" and, collectively, the "**Buyer Indemnified Parties**"), against all claims, losses, Liabilities, damages, deficiencies, diminutions in value, costs, interest, awards, judgments, penalties, and expenses, including reasonable out-of-pocket attorneys' and consultants' fees and expenses and including any such reasonable expenses incurred in connection with investigating, defending against, or settling any of the foregoing (each, a "**Loss**" and, collectively, the "**Losses**") paid, suffered, incurred, sustained, or accrued by any Buyer Indemnified Party, directly or indirectly, as a result of,

DocuSign Envelope ID: 385653A3-E457-4F52-8960-4F7EA9DD75ED

arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Seller contained in this Agreement, (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Seller pursuant to this Agreement, (c) any Excluded Asset or any Excluded Liability.

Section 6.5    Indemnification by the Buyer.  Subject to the limitations set forth in this Article 6, the Buyer agrees to indemnify and hold harmless the Seller, including its Affiliates and agents (each, a "**Seller Indemnified Party**" and, collectively, the "**Seller Indemnified Parties**"), against all Losses paid, suffered, incurred, sustained, or accrued by any Seller Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Buyer contained in this Agreement; (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Buyer pursuant to this Agreement; (c) any event or occurance related to the Purchased Accounts or Buyer occurring after the Closing; or (d) resulting from any omissions or misstatements made by Buyer to investors or potential investors.

Section 6.6    Indemnification Procedures.

(a)    No Restraints.  Promptly following receipt by an Indemnified Party of notice by a Third Party (including any Governmental Body) of any complaint, dispute, or claim or the commencement of any audit, investigation, Action or proceeding with respect to which such Indemnified Party may be entitled to indemnification pursuant hereto (a "**Third-party Claim**"), such Indemnified Party shall provide written notice thereof to the Indemnifying Party, provided, however, that the failure to so notify the Indemnifying Party shall relieve the Indemnifying Party from Liability hereunder with respect to such Third-party Claim only if, and only to the extent that, such failure to so notify the Indemnifying Party results in the forfeiture by the Indemnifying Party of rights and defenses otherwise available to the Indemnifying Party with respect to such Third-party Claim.  The Indemnifying Party shall have the right, upon written notice delivered to the Indemnified Party within twenty days thereafter assuming full responsibility for any Losses resulting from such Third-party Claim, to assume the defense of such Third-party Claim, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the fees and disbursements of such counsel; provided, however, if the Indemnifying Party declines or fails to assume the defense of such Third-party Claim on the terms provided above or to employ counsel reasonably satisfactory to the Indemnified Party, in either case within such twenty day period, then any Losses shall include the reasonable fees and disbursements of counsel for the Indemnified Party as incurred.  In any Third-party Claim for which indemnification is being sought hereunder the Indemnified Party or the Indemnifying Party, whichever is not assuming the defense of such Third-party Claim, shall have the right to participate in such matter and to retain its own counsel at such Party's own expense.  The Indemnifying Party or the Indemnified Party (as the case may be) shall at all times use reasonable efforts to keep the Indemnifying Party or Indemnified Party (as the case may be) reasonably apprised of the status of the defense of any matter, the defense of which it is maintaining, and to cooperate in good faith with each other with respect to the defense of any such matter.

(b)    No Indemnified Party may settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder without the prior written consent of the Indemnifying Party (which may not be unreasonably withheld or delayed), unless (i) the Indemnifying Party fails to assume and maintain the defense of such Third-party Claim or (ii) such settlement, compromise, or consent includes an unconditional release of the Indemnifying Party and its officers, directors, employees and Affiliates from all Liability arising out of, or related to, such Third-party Claim.  An Indemnifying Party may not, without the prior written consent of the Indemnified Party, settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder unless such settlement, compromise, or consent (A) includes an unconditional release of the Indemnified Party and its officers, directors, employees, and Affiliates from all Liability arising out of, or related to, such Third-party

DocuSign Envelope ID: 3B5653A3-E457-4F52-8960-4F3EA9DD35ED

Claim, (B) does not contain any admission or statement suggesting any wrongdoing or Liability on behalf of the Indemnified Party, and (C) does not contain any equitable order, judgment, or term that in any manner affects, restrains, or interferes with the business of the Indemnified Party or any of the Indemnified Party's Affiliates.

(c)      If an Indemnified Party claims a right to payment pursuant hereto with respect to any matter not involving a Third-party Claim (a "**Direct Claim**"), such Indemnified Party shall send written notice of such claim to the appropriate Indemnifying Party (each, a "**Notice of Claim**"). Such Notice of Claim shall specify the basis for such Direct Claim. The failure by any Indemnified Party so to notify the Indemnifying Party shall not relieve the Indemnifying Party from any Liability that it may have to such Indemnified Party with respect to any Direct Claim made pursuant to this Section 6.6(c). If the Indemnifying Party does not notify the Indemnified Party within thirty days following its receipt of such Notice of Claim that the Indemnifying Party disputes its Liability to the Indemnified Party under this Article 6 or the amount thereof, the Direct Claim specified by the Indemnified Party in such Notice of Claim shall be conclusively deemed a Liability of the Indemnifying Party under this Article 6, and the Indemnifying Party shall pay the amount of such Liability to the Indemnified Party on demand or, in the case of any Notice of Claim in which the amount of the Direct Claim (or any portion of the Direct Claim) is estimated, on such later date when the amount of such Direct Claim (or such portion of such Direct Claim) becomes finally determined. In the event that the Indemnifying Party has timely disputed its Liability with respect to such Direct Claim as provided above, as promptly as possible, such Indemnified Party and the appropriate Indemnifying Party shall establish the merits and amount of such Direct Claim (by mutual agreement, litigation, arbitration or otherwise) and, within five business days following the final determination of the merits and amount of such Direct Claim, the Indemnifying Party shall pay to the Indemnified Party an amount equal to such Direct Claim as determined hereunder.

## ARTICLE 7.
## MISCELLANEOUS

Section 7.1      Entire Agreement; Amendment. This Agreement and the Transaction Agreements (including the exhibits hereto and thereto and the documents referred to therein) constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they related in any way to the subject matter hereof. This Agreement may be amended with the written consent of each of the Parties or any successor thereto by execution of an instrument in writing.

Section 7.2      Waivers. The rights and remedies of the Parties to this Agreement are cumulative and not alternative. To the maximum extent permitted by applicable Law: (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Parties; (b) no waiver that may be given by a Party will be applicable except in the specific instance for what it is given; and (c) no notice to, or demand on, one Party will be deemed to be a waiver of any obligation of such Party or of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the Transaction Agreements.

Section 7.3      Notices. All notices and other communications required or permitted hereunder shall be made to the address of a Party listed on the signature page to this Agreement and shall be (a) in writing, (b) effective when given, and (c), in any event, deemed to be given upon receipt or, if earlier: (i) upon delivery, if delivered by hand; (ii) two business days after deposit with FedEx Express or similar recognized international overnight courier service, freight prepaid; or (iii) one business day after facsimile or electronic mail transmission. A Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties advance written notice pursuant to the provisions above.

DocuSign Envelope ID: 185653A3-E4E7-4F52-8960-4F7EA9DD75ED

Section 7.4    <u>Successors and Assigns</u>.  This Agreement shall be binding upon, and inure to the benefit of, the Parties named herein and their respective successors and permitted assigns.  Neither this Agreement nor any rights or obligations of a Party hereunder shall be assigned by a Party (unless to an Affiliate of such Party) without the prior written consent of the other Parties.  This Agreement will be binding upon any permitted assignee of any Party.  No assignment shall have the effect of relieving any Party to this Agreement of any of its obligations hereunder.

Section 7.5    <u>Public Disclosure</u>.  Except as may be required by Law, the Seller shall not issue any statement or communication to any Third Party (other than its respective agents) regarding the subject matter of this Agreement or the transactions contemplated hereby, including, if applicable, the termination of this Agreement and the reasons therefor, without the prior written consent of the Buyer.

Section 7.6    <u>Expenses and Fees</u>.  Whether or not the Closing occurs, all fees and expenses incurred in connection with this transactions contemplated by this Agreement, including all legal, accounting, financial advisory, consulting and all other fees and expenses of Third Parties incurred by a Party in connection with the negotiation and effectuation of the terms and conditions of this Agreement and the transactions contemplated hereby, shall be the obligation of the respective Party incurring such fees and expenses.

Section 7.7    <u>Specific Performance</u>.  The Parties agree that irreparable damage would occur if any provision of this Agreement was not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled hereunder, at Law or in equity.

Section 7.8    <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

Section 7.9    <u>Governing Law</u>.  This Agreement shall, in all respects, be construed in accordance with, and governed by, the Laws of the State of California without regard to conflict of Laws principles.

Section 7.10    <u>Severability</u>.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

Section 7.11    <u>Construction</u>.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

EXHIBIT F

DocuSign Envelope ID: 3B5653A3-E457-4F52-8960-4F7EA9DD75ED

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Agreement Date.

**BUYER:**

**The Litigation Practice Group P.C.**

By: *Daniel S March*
     9D494DB1993341E
Name: Daniel S March
Title: Managing Shareholder

**SELLER:**

**New Horizon Finance LLC**

By: *Caleb Wickman*
     5B4E9031202247D
Name: Caleb Wickman
Title: Owner

**APPROVAL OF ASSIGNMENT AND GUARANTEE**

The assignment of the Purchased Accounts set forth in this Agreement as well as the guarantee included therein is hereby approved, and with respect to the Purchased Accounts, the Buyer shall have all rights of Buyer as set forth in this agreement.

**The Litigation Practice Group P.C.**

By: *Daniel S March*
     9D494DB1993341E
Name: Daniel S. March
Title: Managing Shareholder

*[Signature Page to Accounts Receivable Purchase Agreement]*

**EXHIBIT F**
Page 100

DocuSign Envelope ID: 185653A3-E4E7-4F52-8960-4F7EA9DD35ED

**EXHIBIT A**

**DEFINITIONS**

As used in this Agreement, the following terms have the following meanings (terms defined in the singular to have a correlative meaning when used in the plural and vice versa).

(a)    "**Action**" shall mean any civil, criminal, or administrative action, claim, suit, demand, charge, citation, reexamination, opposition, interference, decree, injunction, mediation, hearing, notice of violation, demand letter, litigation, proceeding, labor dispute, arbitral action, governmental or other audit, inquiry, criminal prosecution, investigation, unfair labor practice charge, or complaint.

(b)    "**Agreement**" shall have the meaning set forth in the preamble to this Agreement.

(c)    "**Agreement Date**" shall have the meaning set forth in the preamble to this Agreement.

(d)    "**Affiliate**" shall mean (i) with respect to any non-natural Person, any Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person and (ii), with respect to any individual, (A) family members of such individual, by blood, adoption, or marriage, (B) such individual's spouse or ex-spouse and (C) any Person that is directly or indirectly under the control of any of the foregoing individuals.  For purposes of this definition, "control" (including with correlative meanings, the terms "controlling," "controlled by," and under "common control with") means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

(e)    "**Bill of Sale and Assignment and Assumption Agreement**" shall have the meaning set forth in Section 6.2.

(f)    "**Business**" shall mean the business of the Seller as conducted on the Agreement Date.

(g)    "**Buyer**" shall have the meaning set forth in the preamble to this Agreement.

(h)    "**Buyer Indemnified Parties**" shall have the meaning set forth in Section 6.4.

(i)    "**Closing**" shall have the meaning set forth in Section 6.1.

(j)    "**Closing Date**" shall have the meaning set forth in Section 6.1.

(k)    "**Direct Claim**" shall have the meaning set forth in Section 6.6(c).

(l)    "**Excluded Assets**" shall have the meaning set forth in Section 2.1.

(m)    "**Excluded Liabilities**" shall have the meaning set forth in Section 2.2.

(n)    "**Governmental Body**" shall mean any: (i) nation, province, state, county, city, town, village, district, or other jurisdiction of any nature; (ii) federal, provincial, state, local, municipal, foreign, or other government; (iii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); (iv) multi-national organization or body; or (v) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

DocuSign Envelope ID: 185653A3-E457-4F52-8960-4F7EA9DD75ED

(o)    "**Indebtedness**" means, without duplication and with respect to the Seller, all: (i) indebtedness for borrowed money; (ii) obligations for the deferred purchase price of property or services, (iii) long or short-term obligations evidenced by notes, bonds, debentures or other similar instruments; (iv) obligations under any interest rate, currency swap, or other hedging agreement or arrangement; (v) capital lease obligations; (vi) reimbursement obligations under any letter of credit, banker's acceptance or similar credit transactions; (vii) guarantees made by the Seller on behalf of any third party in respect of obligations of the kind referred to in the foregoing clauses (i) through (vi); and (viii) any unpaid interest, prepayment penalties, premiums, costs and fees that would arise or become due as a result of the prepayment of any of the obligations referred to in the foregoing clauses (i) through (vii).

(p)    "**Indemnified Party**" shall mean a Buyer Indemnified Party or a Seller Indemnified Party, as the case may be, making a claim for indemnification under Article 6.

(q)    "**Indemnifying Party**" shall mean a Party against whom a claim for indemnification is asserted under Article 6.

(r)    "**Knowledge**" shall mean, with respect to the Seller, the actual or constructive knowledge of all facts relevant to this transaction and the transacting parties, after due inquiry.

(s)    "**Law**" shall mean any law, statute, ordinance, regulation, rule, code, notice requirement, court decision, or agency guideline, of any foreign, federal, state, or local Governmental Body.

(t)    "**Liabilities**" shall mean any direct or indirect liability, Indebtedness, obligation, commitment, expense, claim, deficiency, guaranty, or endorsement of, or by, any Person of any type, known or unknown, and whether accrued, absolute, contingent, matured, unmatured, determined or undeterminable, on- or off-balance sheet, or other.

(u)    "**Lien**" shall mean any mortgage, pledge, lien, charge, claim, security interest, adverse claims of ownership or use, restrictions on transfer, defect of title, or other encumbrance of any sort.

(v)    "**Losses**" shall have the meaning set forth in Section 6.4.

(w)    "**Notice of Claim**" shall have the meaning set forth in Section 6.6(c).

(x)    "**Organizational Documents**" shall mean, with respect to a Person, the charter, bylaws, limited liability company agreement, and other organizational documents of such Person, in each case, as amended.

(y)    "**Party**" or "**Parties**" shall have the meaning set forth in the preamble to this Agreement.

(z)    "**Permitted Liens**" shall mean (i) Liens for Taxes not yet delinquent or being contested in good faith by appropriate proceedings, (ii) statutory Liens (including materialmen's, warehousemen's, mechanic's, repairmen's, landlord's, and other similar Liens) arising in the ordinary course of business securing payments not yet delinquent or being contested in good faith by appropriate proceedings, and (iii) restrictive covenants, easements, and defects, imperfections or irregularities of title, if any, of a nature that do not materially and adversely affect the assets or properties subject thereto.

(aa)    "**Person**" shall mean any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, Governmental Body, or other entity.

DocuSign Envelope ID: 485653A3-E4E7-4F52-8960-4F7EA9DD75ED

(bb)    "**Purchase Price**" shall have the meaning set forth in <u>Section 2.3</u>.

(cc)    "**Purchased Accounts**" shall have the meaning set forth in the Recitals.

(dd)    "**Seller**" shall have the meaning set forth in the preamble to this Agreement.

(ee)    "**Seller Indemnified Parties**" shall have the meaning set forth in <u>Section 6.5</u>.

(ff)    "**Tax**" or "**Taxes**" shall mean any U.S. federal, state, local or non-U.S. income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, escheat, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

(gg)    "**Tax Returns**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(hh)    "**Third Party**" or "**Third Parties**" shall mean any Person other than the Parties or their respective Affiliates.

(ii)    "**Third-party Claim**" shall have the meaning set forth in <u>Section 6.6(a)</u>.

(jj)    "**Transaction Agreements**" shall mean the Bill of Sale and Assignment and Assumption Agreement, and each other agreement, instrument, and/or certificate contemplated by this Agreement or such other agreements to be executed in connection with the transactions contemplated hereby or thereby.

(kk)    "**Upfront Cash Payment**" shall have the meaning set forth in <u>Section 2.3</u>.

(ll)    "**Wire Instructions**" shall have the meaning set forth in <u>Section 2.3</u>.

DocuSign Envelope ID: 385653A3-E4E7-4F52-8960-4F7EA9DD75ED

Case 8:24-ap-01017-SC   Doc 10-1   Filed 03/28/24   Entered 03/28/24 13:37:36   Desc
Exhibit to Amended Complaint   Page 84 of 196

**EXHIBIT B**

**FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

THIS BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this **"Agreement"**), is made by and between **Buyer**, and **Seller**. Each of the Seller and the Buyer are sometimes referred to herein, individually, as a **"Party"** and, collectively, as the **"Parties."**

WHEREAS, the Buyer and the Seller have entered into that certain Accounts Receivable Purchase Agreement, of even date herewith (the **"Purchase Agreement"**), pursuant to which the Seller has agreed to sell, assign, transfer, and deliver to the Buyer, and the Buyer has agreed to purchase, acquire, and accept from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.      <u>Defined Terms</u>. Capitalized terms used but not otherwise defined in this Agreement shall have the meanings assigned to such terms in the Purchase Agreement.

2.      <u>Sale of Purchased Accounts; Assignment</u>. The Seller hereby sells, assigns, transfers, and delivers to the Buyer, and the Buyer hereby purchases, acquires, and accepts from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

3.      <u>Further Assurances</u>. Each of the Parties agrees, from time to time, at the request of the any other Party, to execute and deliver such other instruments of conveyance, power of attorney, sale, transfer, or assignment and take such other actions as such other Party may reasonably request in order to more effectively consummate the transactions contemplated by this Agreement.

4.      <u>Terms of the Purchase Agreement</u>. This Agreement is intended to evidence the consummation of the transactions contemplated by the Purchase Agreement and is subject to the terms and conditions set forth in the Purchase Agreement. The terms of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants, agreements, and indemnities relating to the Purchased Accounts are incorporated herein by this reference. The Parties acknowledge and agree that the representations, warranties, covenants, agreements, and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

5.      <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

*[Remainder of page intentionally left blank.]*

Accounts Receivable Purchase Agreement
Exhibit B – Bill of Sale

DocuSign Envelope ID: 485653A3-E457-4F52-8960-4F7EA9DD75ED

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**BUYER: The Litigation Practice Group P.C.**

By: _Daniel S March_
    9D494DB1993341E
    Name: Daniel S. March
    Title: Managing Shareholder

**SELLER:**

**New Horizon Finance LLC**

By: _Caleb Wickman_
    5D4E9831E92E471
    Name: Caleb Wickman
    Title: Owner

EXHIBIT F
Page 105

**Schedule 2.3**
**Wire Instructions**

**$209,436.35**

**Account Holder Name: New Horizon Finance LLC**

**Address: 8101 Biscayne Blvd, #506 Miami, FL 33138**

**Routing Number:** █████████

**Account Number:** █████████

# EXHIBIT G

DocuSign Envelope ID: C0957CDB-79EC-445B-A442-67DCE6ACA0BF

### ACCOUNTS RECEIVABLE PURCHASE AGREEMENT

This ACCOUNTS RECEIVABLE PURCHASE AGREEMENT (this "**Agreement**") is made as of November 17, 2022 (the "**Agreement Date**"), by and between The Litigation Practice Group PC (collectively the "**Buyer**"), New Horizon Finance LLC (the "**Seller" or "LPG**", and together with the Buyer, the **"Parties"**), and The Litigation Practice Group PC ("LPG").

### RECITALS

WHEREAS, in the regular course of business, the Seller originates account receivables from **LPG** in connection with client on-boarding services provided by the Seller to LPG and its affiliates;

WHEREAS, the account receivables represent an obligation of various clients to pay Seller for services that Seller previously provided, but which LPG shall provide from the date of execution of this Agreement;

WHEREAS, the Seller desires to sell, assign, transfer, and deliver to the Buyer, and the Buyer desires to purchase, acquire, and accept from the Seller, certain of these account receivables (the "**Purchased Accounts**").

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, the Parties, intending to be legally bound, agree as follows:

### ARTICLE 1.
### DEFINITIONS

Section 1.1    <u>Certain Definitions</u>.  Certain defined terms used in this Agreement are set forth on **<u>Exhibit A</u>**.

### ARTICLE 2.
### ASSIGNMENT AND TRANSFER AND CONSIDERATION

Section 2.1    <u>Assignment of the Purchased Accounts to the Buyer</u>.  Upon execution of this Agreement and subject to the terms and conditions set forth herein, the Seller shall sell, assign, transfer, and deliver, and the Buyer shall purchase, acquire, and accept from the Seller, all of the Seller's right, title, and interest in and to the Purchased Accounts set forth on the spreadsheet attached to this Agreement, free and clear of any Liens.  Other than the Purchased Accounts, the Buyer shall not purchase or acquire any other assets of the Seller (collectively, the "**Excluded Assets**").

Section 2.2    <u>No Assumption of Liabilities</u>.  The Buyer shall not assume any Liabilities of the Seller of any kind, whether known or unknown, contingent, matured, or otherwise, whether currently existing or hereinafter created (collectively, the "**Excluded Liabilities**").

Section 2.3    <u>Payment of Purchase Price</u>.  Buyer shall pay $177,586.78 (total purchase price) for the Purchased Accounts (the "**Purchase Price**") by wire transfer of immediately available funds in accordance with the wire transfer instructions set forth in **<u>Schedule 2.3</u>** (the "**Wire Instructions**").  The Purchased Accounts are set forth on the attached spreadsheet.

Section 2.4    <u>Guarantee of LPG</u>.  If any file acquired by buyer shall fail to make a first payment, LPG will replace the file and bear any cost associated with such replacement.  The replacement file shall yield no less than the receivable of the failed file.  In addition, if any any calendar month a total of less than 80% of files make a cleared payment, LPG shall replace any non-performing files in such month so that the performance of the file

DocuSign Envelope ID: C0957CDB-79FC-445B-A442-67DCE6ACA0BF

package as a whole equals 80%.  This guarantee shall continue until the completion of the 24th month following execution of this agreement.

## ARTICLE 3.
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Buyer, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 3.1    <u>Organization; Good Standing</u>.  The Seller is a Limited Liability Company duly organized, validly existing, and in good standing under the Laws of the State of Delaware and is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of the Business requires such qualification, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, results of operations, financial condition, or assets of the Seller.

Section 3.2    <u>Power and Authority</u>.  The Seller has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Seller, and the consummation by the Seller of the transactions contemplated hereby and thereby, have been duly approved by the Seller, and no further action is required on the part of the Seller to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Seller and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Seller, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 3.3    <u>Title to, and Sufficiency of, the Purchased Accounts</u>.  The Seller has and shall convey to the Buyer, at the Closing, good, valid, transferable, and marketable title to, or valid leasehold interests in, all of the Purchased Accounts, free and clear of all Liens.

Section 3.4    <u>Consents</u>.  The Seller is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of, any Governmental Body or Third Party, including a party to any assigned contract, in connection with the execution, delivery, and performance by the Seller of this Agreement or any of the Transaction Agreements to which it is a party or the consummation of the transactions contemplated hereby and thereby.

Section 3.5    <u>No Conflicts</u>. The execution and delivery by the Seller of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of any obligation, or loss of any benefit, under: (a) any provision of the Organizational Documents of the Seller; (b) any contract to which the Seller is party, including, without limitation, any assigned contract; or (c) any Law or order applicable to the Seller or any of the Purchased Accounts.

Section 3.6      <u>Compliance with Laws</u>.  The Seller has materially complied, and is now materially complying, with all Laws applicable to the ownership and use of the Purchased Accounts.

Section 3.7      <u>Legal Proceedings</u>.  There is no Action of any nature pending or, to the Knowledge of the Seller, threatened against or by the Seller: (a) relating to or affecting the Purchased Accounts or (b) that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement and the Transaction Agreements.  No event has occurred or circumstance exists that may give rise to, or serve as a basis for, any such Action.

Section 3.8      <u>Condition of Purchased Accounts</u>.  Each Purchased Account shall have received no less than one processed payment.

Section 3.9      <u>Confidentiality</u>.  Seller agrees and acknowledges that all Purchased Accounts, the pricing, and all terms set forth in this Agreement are confidential (together, the "**Confidential Information**").  Seller will at all times keep the  Confidential Information in confidence and trust.  Seller will not, without the prior written consent of an authorized officer of Buyer, (A) copy, use or disclose any Confidential Information, (B) deliver or disclose any Confidential Information to any person or entity outside the Buyer, or (C) use the Confidential Information for Seller's own use or use it to the detriment of Buyer.  Notwithstanding the foregoing, Seller may, without consent, use the Confidential Information and disclose and deliver same to Seller's employees or agents, if applicable, who have a need to know, provided such employees or agents have entered into written agreements approved by Buyer and containing provisions at least as restrictive as these provisions.  Seller agrees that violation of this Section 3.9.  The Parties agree that the disclosure of the Confidential Information in violation of this Agreement may cause the Buyer irreparable harm and that any breach or threatened breach by the Seller entitles Buyer to seek injunctive relief, in addition to any other legal or equitable remedies available to it, in any court of competent jurisdiction.

**ARTICLE 4.**
**REPRESENTATIONS AND WARRANTIES OF THE BUYER**

The Buyer represents and warrants to the Seller, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 4.1      <u>Organization; Good Standing</u>.  The Buyer is a limited liability company, duly organized, validly existing, and in good standing under the Laws of the State of Florida.

Section 4.2      <u>Power and Authority</u>.  The Buyer has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Buyer, and the consummation by the Buyer of the transactions contemplated hereby and thereby, have been duly approved by the Buyer, and no further action is required on the part of the Buyer to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Buyer and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Buyer, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 4.3    <u>No Conflicts</u>.  The execution and delivery by the Buyer of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of, any obligation, or loss of any benefit under: (a) any provision of the Buyer's Organizational Documents; (b) any contract to which the Buyer is party, other than the Buyer Representation Agreement; or (c) any Law applicable to the Buyer.

Section 4.4    <u>Sufficient Funds</u>.  The Buyer has, and will have, sufficient funds available to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement and the Transaction Agreements.

## ARTICLE 5.
## COVENANTS

Section 5.1    <u>Appropriate Actions</u>.

(a)    <u>General</u>.  Each of the Parties shall use commercially reasonable efforts to take all actions necessary to consummate the transactions contemplated by this Agreement as soon as reasonably practicable after the execution of this Agreement, including taking all actions necessary to comply promptly with all applicable Laws that may be imposed on it or any of its Affiliates with respect to the Closing.

## ARTICLE 6.
## CLOSING

Section 6.1    <u>Closing</u>.  The closing of the transactions contemplated by this Agreement (the "**Closing**") will take place upon the execution and delivery of this Agreement or at such other time, date, and place as the Parties may agree in writing.  The date on which the Closing occurs is hereinafter referred to as the "**Closing Date**." The Parties agree that the Closing may take place by the electronic exchange of executed counterpart documents and the electronic transfer of funds.

Section 6.2    <u>Closing Deliverables of the Seller</u>.  At or prior to the Closing, Seller shall deliver to Buyer any of the following if requested by Buyer:  (i) a bill of sale and assignment and assumption agreement substantially in the form attached hereto as **<u>Exhibit B</u>** (the "**Bill of Sale and Assignment and Assumption Agreement**"), duly executed by the Seller, effecting the transfer and assignment to, and assumption by, the Buyer of the Purchased Accounts; and (ii) such other customary instruments of transfer, assumption, filings, or documents, in form and substance reasonably satisfactory to the Buyer, as may be required to give effect to this Agreement.

Section 6.3    <u>Closing Deliverables of the Buyer</u>.  At or prior to the Closing, the Seller shall have received the following: (i) the Upfront Cash Payment; and (ii) if requested pursuant to <u>Section 6.2</u>, the Bill of Sale and Assignment and Assumption Agreement, duly executed by the Buyer.

Section 6.4    <u>Indemnification by the Seller</u>.  Subject to the limitations set forth in this <u>Article 6</u>, the Seller agrees to indemnify and hold harmless the Buyer, including its shareholders, members, directors, managers, officers, employees, Affiliates, and agents (each, a "**Buyer Indemnified Party**" and, collectively, the "**Buyer Indemnified Parties**"), against all claims, losses, Liabilities, damages, deficiencies, diminutions in value, costs, interest, awards, judgments, penalties, and expenses, including reasonable out-of-pocket attorneys' and consultants' fees and expenses and including any such reasonable expenses incurred in connection with investigating, defending against, or settling any of the foregoing (each, a "**Loss**" and, collectively, the "**Losses**") paid, suffered, incurred, sustained, or accrued by any Buyer Indemnified Party, directly or indirectly, as a result of,

DocuSign Envelope ID: C0957CDB-76EC-445B-A442-67DCE6AC10BF

arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Seller contained in this Agreement, (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Seller pursuant to this Agreement, (c) any Excluded Asset or any Excluded Liability.

Section 6.5    <u>Indemnification by the Buyer</u>.  Subject to the limitations set forth in this <u>Article 6</u>, the Buyer agrees to indemnify and hold harmless the Seller, including its Affiliates and agents (each, a "**Seller Indemnified Party**" and, collectively, the "**Seller Indemnified Parties**"), against all Losses paid, suffered, incurred, sustained, or accrued by any Seller Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Buyer contained in this Agreement; (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Buyer pursuant to this Agreement; (c) any event or occurance related to the Purchased Accounts or Buyer occurring after the Closing; or (d) resulting from any omissions or misstatements made by Buyer to investors or potential investors.

Section 6.6    <u>Indemnification Procedures</u>.

(a)    <u>No Restraints</u>.  Promptly following receipt by an Indemnified Party of notice by a Third Party (including any Governmental Body) of any complaint, dispute, or claim or the commencement of any audit, investigation, Action or proceeding with respect to which such Indemnified Party may be entitled to indemnification pursuant hereto (a "**Third-party Claim**"), such Indemnified Party shall provide written notice thereof to the Indemnifying Party, <u>provided</u>, <u>however</u>, that the failure to so notify the Indemnifying Party shall relieve the Indemnifying Party from Liability hereunder with respect to such Third-party Claim only if, and only to the extent that, such failure to so notify the Indemnifying Party results in the forfeiture by the Indemnifying Party of rights and defenses otherwise available to the Indemnifying Party with respect to such Third-party Claim.  The Indemnifying Party shall have the right, upon written notice delivered to the Indemnified Party within twenty days thereafter assuming full responsibility for any Losses resulting from such Third-party Claim, to assume the defense of such Third-party Claim, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the fees and disbursements of such counsel; <u>provided</u>, <u>however</u>, if the Indemnifying Party declines or fails to assume the defense of such Third-party Claim on the terms provided above or to employ counsel reasonably satisfactory to the Indemnified Party, in either case within such twenty day period, then any Losses shall include the reasonable fees and disbursements of counsel for the Indemnified Party as incurred.  In any Third-party Claim for which indemnification is being sought hereunder the Indemnified Party or the Indemnifying Party, whichever is not assuming the defense of such Third-party Claim, shall have the right to participate in such matter and to retain its own counsel at such Party's own expense.  The Indemnifying Party or the Indemnified Party (as the case may be) shall at all times use reasonable efforts to keep the Indemnifying Party or Indemnified Party (as the case may be) reasonably apprised of the status of the defense of any matter, the defense of which it is maintaining, and to cooperate in good faith with each other with respect to the defense of any such matter.

(b)    No Indemnified Party may settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder without the prior written consent of the Indemnifying Party (which may not be unreasonably withheld or delayed), unless (i) the Indemnifying Party fails to assume and maintain the defense of such Third-party Claim or (ii) such settlement, compromise, or consent includes an unconditional release of the Indemnifying Party and its officers, directors, employees and Affiliates from all Liability arising out of, or related to, such Third-party Claim.  An Indemnifying Party may not, without the prior written consent of the Indemnified Party, settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder unless such settlement, compromise, or consent (A) includes an unconditional release of the Indemnified Party and its officers, directors, employees, and Affiliates from all Liability arising out of, or related to, such Third-party

DocuSign Envelope ID: C0957CDB-79EC-145B-A442-67DCE60CA0BF

Claim, (B) does not contain any admission or statement suggesting any wrongdoing or Liability on behalf of the Indemnified Party, and (C) does not contain any equitable order, judgment, or term that in any manner affects, restrains, or interferes with the business of the Indemnified Party or any of the Indemnified Party's Affiliates.

(c)    If an Indemnified Party claims a right to payment pursuant hereto with respect to any matter not involving a Third-party Claim (a "**Direct Claim**"), such Indemnified Party shall send written notice of such claim to the appropriate Indemnifying Party (each, a "**Notice of Claim**"). Such Notice of Claim shall specify the basis for such Direct Claim. The failure by any Indemnified Party so to notify the Indemnifying Party shall not relieve the Indemnifying Party from any Liability that it may have to such Indemnified Party with respect to any Direct Claim made pursuant to this Section 6.6(c). If the Indemnifying Party does not notify the Indemnified Party within thirty days following its receipt of such Notice of Claim that the Indemnifying Party disputes its Liability to the Indemnified Party under this Article 6 or the amount thereof, the Direct Claim specified by the Indemnified Party in such Notice of Claim shall be conclusively deemed a Liability of the Indemnifying Party under this Article 6, and the Indemnifying Party shall pay the amount of such Liability to the Indemnified Party on demand or, in the case of any Notice of Claim in which the amount of the Direct Claim (or any portion of the Direct Claim) is estimated, on such later date when the amount of such Direct Claim (or such portion of such Direct Claim) becomes finally determined. In the event that the Indemnifying Party has timely disputed its Liability with respect to such Direct Claim as provided above, as promptly as possible, such Indemnified Party and the appropriate Indemnifying Party shall establish the merits and amount of such Direct Claim (by mutual agreement, litigation, arbitration or otherwise) and, within five business days following the final determination of the merits and amount of such Direct Claim, the Indemnifying Party shall pay to the Indemnified Party an amount equal to such Direct Claim as determined hereunder.

### ARTICLE 7.
### MISCELLANEOUS

Section 7.1    Entire Agreement; Amendment. This Agreement and the Transaction Agreements (including the exhibits hereto and thereto and the documents referred to therein) constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they related in any way to the subject matter hereof. This Agreement may be amended with the written consent of each of the Parties or any successor thereto by execution of an instrument in writing.

Section 7.2    Waivers. The rights and remedies of the Parties to this Agreement are cumulative and not alternative. To the maximum extent permitted by applicable Law: (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Parties; (b) no waiver that may be given by a Party will be applicable except in the specific instance for what it is given; and (c) no notice to, or demand on, one Party will be deemed to be a waiver of any obligation of such Party or of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the Transaction Agreements.

Section 7.3    Notices. All notices and other communications required or permitted hereunder shall be made to the address of a Party listed on the signature page to this Agreement and shall be (a) in writing, (b) effective when given, and (c), in any event, deemed to be given upon receipt or, if earlier: (i) upon delivery, if delivered by hand; (ii) two business days after deposit with FedEx Express or similar recognized international overnight courier service, freight prepaid; or (iii) one business day after facsimile or electronic mail transmission. A Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties advance written notice pursuant to the provisions above.

DocuSign Envelope ID: C0957CDB-79EC-4A5B-A442-67DCE60CA0BF

Section 7.4    <u>Successors and Assigns</u>.  This Agreement shall be binding upon, and inure to the benefit of, the Parties named herein and their respective successors and permitted assigns.  Neither this Agreement nor any rights or obligations of a Party hereunder shall be assigned by a Party (unless to an Affiliate of such Party) without the prior written consent of the other Parties.  This Agreement will be binding upon any permitted assignee of any Party.  No assignment shall have the effect of relieving any Party to this Agreement of any of its obligations hereunder.

Section 7.5    <u>Public Disclosure</u>.  Except as may be required by Law, the Seller shall not issue any statement or communication to any Third Party (other than its respective agents) regarding the subject matter of this Agreement or the transactions contemplated hereby, including, if applicable, the termination of this Agreement and the reasons therefor, without the prior written consent of the Buyer.

Section 7.6    <u>Expenses and Fees</u>.  Whether or not the Closing occurs, all fees and expenses incurred in connection with this transactions contemplated by this Agreement, including all legal, accounting, financial advisory, consulting and all other fees and expenses of Third Parties incurred by a Party in connection with the negotiation and effectuation of the terms and conditions of this Agreement and the transactions contemplated hereby, shall be the obligation of the respective Party incurring such fees and expenses.

Section 7.7    <u>Specific Performance</u>.  The Parties agree that irreparable damage would occur if any provision of this Agreement was not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled hereunder, at Law or in equity.

Section 7.8    <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

Section 7.9    <u>Governing Law</u>.  This Agreement shall, in all respects, be construed in accordance with, and governed by, the Laws of the State of California without regard to conflict of Laws principles.

Section 7.10    <u>Severability</u>.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

Section 7.11    <u>Construction</u>.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

DocuSign Envelope ID: C0957CDB-79EC-445B-A442-67DCE6AСA0BF

Case 8:24-ap-01017-SC    Doc 10-1    Filed 03/28/24    Entered 03/28/24 13:37:36    Desc
Exhibit to Amended Complaint    Page 95 of 196

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Agreement Date.

**BUYER:**

**The Litigation Practice Group P.C.**

By: _Daniel S March_
Name: Daniel S March
Title: Managing Shareholder

**SELLER:**

**New Horizon Finance LLC**

By: _Caleb Wickman_
Name: Caleb Wickman
Title: Owner

**APPROVAL OF ASSIGNMENT AND GUARANTEE**

The assignment of the Purchased Accounts set forth in this Agreement as well as the guarantee included therein is hereby approved, and with respect to the Purchased Accounts, the Buyer shall have all rights of Buyer as set forth in this agreement.

**The Litigation Practice Group P.C.**

By: _Daniel S March_
Name: Daniel S. March
Title: Managing Shareholder

*[Signature Page to Accounts Receivable Purchase Agreement]*

DocuSign Envelope ID: C0957CDB-79EC-4A5B-A442-67DCE6ACA0BF

**EXHIBIT A**

**DEFINITIONS**

As used in this Agreement, the following terms have the following meanings (terms defined in the singular to have a correlative meaning when used in the plural and vice versa).

(a)    "**Action**" shall mean any civil, criminal, or administrative action, claim, suit, demand, charge, citation, reexamination, opposition, interference, decree, injunction, mediation, hearing, notice of violation, demand letter, litigation, proceeding, labor dispute, arbitral action, governmental or other audit, inquiry, criminal prosecution, investigation, unfair labor practice charge, or complaint.

(b)    "**Agreement**" shall have the meaning set forth in the preamble to this Agreement.

(c)    "**Agreement Date**" shall have the meaning set forth in the preamble to this Agreement.

(d)    "**Affiliate**" shall mean (i) with respect to any non-natural Person, any Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person and (ii), with respect to any individual, (A) family members of such individual, by blood, adoption, or marriage, (B) such individual's spouse or ex-spouse and (C) any Person that is directly or indirectly under the control of any of the foregoing individuals.  For purposes of this definition, "control" (including with correlative meanings, the terms "controlling," "controlled by," and under "common control with") means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

(e)    "**Bill of Sale and Assignment and Assumption Agreement**" shall have the meaning set forth in Section 6.2.

(f)    "**Business**" shall mean the business of the Seller as conducted on the Agreement Date.

(g)    "**Buyer**" shall have the meaning set forth in the preamble to this Agreement.

(h)    "**Buyer Indemnified Parties**" shall have the meaning set forth in Section 6.4.

(i)    "**Closing**" shall have the meaning set forth in Section 6.1.

(j)    "**Closing Date**" shall have the meaning set forth in Section 6.1.

(k)    "**Direct Claim**" shall have the meaning set forth in Section 6.6(c).

(l)    "**Excluded Assets**" shall have the meaning set forth in Section 2.1.

(m)    "**Excluded Liabilities**" shall have the meaning set forth in Section 2.2.

(n)    "**Governmental Body**" shall mean any: (i) nation, province, state, county, city, town, village, district, or other jurisdiction of any nature; (ii) federal, provincial, state, local, municipal, foreign, or other government; (iii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); (iv) multi-national organization or body; or (v) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

DocuSign Envelope ID: C9957CDB-79FC-445B-A442-67DCE6ACA0BF

(o)    "**Indebtedness**" means, without duplication and with respect to the Seller, all: (i) indebtedness for borrowed money; (ii) obligations for the deferred purchase price of property or services, (iii) long or short-term obligations evidenced by notes, bonds, debentures or other similar instruments; (iv) obligations under any interest rate, currency swap, or other hedging agreement or arrangement; (v) capital lease obligations; (vi) reimbursement obligations under any letter of credit, banker's acceptance or similar credit transactions; (vii) guarantees made by the Seller on behalf of any third party in respect of obligations of the kind referred to in the foregoing clauses (i) through (vi); and (viii) any unpaid interest, prepayment penalties, premiums, costs and fees that would arise or become due as a result of the prepayment of any of the obligations referred to in the foregoing clauses (i) through (vii).

(p)    "**Indemnified Party**" shall mean a Buyer Indemnified Party or a Seller Indemnified Party, as the case may be, making a claim for indemnification under Article 6.

(q)    "**Indemnifying Party**" shall mean a Party against whom a claim for indemnification is asserted under Article 6.

(r)    "**Knowledge**" shall mean, with respect to the Seller, the actual or constructive knowledge of all facts relevant to this transaction and the transacting parties, after due inquiry.

(s)    "**Law**" shall mean any law, statute, ordinance, regulation, rule, code, notice requirement, court decision, or agency guideline, of any foreign, federal, state, or local Governmental Body.

(t)    "**Liabilities**" shall mean any direct or indirect liability, Indebtedness, obligation, commitment, expense, claim, deficiency, guaranty, or endorsement of, or by, any Person of any type, known or unknown, and whether accrued, absolute, contingent, matured, unmatured, determined or undeterminable, on- or off-balance sheet, or other.

(u)    "**Lien**" shall mean any mortgage, pledge, lien, charge, claim, security interest, adverse claims of ownership or use, restrictions on transfer, defect of title, or other encumbrance of any sort.

(v)    "**Losses**" shall have the meaning set forth in Section 6.4.

(w)    "**Notice of Claim**" shall have the meaning set forth in Section 6.6(c).

(x)    "**Organizational Documents**" shall mean, with respect to a Person, the charter, bylaws, limited liability company agreement, and other organizational documents of such Person, in each case, as amended.

(y)    "**Party**" or "**Parties**" shall have the meaning set forth in the preamble to this Agreement.

(z)    "**Permitted Liens**" shall mean (i) Liens for Taxes not yet delinquent or being contested in good faith by appropriate proceedings, (ii) statutory Liens (including materialmen's, warehousemen's, mechanic's, repairmen's, landlord's, and other similar Liens) arising in the ordinary course of business securing payments not yet delinquent or being contested in good faith by appropriate proceedings, and (iii) restrictive covenants, easements, and defects, imperfections or irregularities of title, if any, of a nature that do not materially and adversely affect the assets or properties subject thereto.

(aa)    "**Person**" shall mean any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, Governmental Body, or other entity.

DocuSign Envelope ID: C0957CDB-79EC-445B-A442-67DCE6ACA0BF

(bb)　　"**Purchase Price**" shall have the meaning set forth in <u>Section 2.3</u>.

(cc)　　"**Purchased Accounts**" shall have the meaning set forth in the Recitals.

(dd)　　"**Seller**" shall have the meaning set forth in the preamble to this Agreement.

(ee)　　"**Seller Indemnified Parties**" shall have the meaning set forth in <u>Section 6.5</u>.

(ff)　　"**Tax**" or "**Taxes**" shall mean any U.S. federal, state, local or non-U.S. income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, escheat, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

(gg)　　"**Tax Returns**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(hh)　　"**Third Party**" or "**Third Parties**" shall mean any Person other than the Parties or their respective Affiliates.

(ii)　　"**Third-party Claim**" shall have the meaning set forth in <u>Section 6.6(a)</u>.

(jj)　　"**Transaction Agreements**" shall mean the Bill of Sale and Assignment and Assumption Agreement, and each other agreement, instrument, and/or certificate contemplated by this Agreement or such other agreements to be executed in connection with the transactions contemplated hereby or thereby.

(kk)　　"**Upfront Cash Payment**" shall have the meaning set forth in <u>Section 2.3</u>.

(ll)　　"**Wire Instructions**" shall have the meaning set forth in <u>Section 2.3</u>.

DocuSign Envelope ID: C095TCDB-79EC-445B-A442-67DCE6ACA0BF

**EXHIBIT B**

**FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT**

THIS BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this **"Agreement"**), is made by and between **Buyer**, and **Seller**. Each of the Seller and the Buyer are sometimes referred to herein, individually, as a **"Party"** and, collectively, as the **"Parties."**

WHEREAS, the Buyer and the Seller have entered into that certain Accounts Receivable Purchase Agreement, of even date herewith (the **"Purchase Agreement"**), pursuant to which the Seller has agreed to sell, assign, transfer, and deliver to the Buyer, and the Buyer has agreed to purchase, acquire, and accept from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.    <u>Defined Terms</u>. Capitalized terms used but not otherwise defined in this Agreement shall have the meanings assigned to such terms in the Purchase Agreement.

2.    <u>Sale of Purchased Accounts; Assignment</u>. The Seller hereby sells, assigns, transfers, and delivers to the Buyer, and the Buyer hereby purchases, acquires, and accepts from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

3.    <u>Further Assurances</u>. Each of the Parties agrees, from time to time, at the request of the any other Party, to execute and deliver such other instruments of conveyance, power of attorney, sale, transfer, or assignment and take such other actions as such other Party may reasonably request in order to more effectively consummate the transactions contemplated by this Agreement.

4.    <u>Terms of the Purchase Agreement</u>. This Agreement is intended to evidence the consummation of the transactions contemplated by the Purchase Agreement and is subject to the terms and conditions set forth in the Purchase Agreement. The terms of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants, agreements, and indemnities relating to the Purchased Accounts are incorporated herein by this reference. The Parties acknowledge and agree that the representations, warranties, covenants, agreements, and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

5.    <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

*[Remainder of page intentionally left blank.]*

DocuSign Envelope ID: C0957CDB-7GFC-445B-A442-67DCE6ACA0BF

Case 8:24-ap-01017-SC    Doc 10-1    Filed 03/28/24    Entered 03/28/24 13:37:36    Desc
Exhibit to Amended Complaint    Page 100 of 196

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**BUYER: The Litigation Practice Group P.C.**

By: _____
Name: Daniel S. March
Title: Managing Shareholder

**SELLER:**

**New Horizon Finance LLC**

By: _____
Name: Caleb Wickman
Title: Owner

DocuSign Envelope ID: C0957CDB-7GEC-445B-A442-67DCE6ACA0BF

Case 8:24-ap-01017-SC    Doc 10-1    Filed 03/28/24    Entered 03/28/24 13:37:36    Desc
Exhibit to Amended Complaint    Page 101 of 196

**Schedule 2.3**
**Wire Instructions**

<u>**$177,586.78**</u>

**Account Holder Name: New Horizon Finance LLC**

**Address: 8101 Biscayne Blvd, #506 Miami, FL 33138**

**Routing Number:** ██████████

**Account Number:** ██████████

# EXHIBIT H

DocuSign Envelope ID: 9DF736D2-6056-43FC-AEA8-B814D70B1651

Case 8:24-ap-01017-SC    Doc 10-1    Filed 03/28/24    Entered 03/28/24 13:37:36    Desc
Exhibit to Amended Complaint    Page 103 of 196

### ACCOUNTS RECEIVABLE PURCHASE AGREEMENT

This ACCOUNTS RECEIVABLE PURCHASE AGREEMENT (this "**Agreement**") is made as of January 6, 2023 (the "**Agreement Date**"), by and between The Litigation Practice Group PC (collectively the "**Buyer**"), New Horizon Finance LLC (the "**Seller" or "LPG**", and together with the Buyer, the "**Parties**"), and The Litigation Practice Group PC ("LPG").

### RECITALS

WHEREAS, in the regular course of business, the Seller originates account receivables from **LPG** in connection with client on-boarding services provided by the Seller to LPG and its affiliates;

WHEREAS, the account receivables represent an obligation of various clients to pay Seller for services that Seller previously provided, but which LPG shall provide from the date of execution of this Agreement;

WHEREAS, the Seller desires to sell, assign, transfer, and deliver to the Buyer, and the Buyer desires to purchase, acquire, and accept from the Seller, certain of these account receivables (the "**Purchased Accounts**").

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, the Parties, intending to be legally bound, agree as follows:

### ARTICLE 1.
### DEFINITIONS

Section 1.1    <u>Certain Definitions</u>.  Certain defined terms used in this Agreement are set forth on **<u>Exhibit A</u>**.

### ARTICLE 2.
### ASSIGNMENT AND TRANSFER AND CONSIDERATION

Section 2.1    <u>Assignment of the Purchased Accounts to the Buyer</u>.  Upon execution of this Agreement and subject to the terms and conditions set forth herein, the Seller shall sell, assign, transfer, and deliver, and the Buyer shall purchase, acquire, and accept from the Seller, all of the Seller's right, title, and interest in and to the Purchased Accounts set forth on the spreadsheet attached to this Agreement, free and clear of any Liens.  Other than the Purchased Accounts, the Buyer shall not purchase or acquire any other assets of the Seller (collectively, the "**Excluded Assets**").

Section 2.2    <u>No Assumption of Liabilities</u>.  The Buyer shall not assume any Liabilities of the Seller of any kind, whether known or unknown, contingent, matured, or otherwise, whether currently existing or hereinafter created (collectively, the "**Excluded Liabilities**").

Section 2.3    <u>Payment of Purchase Price</u>.  Buyer shall pay $253,251.60 (total purchase price) for the Purchased Accounts (the "**Purchase Price**") by wire transfer of immediately available funds in accordance with the wire transfer instructions set forth in **<u>Schedule 2.3</u>** (the "**Wire Instructions**").  The Purchased Accounts are set forth on the attached spreadsheet.

Section 2.4    <u>Guarantee of LPG</u>.  If any file acquired by buyer shall fail to make a first payment, LPG will replace the file and bear any cost associated with such replacement.  The replacement file shall yield no less than the receivable of the failed file.  In addition, if any any calendar month a total of less than 80% of files make a cleared payment, LPG shall replace any non-performing files in such month so that the performance of the file

DocuSign Envelope ID: 9DF736D2-6056-43FC-AEA8-8814D70B1651

package as a whole equals 80%. This guarantee shall continue until the completion of the 24th month following execution of this agreement.

## ARTICLE 3.
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Buyer, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 3.1    <u>Organization; Good Standing</u>. The Seller is a Limited Liability Company duly organized, validly existing, and in good standing under the Laws of the State of Delaware and is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of the Business requires such qualification, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, results of operations, financial condition, or assets of the Seller.

Section 3.2    <u>Power and Authority</u>. The Seller has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder. The execution and delivery of this Agreement and the Transaction Agreements by the Seller, and the consummation by the Seller of the transactions contemplated hereby and thereby, have been duly approved by the Seller, and no further action is required on the part of the Seller to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby. This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Seller and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Seller, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 3.3    <u>Title to, and Sufficiency of, the Purchased Accounts</u>. The Seller has and shall convey to the Buyer, at the Closing, good, valid, transferable, and marketable title to, or valid leasehold interests in, all of the Purchased Accounts, free and clear of all Liens.

Section 3.4    <u>Consents</u>. The Seller is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of, any Governmental Body or Third Party, including a party to any assigned contract, in connection with the execution, delivery, and performance by the Seller of this Agreement or any of the Transaction Agreements to which it is a party or the consummation of the transactions contemplated hereby and thereby.

Section 3.5    <u>No Conflicts</u>. The execution and delivery by the Seller of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of any obligation, or loss of any benefit, under: (a) any provision of the Organizational Documents of the Seller; (b) any contract to which the Seller is party, including, without limitation, any assigned contract; or (c) any Law or order applicable to the Seller or any of the Purchased Accounts.

DocuSign Envelope ID: 9DEF36D2-6056-43FC-AEA8-B814D70B1651

Section 3.6    <u>Compliance with Laws</u>.  The Seller has materially complied, and is now materially complying, with all Laws applicable to the ownership and use of the Purchased Accounts.

Section 3.7    <u>Legal Proceedings</u>.  There is no Action of any nature pending or, to the Knowledge of the Seller, threatened against or by the Seller: (a) relating to or affecting the Purchased Accounts or (b) that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement and the Transaction Agreements.  No event has occurred or circumstance exists that may give rise to, or serve as a basis for, any such Action.

Section 3.8    <u>Condition of Purchased Accounts</u>.  Each Purchased Account shall have received no less than one processed payment.

Section 3.9    <u>Confidentiality</u>.  Seller agrees and acknowledges that all Purchased Accounts, the pricing, and all terms set forth in this Agreement are confidential (together, the "**Confidential Information**").  Seller will at all times keep the  Confidential Information in confidence and trust.  Seller will not, without the prior written consent of an authorized officer of Buyer, (A) copy, use or disclose any Confidential Information, (B) deliver or disclose any Confidential Information to any person or entity outside the Buyer, or (C) use the Confidential Information for Seller's own use or use it to the detriment of Buyer.  Notwithstanding the foregoing, Seller may, without consent, use the Confidential Information and disclose and deliver same to Seller's employees or agents, if applicable, who have a need to know, provided such employees or agents have entered into written agreements approved by Buyer and containing provisions at least as restrictive as these provisions.  Seller agrees that violation of this Section 3.9.  The Parties agree that the disclosure of the Confidential Information in violation of this Agreement may cause the Buyer irreparable harm and that any breach or threatened breach by the Seller entitles Buyer to seek injunctive relief, in addition to any other legal or equitable remedies available to it, in any court of competent jurisdiction.

## ARTICLE 4.
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Seller, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 4.1    <u>Organization; Good Standing</u>.  The Buyer is a limited liability company, duly organized, validly existing, and in good standing under the Laws of the State of Florida.

Section 4.2    <u>Power and Authority</u>.  The Buyer has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Buyer, and the consummation by the Buyer of the transactions contemplated hereby and thereby, have been duly approved by the Buyer, and no further action is required on the part of the Buyer to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Buyer and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Buyer, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

DocuSign Envelope ID: 9DE736D2-6956-43EC-AEA8-8814D7081651

Section 4.3    <u>No Conflicts</u>.  The execution and delivery by the Buyer of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of, any obligation, or loss of any benefit under: (a) any provision of the Buyer's Organizational Documents; (b) any contract to which the Buyer is party, other than the Buyer Representation Agreement; or (c) any Law applicable to the Buyer.

Section 4.4    <u>Sufficient Funds</u>.  The Buyer has, and will have, sufficient funds available to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement and the Transaction Agreements.

## ARTICLE 5.
## COVENANTS

Section 5.1    <u>Appropriate Actions</u>.

(a)    <u>General</u>.  Each of the Parties shall use commercially reasonable efforts to take all actions necessary to consummate the transactions contemplated by this Agreement as soon as reasonably practicable after the execution of this Agreement, including taking all actions necessary to comply promptly with all applicable Laws that may be imposed on it or any of its Affiliates with respect to the Closing.

## ARTICLE 6.
## CLOSING

Section 6.1    <u>Closing</u>.  The closing of the transactions contemplated by this Agreement (the "**Closing**") will take place upon the execution and delivery of this Agreement or at such other time, date, and place as the Parties may agree in writing.  The date on which the Closing occurs is hereinafter referred to as the "**Closing Date**." The Parties agree that the Closing may take place by the electronic exchange of executed counterpart documents and the electronic transfer of funds.

Section 6.2    <u>Closing Deliverables of the Seller</u>.  At or prior to the Closing, Seller shall deliver to Buyer any of the following if requested by Buyer:  (i) a bill of sale and assignment and assumption agreement substantially in the form attached hereto as **<u>Exhibit B</u>** (the "**Bill of Sale and Assignment and Assumption Agreement**"), duly executed by the Seller, effecting the transfer and assignment to, and assumption by, the Buyer of the Purchased Accounts; and (ii) such other customary instruments of transfer, assumption, filings, or documents, in form and substance reasonably satisfactory to the Buyer, as may be required to give effect to this Agreement.

Section 6.3    <u>Closing Deliverables of the Buyer</u>.  At or prior to the Closing, the Seller shall have received the following: (i) the Upfront Cash Payment; and (ii) if requested pursuant to <u>Section 6.2</u>, the Bill of Sale and Assignment and Assumption Agreement, duly executed by the Buyer.

Section 6.4    <u>Indemnification by the Seller</u>.  Subject to the limitations set forth in this <u>Article 6</u>, the Seller agrees to indemnify and hold harmless the Buyer, including its shareholders, members, directors, managers, officers, employees, Affiliates, and agents (each, a "**Buyer Indemnified Party**" and, collectively, the "**Buyer Indemnified Parties**"), against all claims, losses, Liabilities, damages, deficiencies, diminutions in value, costs, interest, awards, judgments, penalties, and expenses, including reasonable out-of-pocket attorneys' and consultants' fees and expenses and including any such reasonable expenses incurred in connection with investigating, defending against, or settling any of the foregoing (each, a "**Loss**" and, collectively, the "**Losses**") paid, suffered, incurred, sustained, or accrued by any Buyer Indemnified Party, directly or indirectly, as a result of,

DocuSign Envelope ID: 9DEF36D2-6956-43EC-AEA8-B814D7081651

arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Seller contained in this Agreement, (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Seller pursuant to this Agreement, (c) any Excluded Asset or any Excluded Liability.

Section 6.5    <u>Indemnification by the Buyer</u>.  Subject to the limitations set forth in this <u>Article 6</u>, the Buyer agrees to indemnify and hold harmless the Seller, including its Affiliates and agents (each, a "**Seller Indemnified Party**" and, collectively, the "**Seller Indemnified Parties**"), against all Losses paid, suffered, incurred, sustained, or accrued by any Seller Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Buyer contained in this Agreement; (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Buyer pursuant to this Agreement; (c) any event or occurance related to the Purchased Accounts or Buyer occurring after the Closing; or (d) resulting from any omissions or misstatements made by Buyer to investors or potential investors.

Section 6.6    <u>Indemnification Procedures</u>.

(a)    <u>No Restraints</u>.  Promptly following receipt by an Indemnified Party of notice by a Third Party (including any Governmental Body) of any complaint, dispute, or claim or the commencement of any audit, investigation, Action or proceeding with respect to which such Indemnified Party may be entitled to indemnification pursuant hereto (a "**Third-party Claim**"), such Indemnified Party shall provide written notice thereof to the Indemnifying Party, <u>provided</u>, <u>however</u>, that the failure to so notify the Indemnifying Party shall relieve the Indemnifying Party from Liability hereunder with respect to such Third-party Claim only if, and only to the extent that, such failure to so notify the Indemnifying Party results in the forfeiture by the Indemnifying Party of rights and defenses otherwise available to the Indemnifying Party with respect to such Third-party Claim.  The Indemnifying Party shall have the right, upon written notice delivered to the Indemnified Party within twenty days thereafter assuming full responsibility for any Losses resulting from such Third-party Claim, to assume the defense of such Third-party Claim, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the fees and disbursements of such counsel; <u>provided</u>, <u>however</u>, if the Indemnifying Party declines or fails to assume the defense of such Third-party Claim on the terms provided above or to employ counsel reasonably satisfactory to the Indemnified Party, in either case within such twenty day period, then any Losses shall include the reasonable fees and disbursements of counsel for the Indemnified Party as incurred.  In any Third-party Claim for which indemnification is being sought hereunder the Indemnified Party or the Indemnifying Party, whichever is not assuming the defense of such Third-party Claim, shall have the right to participate in such matter and to retain its own counsel at such Party's own expense.  The Indemnifying Party or the Indemnified Party (as the case may be) shall at all times use reasonable efforts to keep the Indemnifying Party or Indemnified Party (as the case may be) reasonably apprised of the status of the defense of any matter, the defense of which it is maintaining, and to cooperate in good faith with each other with respect to the defense of any such matter.

(b)    No Indemnified Party may settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder without the prior written consent of the Indemnifying Party (which may not be unreasonably withheld or delayed), unless (i) the Indemnifying Party fails to assume and maintain the defense of such Third-party Claim or (ii) such settlement, compromise, or consent includes an unconditional release of the Indemnifying Party and its officers, directors, employees and Affiliates from all Liability arising out of, or related to, such Third-party Claim.  An Indemnifying Party may not, without the prior written consent of the Indemnified Party, settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder unless such settlement, compromise, or consent (A) includes an unconditional release of the Indemnified Party and its officers, directors, employees, and Affiliates from all Liability arising out of, or related to, such Third-party

DocuSign Envelope ID: 9DE736D2-6956-43EC-AEA8-B814D70B1651

Claim, (B) does not contain any admission or statement suggesting any wrongdoing or Liability on behalf of the Indemnified Party, and (C) does not contain any equitable order, judgment, or term that in any manner affects, restrains, or interferes with the business of the Indemnified Party or any of the Indemnified Party's Affiliates.

(c)    If an Indemnified Party claims a right to payment pursuant hereto with respect to any matter not involving a Third-party Claim (a "**Direct Claim**"), such Indemnified Party shall send written notice of such claim to the appropriate Indemnifying Party (each, a "**Notice of Claim**").  Such Notice of Claim shall specify the basis for such Direct Claim.  The failure by any Indemnified Party so to notify the Indemnifying Party shall not relieve the Indemnifying Party from any Liability that it may have to such Indemnified Party with respect to any Direct Claim made pursuant to this Section 6.6(c).  If the Indemnifying Party does not notify the Indemnified Party within thirty days following its receipt of such Notice of Claim that the Indemnifying Party disputes its Liability to the Indemnified Party under this Article 6 or the amount thereof, the Direct Claim specified by the Indemnified Party in such Notice of Claim shall be conclusively deemed a Liability of the Indemnifying Party under this Article 6, and the Indemnifying Party shall pay the amount of such Liability to the Indemnified Party on demand or, in the case of any Notice of Claim in which the amount of the Direct Claim (or any portion of the Direct Claim) is estimated, on such later date when the amount of such Direct Claim (or such portion of such Direct Claim) becomes finally determined.  In the event that the Indemnifying Party has timely disputed its Liability with respect to such Direct Claim as provided above, as promptly as possible, such Indemnified Party and the appropriate Indemnifying Party shall establish the merits and amount of such Direct Claim (by mutual agreement, litigation, arbitration or otherwise) and, within five business days following the final determination of the merits and amount of such Direct Claim, the Indemnifying Party shall pay to the Indemnified Party an amount equal to such Direct Claim as determined hereunder.

### ARTICLE 7.
### MISCELLANEOUS

Section 7.1    Entire Agreement; Amendment.  This Agreement and the Transaction Agreements (including the exhibits hereto and thereto and the documents referred to therein) constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they related in any way to the subject matter hereof.  This Agreement may be amended with the written consent of each of the Parties or any successor thereto by execution of an instrument in writing.

Section 7.2    Waivers.  The rights and remedies of the Parties to this Agreement are cumulative and not alternative.  To the maximum extent permitted by applicable Law: (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Parties; (b) no waiver that may be given by a Party will be applicable except in the specific instance for what it is given; and (c) no notice to, or demand on, one Party will be deemed to be a waiver of any obligation of such Party or of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the Transaction Agreements.

Section 7.3    Notices.  All notices and other communications required or permitted hereunder shall be made to the address of a Party listed on the signature page to this Agreement and shall be (a) in writing, (b) effective when given, and (c), in any event, deemed to be given upon receipt or, if earlier: (i) upon delivery, if delivered by hand; (ii) two business days after deposit with FedEx Express or similar recognized international overnight courier service, freight prepaid; or (iii) one business day after facsimile or electronic mail transmission.  A Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties advance written notice pursuant to the provisions above.

DocuSign Envelope ID: 9DF736D2-6056-43FC-AEA8-B814D70B1651

Section 7.4    <u>Successors and Assigns</u>.  This Agreement shall be binding upon, and inure to the benefit of, the Parties named herein and their respective successors and permitted assigns.  Neither this Agreement nor any rights or obligations of a Party hereunder shall be assigned by a Party (unless to an Affiliate of such Party) without the prior written consent of the other Parties.  This Agreement will be binding upon any permitted assignee of any Party.  No assignment shall have the effect of relieving any Party to this Agreement of any of its obligations hereunder.

Section 7.5    <u>Public Disclosure</u>.  Except as may be required by Law, the Seller shall not issue any statement or communication to any Third Party (other than its respective agents) regarding the subject matter of this Agreement or the transactions contemplated hereby, including, if applicable, the termination of this Agreement and the reasons therefor, without the prior written consent of the Buyer.

Section 7.6    <u>Expenses and Fees</u>.  Whether or not the Closing occurs, all fees and expenses incurred in connection with this transactions contemplated by this Agreement, including all legal, accounting, financial advisory, consulting and all other fees and expenses of Third Parties incurred by a Party in connection with the negotiation and effectuation of the terms and conditions of this Agreement and the transactions contemplated hereby, shall be the obligation of the respective Party incurring such fees and expenses.

Section 7.7    <u>Specific Performance</u>.  The Parties agree that irreparable damage would occur if any provision of this Agreement was not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled hereunder, at Law or in equity.

Section 7.8    <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

Section 7.9    <u>Governing Law</u>.  This Agreement shall, in all respects, be construed in accordance with, and governed by, the Laws of the State of California without regard to conflict of Laws principles.

Section 7.10    <u>Severability</u>.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

Section 7.11    <u>Construction</u>.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

Case 8:24-ap-01017-SC    Doc 10-1    Filed 03/28/24    Entered 03/28/24 13:37:36    Desc
Exhibit to Amended Complaint    Page 110 of 196

DocuSign Envelope ID: 9DEF36D2-6056-43EC-AEA8-8814D70B1651

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Agreement Date.

**BUYER:**

**The Litigation Practice Group P.C.**

By: _Daniel S March_
_____
Name: Daniel S March
Title: Managing Shareholder

**SELLER:**

**New Horizon Finance LLC**

By: _Caleb Wickman_
_____
Name: Caleb Wickman
Title: Owner

**APPROVAL OF ASSIGNMENT AND GUARANTEE**

The assignment of the Purchased Accounts set forth in this Agreement as well as the guarantee included therein is hereby approved, and with respect to the Purchased Accounts, the Buyer shall have all rights of Buyer as set forth in this agreement.

**The Litigation Practice Group P.C.**

By: _Daniel S March_
_____
Name: Daniel S. March
Title: Managing Shareholder

*[Signature Page to Accounts Receivable Purchase Agreement]*

EXHIBIT H
Page 130

DocuSign Envelope ID: 9DF736D2-6056-43EC-AEA8-P814D70B1651

**EXHIBIT A**

**DEFINITIONS**

As used in this Agreement, the following terms have the following meanings (terms defined in the singular to have a correlative meaning when used in the plural and vice versa).

(a)    "**Action**" shall mean any civil, criminal, or administrative action, claim, suit, demand, charge, citation, reexamination, opposition, interference, decree, injunction, mediation, hearing, notice of violation, demand letter, litigation, proceeding, labor dispute, arbitral action, governmental or other audit, inquiry, criminal prosecution, investigation, unfair labor practice charge, or complaint.

(b)    "**Agreement**" shall have the meaning set forth in the preamble to this Agreement.

(c)    "**Agreement Date**" shall have the meaning set forth in the preamble to this Agreement.

(d)    "**Affiliate**" shall mean (i) with respect to any non-natural Person, any Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person and (ii), with respect to any individual, (A) family members of such individual, by blood, adoption, or marriage, (B) such individual's spouse or ex-spouse and (C) any Person that is directly or indirectly under the control of any of the foregoing individuals.  For purposes of this definition, "control" (including with correlative meanings, the terms "controlling," "controlled by," and under "common control with") means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

(e)    "**Bill of Sale and Assignment and Assumption Agreement**" shall have the meaning set forth in Section 6.2.

(f)    "**Business**" shall mean the business of the Seller as conducted on the Agreement Date.

(g)    "**Buyer**" shall have the meaning set forth in the preamble to this Agreement.

(h)    "**Buyer Indemnified Parties**" shall have the meaning set forth in Section 6.4.

(i)    "**Closing**" shall have the meaning set forth in Section 6.1.

(j)    "**Closing Date**" shall have the meaning set forth in Section 6.1.

(k)    "**Direct Claim**" shall have the meaning set forth in Section 6.6(c).

(l)    "**Excluded Assets**" shall have the meaning set forth in Section 2.1.

(m)    "**Excluded Liabilities**" shall have the meaning set forth in Section 2.2.

(n)    "**Governmental Body**" shall mean any: (i) nation, province, state, county, city, town, village, district, or other jurisdiction of any nature; (ii) federal, provincial, state, local, municipal, foreign, or other government; (iii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); (iv) multi-national organization or body; or (v) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

DocuSign Envelope ID: 9DE736D2-6056-43EC-AEA8-8814D70B1651

(o)    "**Indebtedness**" means, without duplication and with respect to the Seller, all: (i) indebtedness for borrowed money; (ii) obligations for the deferred purchase price of property or services, (iii) long or short-term obligations evidenced by notes, bonds, debentures or other similar instruments; (iv) obligations under any interest rate, currency swap, or other hedging agreement or arrangement; (v) capital lease obligations; (vi) reimbursement obligations under any letter of credit, banker's acceptance or similar credit transactions; (vii) guarantees made by the Seller on behalf of any third party in respect of obligations of the kind referred to in the foregoing clauses (i) through (vi); and (viii) any unpaid interest, prepayment penalties, premiums, costs and fees that would arise or become due as a result of the prepayment of any of the obligations referred to in the foregoing clauses (i) through (vii).

(p)    "**Indemnified Party**" shall mean a Buyer Indemnified Party or a Seller Indemnified Party, as the case may be, making a claim for indemnification under Article 6.

(q)    "**Indemnifying Party**" shall mean a Party against whom a claim for indemnification is asserted under Article 6.

(r)    "**Knowledge**" shall mean, with respect to the Seller, the actual or constructive knowledge of all facts relevant to this transaction and the transacting parties, after due inquiry.

(s)    "**Law**" shall mean any law, statute, ordinance, regulation, rule, code, notice requirement, court decision, or agency guideline, of any foreign, federal, state, or local Governmental Body.

(t)    "**Liabilities**" shall mean any direct or indirect liability, Indebtedness, obligation, commitment, expense, claim, deficiency, guaranty, or endorsement of, or by, any Person of any type, known or unknown, and whether accrued, absolute, contingent, matured, unmatured, determined or undeterminable, on- or off-balance sheet, or other.

(u)    "**Lien**" shall mean any mortgage, pledge, lien, charge, claim, security interest, adverse claims of ownership or use, restrictions on transfer, defect of title, or other encumbrance of any sort.

(v)    "**Losses**" shall have the meaning set forth in Section 6.4.

(w)    "**Notice of Claim**" shall have the meaning set forth in Section 6.6(c).

(x)    "**Organizational Documents**" shall mean, with respect to a Person, the charter, bylaws, limited liability company agreement, and other organizational documents of such Person, in each case, as amended.

(y)    "**Party**" or "**Parties**" shall have the meaning set forth in the preamble to this Agreement.

(z)    "**Permitted Liens**" shall mean (i) Liens for Taxes not yet delinquent or being contested in good faith by appropriate proceedings, (ii) statutory Liens (including materialmen's, warehousemen's, mechanic's, repairmen's, landlord's, and other similar Liens) arising in the ordinary course of business securing payments not yet delinquent or being contested in good faith by appropriate proceedings, and (iii) restrictive covenants, easements, and defects, imperfections or irregularities of title, if any, of a nature that do not materially and adversely affect the assets or properties subject thereto.

(aa)    "**Person**" shall mean any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, Governmental Body, or other entity.

DocuSign Envelope ID: 9DEF36D2-6056-43EC-AEA8-8814D70B1651

(bb)      "**Purchase Price**" shall have the meaning set forth in <u>Section 2.3</u>.

(cc)      "**Purchased Accounts**" shall have the meaning set forth in the Recitals.

(dd)      "**Seller**" shall have the meaning set forth in the preamble to this Agreement.

(ee)      "**Seller Indemnified Parties**" shall have the meaning set forth in <u>Section 6.5</u>.

(ff)      "**Tax**" or "**Taxes**" shall mean any U.S. federal, state, local or non-U.S. income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, escheat, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

(gg)      "**Tax Returns**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(hh)      "**Third Party**" or "**Third Parties**" shall mean any Person other than the Parties or their respective Affiliates.

(ii)      "**Third-party Claim**" shall have the meaning set forth in <u>Section 6.6(a)</u>.

(jj)      "**Transaction Agreements**" shall mean the Bill of Sale and Assignment and Assumption Agreement, and each other agreement, instrument, and/or certificate contemplated by this Agreement or such other agreements to be executed in connection with the transactions contemplated hereby or thereby.

(kk)      "**Upfront Cash Payment**" shall have the meaning set forth in <u>Section 2.3</u>.

(ll)      "**Wire Instructions**" shall have the meaning set forth in <u>Section 2.3</u>.

DocuSign Envelope ID: 9DEF36D2-6056-43FC-AEA8-B814D7081651

Case 8:24-ap-01017-SC   Doc 10-1   Filed 03/28/24   Entered 03/28/24 13:37:36   Desc
Exhibit to Amended Complaint   Page 114 of 196

## EXHIBIT B

### FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this **"Agreement"**), is made by and between **Buyer**, and **Seller**.  Each of the Seller and the Buyer are sometimes referred to herein, individually, as a **"Party"** and, collectively, as the **"Parties."**

WHEREAS, the Buyer and the Seller have entered into that certain Accounts Receivable Purchase Agreement, of even date herewith (the **"Purchase Agreement"**), pursuant to which the Seller has agreed to sell, assign, transfer, and deliver to the Buyer, and the Buyer has agreed to purchase, acquire, and accept from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.      <u>Defined Terms</u>.  Capitalized terms used but not otherwise defined in this Agreement shall have the meanings assigned to such terms in the Purchase Agreement.

2.      <u>Sale of Purchased Accounts; Assignment</u>.  The Seller hereby sells, assigns, transfers, and delivers to the Buyer, and the Buyer hereby purchases, acquires, and accepts from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

3.      <u>Further Assurances</u>.  Each of the Parties agrees, from time to time, at the request of the any other Party, to execute and deliver such other instruments of conveyance, power of attorney, sale, transfer, or assignment and take such other actions as such other Party may reasonably request in order to more effectively consummate the transactions contemplated by this Agreement.

4.      <u>Terms of the Purchase Agreement</u>.  This Agreement is intended to evidence the consummation of the transactions contemplated by the Purchase Agreement and is subject to the terms and conditions set forth in the Purchase Agreement.   The terms of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants, agreements, and indemnities relating to the Purchased Accounts are incorporated herein by this reference.  The Parties acknowledge and agree that the representations, warranties, covenants, agreements, and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein.  In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

5.      <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

*[Remainder of page intentionally left blank.]*

DocuSign Envelope ID: 9DEF36D2-6056-43FC-AEA8-8814D70B1651

Case 8:24-ap-01017-SC   Doc 10-1   Filed 03/28/24   Entered 03/28/24 13:37:36   Desc
Exhibit to Amended Complaint   Page 115 of 196

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**BUYER: The Litigation Practice Group P.C.**

By: _____
Name: Daniel S. March
Title: Managing Shareholder

**SELLER:**

**New Horizon Finance LLC**

By: _____
Name: Caleb Wickman
Title: Owner

DocuSign Envelope ID: 9DEF36D2-6056-43EC-AEA8-9814D70B1651

Case 8:24-ap-01017-SC    Doc 10-1    Filed 03/28/24    Entered 03/28/24 13:37:36    Desc
Exhibit to Amended Complaint    Page 116 of 196

**Schedule 2.3**
**Wire Instructions**

**$253,251.60**

**Account Holder Name: New Horizon Finance LLC**

**Address: 8101 Biscayne Blvd, #506 Miami, FL 33138**

**Routing Number:** ███████

**Account Number:** ███████

# EXHIBIT I

EXHIBIT I
Page 137

DocuSign Envelope ID: 73E5EC86-4C14-4FA1-93CF-B7592606F2D3

### ACCOUNTS RECEIVABLE PURCHASE AGREEMENT

This ACCOUNTS RECEIVABLE PURCHASE AGREEMENT (this "**Agreement**") is made as of January 6, 2023 (the "**Agreement Date**"), by and between ProofPositive LLC (collectively the "**Buyer**"), and New Horizon Finance LLC (the "**Seller" or "LPG**", and together with the Buyer, the **"Parties"**), and The Litigation Practice Group PC ("LPG").

### RECITALS

WHEREAS, in the regular course of business, the Seller originates account receivables from **LPG** in connection with client on-boarding services provided by the Seller to LPG and its affiliates;

WHEREAS, the account receivables represent an obligation of various clients to pay Seller for services that Seller previously provided, but which LPG shall provide from the date of execution of this Agreement;

WHEREAS, the Seller desires to sell, assign, transfer, and deliver to the Buyer, and the Buyer desires to purchase, acquire, and accept from the Seller, certain of these account receivables (the "**Purchased Accounts**").

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, the Parties, intending to be legally bound, agree as follows:

### ARTICLE 1.
### DEFINITIONS

Section 1.1    Certain Definitions.  Certain defined terms used in this Agreement are set forth on **Exhibit A**.

### ARTICLE 2.
### ASSIGNMENT AND TRANSFER AND CONSIDERATION

Section 2.1    Assignment of the Purchased Accounts to the Buyer.  Upon execution of this Agreement and subject to the terms and conditions set forth herein, the Seller shall sell, assign, transfer, and deliver, and the Buyer shall purchase, acquire, and accept from the Seller, all of the Seller's right, title, and interest in and to the Purchased Accounts set forth on the spreadsheet attached to this Agreement, free and clear of any Liens.  Other than the Purchased Accounts, the Buyer shall not purchase or acquire any other assets of the Seller (collectively, the "**Excluded Assets**").

Section 2.2    No Assumption of Liabilities.  The Buyer shall not assume any Liabilities of the Seller of any kind, whether known or unknown, contingent, matured, or otherwise, whether currently existing or hereinafter created (collectively, the "**Excluded Liabilities**").

Section 2.3    Payment of Purchase Price.  Buyer shall pay $15,428.84 (total purchase price) for the Purchased Accounts (the "**Purchase Price**") by wire transfer of immediately available funds in accordance with the wire transfer instructions set forth in **Schedule 2.3** (the "**Wire Instructions**").  The Purchased Accounts are set forth on the attached spreadsheet.

Section 2.4    Guarantee of LPG.  If any file acquired by buyer shall fail to make a first payment, LPG will replace the file and bear any cost associated with such replacement.  The replacement file shall yield no less than the receivable of the failed file.  In addition, if any any calendar month a total of less than 80% of files make a cleared payment, LPG shall replace any non-performing files in such month so that the performance of the file

EXHIBIT I
Page 138

DocuSign Envelope ID: 73C5EC86-4C14-4FA1-93CF-B7592606F2D3

package as a whole equals 80%.  This guarantee shall continue until the completion of the 24th month following execution of this agreement.

## ARTICLE 3.
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Buyer, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 3.1    <u>Organization; Good Standing</u>.  The Seller is a Limited Liability Company duly organized, validly existing, and in good standing under the Laws of the State of Arizona and is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of the Business requires such qualification, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, results of operations, financial condition, or assets of the Seller.

Section 3.2    <u>Power and Authority</u>.  The Seller has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Seller, and the consummation by the Seller of the transactions contemplated hereby and thereby, have been duly approved by the Seller, and no further action is required on the part of the Seller to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Seller and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Seller, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 3.3    <u>Title to, and Sufficiency of, the Purchased Accounts</u>.  The Seller has and shall convey to the Buyer, at the Closing, good, valid, transferable, and marketable title to, or valid leasehold interests in, all of the Purchased Accounts, free and clear of all Liens.

Section 3.4    <u>Consents</u>.  The Seller is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of, any Governmental Body or Third Party, including a party to any assigned contract, in connection with the execution, delivery, and performance by the Seller of this Agreement or any of the Transaction Agreements to which it is a party or the consummation of the transactions contemplated hereby and thereby.

Section 3.5    <u>No Conflicts</u>. The execution and delivery by the Seller of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of any obligation, or loss of any benefit, under: (a) any provision of the Organizational Documents of the Seller; (b) any contract to which the Seller is party, including, without limitation, any assigned contract; or (c) any Law or order applicable to the Seller or any of the Purchased Accounts.

EXHIBIT I
Page 139

DocuSign Envelope ID: 73C5EC86-0C14-4FA1-93CF-B7592606F2D3

Section 3.6    <u>Compliance with Laws</u>.  The Seller has materially complied, and is now materially complying, with all Laws applicable to the ownership and use of the Purchased Accounts.

Section 3.7    <u>Legal Proceedings</u>.  There is no Action of any nature pending or, to the Knowledge of the Seller, threatened against or by the Seller: (a) relating to or affecting the Purchased Accounts or (b) that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement and the Transaction Agreements.  No event has occurred or circumstance exists that may give rise to, or serve as a basis for, any such Action.

Section 3.8    <u>Condition of Purchased Accounts</u>.  Each Purchased Account shall have received no less than one processed payment.

Section 3.9    <u>Confidentiality</u>.  Seller agrees and acknowledges that all Purchased Accounts, the pricing, and all terms set forth in this Agreement are confidential (together, the "**Confidential Information**").  Seller will at all times keep the  Confidential Information in confidence and trust.  Seller will not, without the prior written consent of an authorized officer of Buyer, (A) copy, use or disclose any Confidential Information, (B) deliver or disclose any Confidential Information to any person or entity outside the Buyer, or (C) use the Confidential Information for Seller's own use or use it to the detriment of Buyer.  Notwithstanding the foregoing, Seller may, without consent, use the Confidential Information and disclose and deliver same to Seller's employees or agents, if applicable, who have a need to know, provided such employees or agents have entered into written agreements approved by Buyer and containing provisions at least as restrictive as these provisions.  Seller agrees that violation of this Section 3.9.  The Parties agree that the disclosure of the Confidential Information in violation of this Agreement may cause the Buyer irreparable harm and that any breach or threatened breach by the Seller entitles Buyer to seek injunctive relief, in addition to any other legal or equitable remedies available to it, in any court of competent jurisdiction.

## ARTICLE 4.
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Seller, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 4.1    <u>Organization; Good Standing</u>.  The Buyer is a limited liability company, duly organized, validly existing, and in good standing under the Laws of the State of Wyoming.

Section 4.2    <u>Power and Authority</u>.  The Buyer has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Buyer, and the consummation by the Buyer of the transactions contemplated hereby and thereby, have been duly approved by the Buyer, and no further action is required on the part of the Buyer to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Buyer and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Buyer, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

EXHIBIT I
Page 140

Section 4.3    <u>No Conflicts</u>.  The execution and delivery by the Buyer of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of, any obligation, or loss of any benefit under: (a) any provision of the Buyer's Organizational Documents; (b) any contract to which the Buyer is party, other than the Buyer Representation Agreement; or (c) any Law applicable to the Buyer.

Section 4.4    <u>Sufficient Funds</u>.  The Buyer has, and will have, sufficient funds available to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement and the Transaction Agreements.

## ARTICLE 5.
## COVENANTS

Section 5.1    <u>Appropriate Actions</u>.

(a)    <u>General</u>.  Each of the Parties shall use commercially reasonable efforts to take all actions necessary to consummate the transactions contemplated by this Agreement as soon as reasonably practicable after the execution of this Agreement, including taking all actions necessary to comply promptly with all applicable Laws that may be imposed on it or any of its Affiliates with respect to the Closing.

## ARTICLE 6.
## CLOSING

Section 6.1    <u>Closing</u>.  The closing of the transactions contemplated by this Agreement (the "**Closing**") will take place upon the execution and delivery of this Agreement or at such other time, date, and place as the Parties may agree in writing.  The date on which the Closing occurs is hereinafter referred to as the "**Closing Date**." The Parties agree that the Closing may take place by the electronic exchange of executed counterpart documents and the electronic transfer of funds.

Section 6.2    <u>Closing Deliverables of the Seller</u>.  At or prior to the Closing, Seller shall deliver to Buyer any of the following if requested by Buyer:  (i) a bill of sale and assignment and assumption agreement substantially in the form attached hereto as **<u>Exhibit B</u>** (the "**Bill of Sale and Assignment and Assumption Agreement**"), duly executed by the Seller, effecting the transfer and assignment to, and assumption by, the Buyer of the Purchased Accounts; and (ii) such other customary instruments of transfer, assumption, filings, or documents, in form and substance reasonably satisfactory to the Buyer, as may be required to give effect to this Agreement.

Section 6.3    <u>Closing Deliverables of the Buyer</u>.  At or prior to the Closing, the Seller shall have received the following: (i) the Upfront Cash Payment; and (ii) if requested pursuant to <u>Section 6.2</u>, the Bill of Sale and Assignment and Assumption Agreement, duly executed by the Buyer.

Section 6.4    <u>Indemnification by the Seller</u>.  Subject to the limitations set forth in this <u>Article 6</u>, the Seller agrees to indemnify and hold harmless the Buyer, including its shareholders, members, directors, managers, officers, employees, Affiliates, and agents (each, a "**Buyer Indemnified Party**" and, collectively, the "**Buyer Indemnified Parties**"), against all claims, losses, Liabilities, damages, deficiencies, diminutions in value, costs, interest, awards, judgments, penalties, and expenses, including reasonable out-of-pocket attorneys' and consultants' fees and expenses and including any such reasonable expenses incurred in connection with investigating, defending against, or settling any of the foregoing (each, a "**Loss**" and, collectively, the "**Losses**") paid, suffered, incurred, sustained, or accrued by any Buyer Indemnified Party, directly or indirectly, as a result of,

EXHIBIT I
Page 141

DocuSign Envelope ID: 73C5EC86-A614-4FA1-93CF-B7592606F2D3

Case 8:24-ap-01017-SC    Doc 16-1    Filed 03/28/24    Entered 03/28/24 13:37:36    Desc
Exhibit to Amended Complaint    Page 122 of 196

arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Seller contained in this Agreement, (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Seller pursuant to this Agreement, (c) any Excluded Asset or any Excluded Liability.

Section 6.5    Indemnification by the Buyer.  Subject to the limitations set forth in this Article 6, the Buyer agrees to indemnify and hold harmless the Seller, including its Affiliates and agents (each, a "**Seller Indemnified Party**" and, collectively, the "**Seller Indemnified Parties**"), against all Losses paid, suffered, incurred, sustained, or accrued by any Seller Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Buyer contained in this Agreement; (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Buyer pursuant to this Agreement; (c) any event or occurance related to the Purchased Accounts or Buyer occurring after the Closing; or (d) resulting from any omissions or misstatements made by Buyer to investors or potential investors.

Section 6.6    Indemnification Procedures.

(a)    No Restraints.  Promptly following receipt by an Indemnified Party of notice by a Third Party (including any Governmental Body) of any complaint, dispute, or claim or the commencement of any audit, investigation, Action or proceeding with respect to which such Indemnified Party may be entitled to indemnification pursuant hereto (a "**Third-party Claim**"), such Indemnified Party shall provide written notice thereof to the Indemnifying Party, provided, however, that the failure to so notify the Indemnifying Party shall relieve the Indemnifying Party from Liability hereunder with respect to such Third-party Claim only if, and only to the extent that, such failure to so notify the Indemnifying Party results in the forfeiture by the Indemnifying Party of rights and defenses otherwise available to the Indemnifying Party with respect to such Third-party Claim.  The Indemnifying Party shall have the right, upon written notice delivered to the Indemnified Party within twenty days thereafter assuming full responsibility for any Losses resulting from such Third-party Claim, to assume the defense of such Third-party Claim, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the fees and disbursements of such counsel; provided, however, if the Indemnifying Party declines or fails to assume the defense of such Third-party Claim on the terms provided above or to employ counsel reasonably satisfactory to the Indemnified Party, in either case within such twenty day period, then any Losses shall include the reasonable fees and disbursements of counsel for the Indemnified Party as incurred.  In any Third-party Claim for which indemnification is being sought hereunder the Indemnified Party or the Indemnifying Party, whichever is not assuming the defense of such Third-party Claim, shall have the right to participate in such matter and to retain its own counsel at such Party's own expense.  The Indemnifying Party or the Indemnified Party (as the case may be) shall at all times use reasonable efforts to keep the Indemnifying Party or Indemnified Party (as the case may be) reasonably apprised of the status of the defense of any matter, the defense of which it is maintaining, and to cooperate in good faith with each other with respect to the defense of any such matter.

(b)    No Indemnified Party may settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder without the prior written consent of the Indemnifying Party (which may not be unreasonably withheld or delayed), unless (i) the Indemnifying Party fails to assume and maintain the defense of such Third-party Claim or (ii) such settlement, compromise, or consent includes an unconditional release of the Indemnifying Party and its officers, directors, employees and Affiliates from all Liability arising out of, or related to, such Third-party Claim.  An Indemnifying Party may not, without the prior written consent of the Indemnified Party, settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder unless such settlement, compromise, or consent (A) includes an unconditional release of the Indemnified Party and its officers, directors, employees, and Affiliates from all Liability arising out of, or related to, such Third-party

EXHIBIT I
Page 142

DocuSign Envelope ID: 73C5EC86-6C14-4F41-93CF-B7592606F2D3

Claim, (B) does not contain any admission or statement suggesting any wrongdoing or Liability on behalf of the Indemnified Party, and (C) does not contain any equitable order, judgment, or term that in any manner affects, restrains, or interferes with the business of the Indemnified Party or any of the Indemnified Party's Affiliates.

(c)    If an Indemnified Party claims a right to payment pursuant hereto with respect to any matter not involving a Third-party Claim (a "**Direct Claim**"), such Indemnified Party shall send written notice of such claim to the appropriate Indemnifying Party (each, a "**Notice of Claim**").  Such Notice of Claim shall specify the basis for such Direct Claim.  The failure by any Indemnified Party so to notify the Indemnifying Party shall not relieve the Indemnifying Party from any Liability that it may have to such Indemnified Party with respect to any Direct Claim made pursuant to this Section 6.6(c).  If the Indemnifying Party does not notify the Indemnified Party within thirty days following its receipt of such Notice of Claim that the Indemnifying Party disputes its Liability to the Indemnified Party under this Article 6 or the amount thereof, the Direct Claim specified by the Indemnified Party in such Notice of Claim shall be conclusively deemed a Liability of the Indemnifying Party under this Article 6, and the Indemnifying Party shall pay the amount of such Liability to the Indemnified Party on demand or, in the case of any Notice of Claim in which the amount of the Direct Claim (or any portion of the Direct Claim) is estimated, on such later date when the amount of such Direct Claim (or such portion of such Direct Claim) becomes finally determined.  In the event that the Indemnifying Party has timely disputed its Liability with respect to such Direct Claim as provided above, as promptly as possible, such Indemnified Party and the appropriate Indemnifying Party shall establish the merits and amount of such Direct Claim (by mutual agreement, litigation, arbitration or otherwise) and, within five business days following the final determination of the merits and amount of such Direct Claim, the Indemnifying Party shall pay to the Indemnified Party an amount equal to such Direct Claim as determined hereunder.

### ARTICLE 7.
### MISCELLANEOUS

Section 7.1    Entire Agreement; Amendment.  This Agreement and the Transaction Agreements (including the exhibits hereto and thereto and the documents referred to therein) constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they related in any way to the subject matter hereof.  This Agreement may be amended with the written consent of each of the Parties or any successor thereto by execution of an instrument in writing.

Section 7.2    Waivers.  The rights and remedies of the Parties to this Agreement are cumulative and not alternative.  To the maximum extent permitted by applicable Law: (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Parties; (b) no waiver that may be given by a Party will be applicable except in the specific instance for what it is given; and (c) no notice to, or demand on, one Party will be deemed to be a waiver of any obligation of such Party or of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the Transaction Agreements.

Section 7.3    Notices.  All notices and other communications required or permitted hereunder shall be made to the address of a Party listed on the signature page to this Agreement and shall be (a) in writing, (b) effective when given, and (c), in any event, deemed to be given upon receipt or, if earlier: (i) upon delivery, if delivered by hand; (ii) two business days after deposit with FedEx Express or similar recognized international overnight courier service, freight prepaid; or (iii) one business day after facsimile or electronic mail transmission. A Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties advance written notice pursuant to the provisions above.

EXHIBIT I
Page 143

DocuSign Envelope ID: 73C5EC86-0C14-4FA1-93CF-B7592606E2D3

Case 8:24-ap-01017-SC    Doc 16-1    Filed 03/28/24    Entered 03/28/24 13:37:36    Desc
Exhibit to Amended Complaint    Page 124 of 196

Section 7.4    <u>Successors and Assigns</u>.  This Agreement shall be binding upon, and inure to the benefit of, the Parties named herein and their respective successors and permitted assigns.  Neither this Agreement nor any rights or obligations of a Party hereunder shall be assigned by a Party (unless to an Affiliate of such Party) without the prior written consent of the other Parties.  This Agreement will be binding upon any permitted assignee of any Party.  No assignment shall have the effect of relieving any Party to this Agreement of any of its obligations hereunder.

Section 7.5    <u>Public Disclosure</u>.  Except as may be required by Law, the Seller shall not issue any statement or communication to any Third Party (other than its respective agents) regarding the subject matter of this Agreement or the transactions contemplated hereby, including, if applicable, the termination of this Agreement and the reasons therefor, without the prior written consent of the Buyer.

Section 7.6    <u>Expenses and Fees</u>.  Whether or not the Closing occurs, all fees and expenses incurred in connection with this transactions contemplated by this Agreement, including all legal, accounting, financial advisory, consulting and all other fees and expenses of Third Parties incurred by a Party in connection with the negotiation and effectuation of the terms and conditions of this Agreement and the transactions contemplated hereby, shall be the obligation of the respective Party incurring such fees and expenses.

Section 7.7    <u>Specific Performance</u>.  The Parties agree that irreparable damage would occur if any provision of this Agreement was not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled hereunder, at Law or in equity.

Section 7.8    <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

Section 7.9    <u>Governing Law</u>.  This Agreement shall, in all respects, be construed in accordance with, and governed by, the Laws of the State of California without regard to conflict of Laws principles.

Section 7.10    <u>Severability</u>.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

Section 7.11    <u>Construction</u>.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

EXHIBIT I
Page 144

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Agreement Date.

**BUYER:**

**ProofPositive LLC**

By: *Gail Hanson*

Name: Gail Hanson

Title: Member

**SELLER:**

**New Horizon Finance LLC**

By: *Caleb Wickman*

Name: Caleb Wickman

Title: Owner

**APPROVAL OF ASSIGNMENT AND GUARANTEE**

The assignment of the Purchased Accounts set forth in this Agreement as well as the guarantee included therein is hereby approved, and with respect to the Purchased Accounts, the Buyer shall have all rights of Buyer as set forth in this agreement.

**The Litigation Practice Group P.C.**

By: *Daniel S March*

Name: Daniel S. March

Title: Managing Shareholder

*[Signature Page to Accounts Receivable Purchase Agreement]*

EXHIBIT I

DocuSign Envelope ID: 73C5EC86-4C14-4FA7-93CF-P7592606F2D3

## EXHIBIT A

## DEFINITIONS

As used in this Agreement, the following terms have the following meanings (terms defined in the singular to have a correlative meaning when used in the plural and vice versa).

(a)    "**Action**" shall mean any civil, criminal, or administrative action, claim, suit, demand, charge, citation, reexamination, opposition, interference, decree, injunction, mediation, hearing, notice of violation, demand letter, litigation, proceeding, labor dispute, arbitral action, governmental or other audit, inquiry, criminal prosecution, investigation, unfair labor practice charge, or complaint.

(b)    "**Agreement**" shall have the meaning set forth in the preamble to this Agreement.

(c)    "**Agreement Date**" shall have the meaning set forth in the preamble to this Agreement.

(d)    "**Affiliate**" shall mean (i) with respect to any non-natural Person, any Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person and (ii), with respect to any individual, (A) family members of such individual, by blood, adoption, or marriage, (B) such individual's spouse or ex-spouse and (C) any Person that is directly or indirectly under the control of any of the foregoing individuals.  For purposes of this definition, "control" (including with correlative meanings, the terms "controlling," "controlled by," and under "common control with") means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

(e)    "**Bill of Sale and Assignment and Assumption Agreement**" shall have the meaning set forth in Section 6.2.

(f)    "**Business**" shall mean the business of the Seller as conducted on the Agreement Date.

(g)    "**Buyer**" shall have the meaning set forth in the preamble to this Agreement.

(h)    "**Buyer Indemnified Parties**" shall have the meaning set forth in Section 6.4.

(i)    "**Closing**" shall have the meaning set forth in Section 6.1.

(j)    "**Closing Date**" shall have the meaning set forth in Section 6.1.

(k)    "**Direct Claim**" shall have the meaning set forth in Section 6.6(c).

(l)    "**Excluded Assets**" shall have the meaning set forth in Section 2.1.

(m)    "**Excluded Liabilities**" shall have the meaning set forth in Section 2.2.

(n)    "**Governmental Body**" shall mean any: (i) nation, province, state, county, city, town, village, district, or other jurisdiction of any nature; (ii) federal, provincial, state, local, municipal, foreign, or other government; (iii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); (iv) multi-national organization or body; or (v) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

EXHIBIT I
Page 146

DocuSign Envelope ID: 73E5EC86-4G14-4FA7-93CF-D7592606F2D3

(o)    "**Indebtedness**" means, without duplication and with respect to the Seller, all: (i) indebtedness for borrowed money; (ii) obligations for the deferred purchase price of property or services, (iii) long or short-term obligations evidenced by notes, bonds, debentures or other similar instruments; (iv) obligations under any interest rate, currency swap, or other hedging agreement or arrangement; (v) capital lease obligations; (vi) reimbursement obligations under any letter of credit, banker's acceptance or similar credit transactions; (vii) guarantees made by the Seller on behalf of any third party in respect of obligations of the kind referred to in the foregoing clauses (i) through (vi); and (viii) any unpaid interest, prepayment penalties, premiums, costs and fees that would arise or become due as a result of the prepayment of any of the obligations referred to in the foregoing clauses (i) through (vii).

(p)    "**Indemnified Party**" shall mean a Buyer Indemnified Party or a Seller Indemnified Party, as the case may be, making a claim for indemnification under Article 6.

(q)    "**Indemnifying Party**" shall mean a Party against whom a claim for indemnification is asserted under Article 6.

(r)    "**Knowledge**" shall mean, with respect to the Seller, the actual or constructive knowledge of all facts relevant to this transaction and the transacting parties, after due inquiry.

(s)    "**Law**" shall mean any law, statute, ordinance, regulation, rule, code, notice requirement, court decision, or agency guideline, of any foreign, federal, state, or local Governmental Body.

(t)    "**Liabilities**" shall mean any direct or indirect liability, Indebtedness, obligation, commitment, expense, claim, deficiency, guaranty, or endorsement of, or by, any Person of any type, known or unknown, and whether accrued, absolute, contingent, matured, unmatured, determined or undeterminable, on- or off-balance sheet, or other.

(u)    "**Lien**" shall mean any mortgage, pledge, lien, charge, claim, security interest, adverse claims of ownership or use, restrictions on transfer, defect of title, or other encumbrance of any sort.

(v)    "**Losses**" shall have the meaning set forth in Section 6.4.

(w)    "**Notice of Claim**" shall have the meaning set forth in Section 6.6(c).

(x)    "**Organizational Documents**" shall mean, with respect to a Person, the charter, bylaws, limited liability company agreement, and other organizational documents of such Person, in each case, as amended.

(y)    "**Party**" or "**Parties**" shall have the meaning set forth in the preamble to this Agreement.

(z)    "**Permitted Liens**" shall mean (i) Liens for Taxes not yet delinquent or being contested in good faith by appropriate proceedings, (ii) statutory Liens (including materialmen's, warehousemen's, mechanic's, repairmen's, landlord's, and other similar Liens) arising in the ordinary course of business securing payments not yet delinquent or being contested in good faith by appropriate proceedings, and (iii) restrictive covenants, easements, and defects, imperfections or irregularities of title, if any, of a nature that do not materially and adversely affect the assets or properties subject thereto.

(aa)    "**Person**" shall mean any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, Governmental Body, or other entity.

EXHIBIT I
Page 147

DocuSign Envelope ID: 73C5EC86-1C14-4FA1-93CF-D7592606F2D3

(bb)    "**Purchase Price**" shall have the meaning set forth in <u>Section 2.3</u>.

(cc)    "**Purchased Accounts**" shall have the meaning set forth in the Recitals.

(dd)    "**Seller**" shall have the meaning set forth in the preamble to this Agreement.

(ee)    "**Seller Indemnified Parties**" shall have the meaning set forth in <u>Section 6.5</u>.

(ff)    "**Tax**" or "**Taxes**" shall mean any U.S. federal, state, local or non-U.S. income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, escheat, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

(gg)    "**Tax Returns**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(hh)    "**Third Party**" or "**Third Parties**" shall mean any Person other than the Parties or their respective Affiliates.

(ii)    "**Third-party Claim**" shall have the meaning set forth in <u>Section 6.6(a)</u>.

(jj)    "**Transaction Agreements**" shall mean the Bill of Sale and Assignment and Assumption Agreement, and each other agreement, instrument, and/or certificate contemplated by this Agreement or such other agreements to be executed in connection with the transactions contemplated hereby or thereby.

(kk)    "**Upfront Cash Payment**" shall have the meaning set forth in <u>Section 2.3</u>.

(ll)    "**Wire Instructions**" shall have the meaning set forth in <u>Section 2.3</u>.

EXHIBIT I
Page 148

DocuSign Envelope ID: 73C5EC86-4C14-4FA7-93CF-B7592606F2D3

Case 8:24-ap-01017-SC    Doc 16-1    Filed 03/28/24    Entered 03/28/24 13:37:36    Desc
Exhibit to Amended Complaint    Page 129 of 196

## EXHIBIT B

### FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this **"Agreement"**), is made by and between **Buyer**, and **Seller**. Each of the Seller and the Buyer are sometimes referred to herein, individually, as a **"Party"** and, collectively, as the **"Parties."**

WHEREAS, the Buyer and the Seller have entered into that certain Accounts Receivable Purchase Agreement, of even date herewith (the **"Purchase Agreement"**), pursuant to which the Seller has agreed to sell, assign, transfer, and deliver to the Buyer, and the Buyer has agreed to purchase, acquire, and accept from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.      <u>Defined Terms</u>. Capitalized terms used but not otherwise defined in this Agreement shall have the meanings assigned to such terms in the Purchase Agreement.

2.      <u>Sale of Purchased Accounts; Assignment</u>. The Seller hereby sells, assigns, transfers, and delivers to the Buyer, and the Buyer hereby purchases, acquires, and accepts from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

3.      <u>Further Assurances</u>. Each of the Parties agrees, from time to time, at the request of the any other Party, to execute and deliver such other instruments of conveyance, power of attorney, sale, transfer, or assignment and take such other actions as such other Party may reasonably request in order to more effectively consummate the transactions contemplated by this Agreement.

4.      <u>Terms of the Purchase Agreement</u>. This Agreement is intended to evidence the consummation of the transactions contemplated by the Purchase Agreement and is subject to the terms and conditions set forth in the Purchase Agreement. The terms of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants, agreements, and indemnities relating to the Purchased Accounts are incorporated herein by this reference. The Parties acknowledge and agree that the representations, warranties, covenants, agreements, and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

5.      <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

*[Remainder of page intentionally left blank.]*

DocuSign Envelope ID: 73C5EC86-4C14-4FA1-93CF-D7592606F2D3

Case 8:24-ap-01017-SC    Doc 16-1    Filed 03/28/24    Entered 03/28/24 13:37:36    Desc
Exhibit to Amended Complaint    Page 130 of 196

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.


**BUYER:**

**ProofPositive LLC**


By: _Gail Hanson_
          BF640F37742742A...
     Name: Gail Hanson
     Title: Member


**SELLER:**

**New Horizon Finance LLC**


By: _Caleb Wickman_
          5B4E9031292247...
     Name: Caleb Wickman
     Title: Owner

**Schedule 2.3**
**Wire Instructions**

<u>**$15,428.84**</u>

**Account Holder Name: New Horizon Finance LLC**

**Address: 8101 Biscayne Blvd, #506 Miami, FL 33138**

**Routing Number:** ████████

**Account Number:** ████████

# EXHIBIT J

DocuSign Envelope ID: 393509D5-AE8A-4893-8746-9663145687A1

## ACCOUNTS RECEIVABLE PURCHASE AGREEMENT

This ACCOUNTS RECEIVABLE PURCHASE AGREEMENT (this "**Agreement**") is made as of February 28, 2023 (the "**Agreement Date**"), by and between The Litigation Practice Group PC (collectively the "**Buyer**"), New Horizon Finance LLC (the "**Seller" or "LPG**", and together with the Buyer, the **"Parties"**), and The Litigation Practice Group PC ("LPG").

### RECITALS

WHEREAS, in the regular course of business, the Seller originates account receivables from **LPG** in connection with client on-boarding services provided by the Seller to LPG and its affiliates;

WHEREAS, the account receivables represent an obligation of various clients to pay Seller for services that Seller previously provided, but which LPG shall provide from the date of execution of this Agreement;

WHEREAS, the Seller desires to sell, assign, transfer, and deliver to the Buyer, and the Buyer desires to purchase, acquire, and accept from the Seller, certain of these account receivables (the "**Purchased Accounts**").

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, the Parties, intending to be legally bound, agree as follows:

### ARTICLE 1.
### DEFINITIONS

Section 1.1     Certain Definitions.  Certain defined terms used in this Agreement are set forth on **Exhibit A**.

### ARTICLE 2.
### ASSIGNMENT AND TRANSFER AND CONSIDERATION

Section 2.1     Assignment of the Purchased Accounts to the Buyer.  Upon execution of this Agreement and subject to the terms and conditions set forth herein, the Seller shall sell, assign, transfer, and deliver, and the Buyer shall purchase, acquire, and accept from the Seller, all of the Seller's right, title, and interest in and to the Purchased Accounts set forth on the spreadsheet attached to this Agreement, free and clear of any Liens.  Other than the Purchased Accounts, the Buyer shall not purchase or acquire any other assets of the Seller (collectively, the "**Excluded Assets**").

Section 2.2     No Assumption of Liabilities.  The Buyer shall not assume any Liabilities of the Seller of any kind, whether known or unknown, contingent, matured, or otherwise, whether currently existing or hereinafter created (collectively, the "**Excluded Liabilities**").

Section 2.3     Payment of Purchase Price.  Buyer shall pay $22,975.41 (total purchase price) for the Purchased Accounts (the "**Purchase Price**") by wire transfer of immediately available funds in accordance with the wire transfer instructions set forth in **Schedule 2.3** (the "**Wire Instructions**").  The Purchased Accounts are set forth on the attached spreadsheet.

Section 2.4     Guarantee of LPG.  If any file acquired by buyer shall fail to make a first payment, LPG will replace the file and bear any cost associated with such replacement.  The replacement file shall yield no less than the receivable of the failed file.  In addition, if any any calendar month a total of less than 80% of files make a cleared payment, LPG shall replace any non-performing files in such month so that the performance of the file

DocuSign Envelope ID: 393509D5-AF88-4893-8746-9663145607A1

package as a whole equals 80%.  This guarantee shall continue until the completion of the 24th month following execution of this agreement.

## ARTICLE 3.
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Buyer, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 3.1    <u>Organization; Good Standing</u>.  The Seller is a Limited Liability Company duly organized, validly existing, and in good standing under the Laws of the State of Delaware and is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the ownership or operation of the Business requires such qualification, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, results of operations, financial condition, or assets of the Seller.

Section 3.2    <u>Power and Authority</u>.  The Seller has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Seller, and the consummation by the Seller of the transactions contemplated hereby and thereby, have been duly approved by the Seller, and no further action is required on the part of the Seller to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Seller and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Seller, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 3.3    <u>Title to, and Sufficiency of, the Purchased Accounts</u>.  The Seller has and shall convey to the Buyer, at the Closing, good, valid, transferable, and marketable title to, or valid leasehold interests in, all of the Purchased Accounts, free and clear of all Liens.

Section 3.4    <u>Consents</u>.  The Seller is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of, any Governmental Body or Third Party, including a party to any assigned contract, in connection with the execution, delivery, and performance by the Seller of this Agreement or any of the Transaction Agreements to which it is a party or the consummation of the transactions contemplated hereby and thereby.

Section 3.5    <u>No Conflicts</u>. The execution and delivery by the Seller of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of any obligation, or loss of any benefit, under: (a) any provision of the Organizational Documents of the Seller; (b) any contract to which the Seller is party, including, without limitation, any assigned contract; or (c) any Law or order applicable to the Seller or any of the Purchased Accounts.

DocuSign Envelope ID: 393E509D5-AE8B-4893-8746-9663145687A1

Section 3.6    Compliance with Laws.  The Seller has materially complied, and is now materially complying, with all Laws applicable to the ownership and use of the Purchased Accounts.

Section 3.7    Legal Proceedings.  There is no Action of any nature pending or, to the Knowledge of the Seller, threatened against or by the Seller: (a) relating to or affecting the Purchased Accounts or (b) that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement and the Transaction Agreements.  No event has occurred or circumstance exists that may give rise to, or serve as a basis for, any such Action.

Section 3.8    Condition of Purchased Accounts.  Each Purchased Account shall have received no less than one processed payment.

Section 3.9    Confidentiality.  Seller agrees and acknowledges that all Purchased Accounts, the pricing, and all terms set forth in this Agreement are confidential (together, the "**Confidential Information**").  Seller will at all times keep the  Confidential Information in confidence and trust.  Seller will not, without the prior written consent of an authorized officer of Buyer, (A) copy, use or disclose any Confidential Information, (B) deliver or disclose any Confidential Information to any person or entity outside the Buyer, or (C) use the Confidential Information for Seller's own use or use it to the detriment of Buyer.  Notwithstanding the foregoing, Seller may, without consent, use the Confidential Information and disclose and deliver same to Seller's employees or agents, if applicable, who have a need to know, provided such employees or agents have entered into written agreements approved by Buyer and containing provisions at least as restrictive as these provisions.  Seller agrees that violation of this Section 3.9.  The Parties agree that the disclosure of the Confidential Information in violation of this Agreement may cause the Buyer irreparable harm and that any breach or threatened breach by the Seller entitles Buyer to seek injunctive relief, in addition to any other legal or equitable remedies available to it, in any court of competent jurisdiction.

**ARTICLE 4.**
**REPRESENTATIONS AND WARRANTIES OF THE BUYER**

The Buyer represents and warrants to the Seller, as of the Agreement Date and as of the Closing Date, or, if expressly made as of a specified date, as of such specified date, as follows:

Section 4.1    Organization; Good Standing.  The Buyer is a limited liability company, duly organized, validly existing, and in good standing under the Laws of the State of Florida.

Section 4.2    Power and Authority.  The Buyer has all requisite right, power, and authority to execute, deliver, and perform this Agreement and the Transaction Agreements to which it is a party, to consummate the transactions contemplated hereby and thereby, and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and the Transaction Agreements by the Buyer, and the consummation by the Buyer of the transactions contemplated hereby and thereby, have been duly approved by the Buyer, and no further action is required on the part of the Buyer to authorize this Agreement, any Transaction Agreement to which it is a party, or the transactions contemplated hereby and thereby.  This Agreement has been, and each of the Transaction Agreements will be, duly and validly executed and delivered by the Buyer and, assuming the due and valid authorization, execution, and delivery of this Agreement by the other Parties, and of each such Transaction Agreement by the other parties thereto, constitutes, or will constitute, a valid and binding obligation of the Buyer, enforceable against it in accordance with its terms and conditions, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium and other Laws affecting enforcement of creditor's rights generally and except insofar as the availability of equitable remedies may be limited by applicable Law.

Section 4.3    <u>No Conflicts</u>.  The execution and delivery by the Buyer of this Agreement and each of the Transaction Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with, result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to an additional payment obligation, a right of termination, cancellation, modification, or acceleration of, any obligation, or loss of any benefit under: (a) any provision of the Buyer's Organizational Documents; (b) any contract to which the Buyer is party, other than the Buyer Representation Agreement; or (c) any Law applicable to the Buyer.

Section 4.4    <u>Sufficient Funds</u>.  The Buyer has, and will have, sufficient funds available to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement and the Transaction Agreements.

## ARTICLE 5.
## COVENANTS

Section 5.1    <u>Appropriate Actions</u>.

(a)    <u>General</u>.  Each of the Parties shall use commercially reasonable efforts to take all actions necessary to consummate the transactions contemplated by this Agreement as soon as reasonably practicable after the execution of this Agreement, including taking all actions necessary to comply promptly with all applicable Laws that may be imposed on it or any of its Affiliates with respect to the Closing.

## ARTICLE 6.
## CLOSING

Section 6.1    <u>Closing</u>.  The closing of the transactions contemplated by this Agreement (the "**Closing**") will take place upon the execution and delivery of this Agreement or at such other time, date, and place as the Parties may agree in writing.  The date on which the Closing occurs is hereinafter referred to as the "**Closing Date**." The Parties agree that the Closing may take place by the electronic exchange of executed counterpart documents and the electronic transfer of funds.

Section 6.2    <u>Closing Deliverables of the Seller</u>.  At or prior to the Closing, Seller shall deliver to Buyer any of the following if requested by Buyer:  (i) a bill of sale and assignment and assumption agreement substantially in the form attached hereto as **<u>Exhibit B</u>** (the "**Bill of Sale and Assignment and Assumption Agreement**"), duly executed by the Seller, effecting the transfer and assignment to, and assumption by, the Buyer of the Purchased Accounts; and (ii) such other customary instruments of transfer, assumption, filings, or documents, in form and substance reasonably satisfactory to the Buyer, as may be required to give effect to this Agreement.

Section 6.3    <u>Closing Deliverables of the Buyer</u>.  At or prior to the Closing, the Seller shall have received the following: (i) the Upfront Cash Payment; and (ii) if requested pursuant to <u>Section 6.2</u>, the Bill of Sale and Assignment and Assumption Agreement, duly executed by the Buyer.

Section 6.4    <u>Indemnification by the Seller</u>.  Subject to the limitations set forth in this <u>Article 6</u>, the Seller agrees to indemnify and hold harmless the Buyer, including its shareholders, members, directors, managers, officers, employees, Affiliates, and agents (each, a "**Buyer Indemnified Party**" and, collectively, the "**Buyer Indemnified Parties**"), against all claims, losses, Liabilities, damages, deficiencies, diminutions in value, costs, interest, awards, judgments, penalties, and expenses, including reasonable out-of-pocket attorneys' and consultants' fees and expenses and including any such reasonable expenses incurred in connection with investigating, defending against, or settling any of the foregoing (each, a "**Loss**" and, collectively, the "**Losses**") paid, suffered, incurred, sustained, or accrued by any Buyer Indemnified Party, directly or indirectly, as a result of,

DocuSign Envelope ID: 393509D5-AF88-4893-8746-9663145607A1

arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Seller contained in this Agreement, (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Seller pursuant to this Agreement, (c) any Excluded Asset or any Excluded Liability.

Section 6.5    <u>Indemnification by the Buyer</u>.  Subject to the limitations set forth in this <u>Article 6</u>, the Buyer agrees to indemnify and hold harmless the Seller, including its Affiliates and agents (each, a "**Seller Indemnified Party**" and, collectively, the "**Seller Indemnified Parties**"), against all Losses paid, suffered, incurred, sustained, or accrued by any Seller Indemnified Party, directly or indirectly, as a result of, arising out of, or in connection with: (a) any inaccuracy in, or breach of, any of the representations or warranties of the Buyer contained in this Agreement; (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by the Buyer pursuant to this Agreement; (c) any event or occurance related to the Purchased Accounts or Buyer occurring after the Closing; or (d) resulting from any omissions or misstatements made by Buyer to investors or potential investors.

Section 6.6    <u>Indemnification Procedures</u>.

(a)    <u>No Restraints</u>.  Promptly following receipt by an Indemnified Party of notice by a Third Party (including any Governmental Body) of any complaint, dispute, or claim or the commencement of any audit, investigation, Action or proceeding with respect to which such Indemnified Party may be entitled to indemnification pursuant hereto (a "**Third-party Claim**"), such Indemnified Party shall provide written notice thereof to the Indemnifying Party, <u>provided</u>, <u>however</u>, that the failure to so notify the Indemnifying Party shall relieve the Indemnifying Party from Liability hereunder with respect to such Third-party Claim only if, and only to the extent that, such failure to so notify the Indemnifying Party results in the forfeiture by the Indemnifying Party of rights and defenses otherwise available to the Indemnifying Party with respect to such Third-party Claim.  The Indemnifying Party shall have the right, upon written notice delivered to the Indemnified Party within twenty days thereafter assuming full responsibility for any Losses resulting from such Third-party Claim, to assume the defense of such Third-party Claim, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of the fees and disbursements of such counsel; <u>provided</u>, <u>however</u>, if the Indemnifying Party declines or fails to assume the defense of such Third-party Claim on the terms provided above or to employ counsel reasonably satisfactory to the Indemnified Party, in either case within such twenty day period, then any Losses shall include the reasonable fees and disbursements of counsel for the Indemnified Party as incurred.  In any Third-party Claim for which indemnification is being sought hereunder the Indemnified Party or the Indemnifying Party, whichever is not assuming the defense of such Third-party Claim, shall have the right to participate in such matter and to retain its own counsel at such Party's own expense.  The Indemnifying Party or the Indemnified Party (as the case may be) shall at all times use reasonable efforts to keep the Indemnifying Party or Indemnified Party (as the case may be) reasonably apprised of the status of the defense of any matter, the defense of which it is maintaining, and to cooperate in good faith with each other with respect to the defense of any such matter.

(b)    No Indemnified Party may settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder without the prior written consent of the Indemnifying Party (which may not be unreasonably withheld or delayed), unless (i) the Indemnifying Party fails to assume and maintain the defense of such Third-party Claim or (ii) such settlement, compromise, or consent includes an unconditional release of the Indemnifying Party and its officers, directors, employees and Affiliates from all Liability arising out of, or related to, such Third-party Claim.  An Indemnifying Party may not, without the prior written consent of the Indemnified Party, settle or compromise any Third-party Claim or consent to the entry of any judgment with respect to which indemnification is being sought hereunder unless such settlement, compromise, or consent (A) includes an unconditional release of the Indemnified Party and its officers, directors, employees, and Affiliates from all Liability arising out of, or related to, such Third-party

DocuSign Envelope ID: 393509D5-AF88-4893-8746-9663145607A1

Claim, (B) does not contain any admission or statement suggesting any wrongdoing or Liability on behalf of the Indemnified Party, and (C) does not contain any equitable order, judgment, or term that in any manner affects, restrains, or interferes with the business of the Indemnified Party or any of the Indemnified Party's Affiliates.

(c)    If an Indemnified Party claims a right to payment pursuant hereto with respect to any matter not involving a Third-party Claim (a "**Direct Claim**"), such Indemnified Party shall send written notice of such claim to the appropriate Indemnifying Party (each, a "**Notice of Claim**").  Such Notice of Claim shall specify the basis for such Direct Claim.  The failure by any Indemnified Party so to notify the Indemnifying Party shall not relieve the Indemnifying Party from any Liability that it may have to such Indemnified Party with respect to any Direct Claim made pursuant to this Section 6.6(c).  If the Indemnifying Party does not notify the Indemnified Party within thirty days following its receipt of such Notice of Claim that the Indemnifying Party disputes its Liability to the Indemnified Party under this Article 6 or the amount thereof, the Direct Claim specified by the Indemnified Party in such Notice of Claim shall be conclusively deemed a Liability of the Indemnifying Party under this Article 6, and the Indemnifying Party shall pay the amount of such Liability to the Indemnified Party on demand or, in the case of any Notice of Claim in which the amount of the Direct Claim (or any portion of the Direct Claim) is estimated, on such later date when the amount of such Direct Claim (or such portion of such Direct Claim) becomes finally determined.  In the event that the Indemnifying Party has timely disputed its Liability with respect to such Direct Claim as provided above, as promptly as possible, such Indemnified Party and the appropriate Indemnifying Party shall establish the merits and amount of such Direct Claim (by mutual agreement, litigation, arbitration or otherwise) and, within five business days following the final determination of the merits and amount of such Direct Claim, the Indemnifying Party shall pay to the Indemnified Party an amount equal to such Direct Claim as determined hereunder.

### ARTICLE 7.
### MISCELLANEOUS

Section 7.1    Entire Agreement; Amendment.  This Agreement and the Transaction Agreements (including the exhibits hereto and thereto and the documents referred to therein) constitute the entire agreement among the Parties with respect to the subject matter hereof and supersede any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they related in any way to the subject matter hereof.  This Agreement may be amended with the written consent of each of the Parties or any successor thereto by execution of an instrument in writing.

Section 7.2    Waivers.  The rights and remedies of the Parties to this Agreement are cumulative and not alternative.  To the maximum extent permitted by applicable Law: (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Parties; (b) no waiver that may be given by a Party will be applicable except in the specific instance for what it is given; and (c) no notice to, or demand on, one Party will be deemed to be a waiver of any obligation of such Party or of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the Transaction Agreements.

Section 7.3    Notices.  All notices and other communications required or permitted hereunder shall be made to the address of a Party listed on the signature page to this Agreement and shall be (a) in writing, (b) effective when given, and (c), in any event, deemed to be given upon receipt or, if earlier: (i) upon delivery, if delivered by hand; (ii) two business days after deposit with FedEx Express or similar recognized international overnight courier service, freight prepaid; or (iii) one business day after facsimile or electronic mail transmission. A Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties advance written notice pursuant to the provisions above.

Section 7.4    <u>Successors and Assigns</u>.  This Agreement shall be binding upon, and inure to the benefit of, the Parties named herein and their respective successors and permitted assigns.  Neither this Agreement nor any rights or obligations of a Party hereunder shall be assigned by a Party (unless to an Affiliate of such Party) without the prior written consent of the other Parties.  This Agreement will be binding upon any permitted assignee of any Party.  No assignment shall have the effect of relieving any Party to this Agreement of any of its obligations hereunder.

Section 7.5    <u>Public Disclosure</u>.  Except as may be required by Law, the Seller shall not issue any statement or communication to any Third Party (other than its respective agents) regarding the subject matter of this Agreement or the transactions contemplated hereby, including, if applicable, the termination of this Agreement and the reasons therefor, without the prior written consent of the Buyer.

Section 7.6    <u>Expenses and Fees</u>.  Whether or not the Closing occurs, all fees and expenses incurred in connection with this transactions contemplated by this Agreement, including all legal, accounting, financial advisory, consulting and all other fees and expenses of Third Parties incurred by a Party in connection with the negotiation and effectuation of the terms and conditions of this Agreement and the transactions contemplated hereby, shall be the obligation of the respective Party incurring such fees and expenses.

Section 7.7    <u>Specific Performance</u>.  The Parties agree that irreparable damage would occur if any provision of this Agreement was not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled hereunder, at Law or in equity.

Section 7.8    <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

Section 7.9    <u>Governing Law</u>.  This Agreement shall, in all respects, be construed in accordance with, and governed by, the Laws of the State of California without regard to conflict of Laws principles.

Section 7.10    <u>Severability</u>.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

Section 7.11    <u>Construction</u>.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

DocuSign Envelope ID: 393509D5-AF88-4893-8746-9663145687A1

Case 8:24-ap-01017-SC   Doc 10-1   Filed 03/28/24   Entered 03/28/24 13:37:36   Desc
Exhibit to Amended Complaint   Page 140 of 196

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Agreement Date.

**BUYER:**

**The Litigation Practice Group P.C.**

By: _Daniel S March_
    9D494DB1993341E
    Name: Daniel S March
    Title: Managing Shareholder

**SELLER:**

**New Horizon Finance LLC**

By: _Caleb Wickman_
    3B4E9031292247F
    Name: Caleb Wickman
    Title: Owner

**APPROVAL OF ASSIGNMENT AND GUARANTEE**

The assignment of the Purchased Accounts set forth in this Agreement as well as the guarantee included therein is hereby approved, and with respect to the Purchased Accounts, the Buyer shall have all rights of Buyer as set forth in this agreement.

**The Litigation Practice Group P.C.**

By: _Daniel S March_
    9D494DB1993341E
    Name: Daniel S. March
    Title: Managing Shareholder

*[Signature Page to Accounts Receivable Purchase Agreement]*

EXHIBIT J
Page 160

DocuSign Envelope ID: 393509D5-AE8B-4893-8746-9663145607A1

Case 8:24-ap-01017-SC    Doc 10-1    Filed 03/28/24    Entered 03/28/24 13:37:36    Desc
Exhibit to Amended Complaint    Page 141 of 196

**EXHIBIT A**

**DEFINITIONS**

As used in this Agreement, the following terms have the following meanings (terms defined in the singular to have a correlative meaning when used in the plural and vice versa).

(a)    "**Action**" shall mean any civil, criminal, or administrative action, claim, suit, demand, charge, citation, reexamination, opposition, interference, decree, injunction, mediation, hearing, notice of violation, demand letter, litigation, proceeding, labor dispute, arbitral action, governmental or other audit, inquiry, criminal prosecution, investigation, unfair labor practice charge, or complaint.

(b)    "**Agreement**" shall have the meaning set forth in the preamble to this Agreement.

(c)    "**Agreement Date**" shall have the meaning set forth in the preamble to this Agreement.

(d)    "**Affiliate**" shall mean (i) with respect to any non-natural Person, any Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person and (ii), with respect to any individual, (A) family members of such individual, by blood, adoption, or marriage, (B) such individual's spouse or ex-spouse and (C) any Person that is directly or indirectly under the control of any of the foregoing individuals.  For purposes of this definition, "control" (including with correlative meanings, the terms "controlling," "controlled by," and under "common control with") means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

(e)    "**Bill of Sale and Assignment and Assumption Agreement**" shall have the meaning set forth in Section 6.2.

(f)    "**Business**" shall mean the business of the Seller as conducted on the Agreement Date.

(g)    "**Buyer**" shall have the meaning set forth in the preamble to this Agreement.

(h)    "**Buyer Indemnified Parties**" shall have the meaning set forth in Section 6.4.

(i)    "**Closing**" shall have the meaning set forth in Section 6.1.

(j)    "**Closing Date**" shall have the meaning set forth in Section 6.1.

(k)    "**Direct Claim**" shall have the meaning set forth in Section 6.6(c).

(l)    "**Excluded Assets**" shall have the meaning set forth in Section 2.1.

(m)    "**Excluded Liabilities**" shall have the meaning set forth in Section 2.2.

(n)    "**Governmental Body**" shall mean any: (i) nation, province, state, county, city, town, village, district, or other jurisdiction of any nature; (ii) federal, provincial, state, local, municipal, foreign, or other government; (iii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); (iv) multi-national organization or body; or (v) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

DocuSign Envelope ID: 393509D5-AF8B-4893-8746-9663145607A1

(o)    "**Indebtedness**" means, without duplication and with respect to the Seller, all: (i) indebtedness for borrowed money; (ii) obligations for the deferred purchase price of property or services, (iii) long or short-term obligations evidenced by notes, bonds, debentures or other similar instruments; (iv) obligations under any interest rate, currency swap, or other hedging agreement or arrangement; (v) capital lease obligations; (vi) reimbursement obligations under any letter of credit, banker's acceptance or similar credit transactions; (vii) guarantees made by the Seller on behalf of any third party in respect of obligations of the kind referred to in the foregoing clauses (i) through (vi); and (viii) any unpaid interest, prepayment penalties, premiums, costs and fees that would arise or become due as a result of the prepayment of any of the obligations referred to in the foregoing clauses (i) through (vii).

(p)    "**Indemnified Party**" shall mean a Buyer Indemnified Party or a Seller Indemnified Party, as the case may be, making a claim for indemnification under Article 6.

(q)    "**Indemnifying Party**" shall mean a Party against whom a claim for indemnification is asserted under Article 6.

(r)    "**Knowledge**" shall mean, with respect to the Seller, the actual or constructive knowledge of all facts relevant to this transaction and the transacting parties, after due inquiry.

(s)    "**Law**" shall mean any law, statute, ordinance, regulation, rule, code, notice requirement, court decision, or agency guideline, of any foreign, federal, state, or local Governmental Body.

(t)    "**Liabilities**" shall mean any direct or indirect liability, Indebtedness, obligation, commitment, expense, claim, deficiency, guaranty, or endorsement of, or by, any Person of any type, known or unknown, and whether accrued, absolute, contingent, matured, unmatured, determined or undeterminable, on- or off-balance sheet, or other.

(u)    "**Lien**" shall mean any mortgage, pledge, lien, charge, claim, security interest, adverse claims of ownership or use, restrictions on transfer, defect of title, or other encumbrance of any sort.

(v)    "**Losses**" shall have the meaning set forth in Section 6.4.

(w)    "**Notice of Claim**" shall have the meaning set forth in Section 6.6(c).

(x)    "**Organizational Documents**" shall mean, with respect to a Person, the charter, bylaws, limited liability company agreement, and other organizational documents of such Person, in each case, as amended.

(y)    "**Party**" or "**Parties**" shall have the meaning set forth in the preamble to this Agreement.

(z)    "**Permitted Liens**" shall mean (i) Liens for Taxes not yet delinquent or being contested in good faith by appropriate proceedings, (ii) statutory Liens (including materialmen's, warehousemen's, mechanic's, repairmen's, landlord's, and other similar Liens) arising in the ordinary course of business securing payments not yet delinquent or being contested in good faith by appropriate proceedings, and (iii) restrictive covenants, easements, and defects, imperfections or irregularities of title, if any, of a nature that do not materially and adversely affect the assets or properties subject thereto.

(aa)    "**Person**" shall mean any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, Governmental Body, or other entity.

EXHIBIT J
Page 162

DocuSign Envelope ID: 393509D5-AE8B-4893-8746-9663145687A1

(bb)    "**Purchase Price**" shall have the meaning set forth in <u>Section 2.3</u>.

(cc)    "**Purchased Accounts**" shall have the meaning set forth in the Recitals.

(dd)    "**Seller**" shall have the meaning set forth in the preamble to this Agreement.

(ee)    "**Seller Indemnified Parties**" shall have the meaning set forth in <u>Section 6.5</u>.

(ff)    "**Tax**" or "**Taxes**" shall mean any U.S. federal, state, local or non-U.S. income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, escheat, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

(gg)    "**Tax Returns**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(hh)    "**Third Party**" or "**Third Parties**" shall mean any Person other than the Parties or their respective Affiliates.

(ii)    "**Third-party Claim**" shall have the meaning set forth in <u>Section 6.6(a)</u>.

(jj)    "**Transaction Agreements**" shall mean the Bill of Sale and Assignment and Assumption Agreement, and each other agreement, instrument, and/or certificate contemplated by this Agreement or such other agreements to be executed in connection with the transactions contemplated hereby or thereby.

(kk)    "**Upfront Cash Payment**" shall have the meaning set forth in <u>Section 2.3</u>.

(ll)    "**Wire Instructions**" shall have the meaning set forth in <u>Section 2.3</u>.

DocuSign Envelope ID: 393509D5-AF08-4893-8746-9663145687A1

## EXHIBIT B

## FORM OF BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this **"Agreement"**), is made by and between **Buyer**, and **Seller**.  Each of the Seller and the Buyer are sometimes referred to herein, individually, as a **"Party"** and, collectively, as the **"Parties."**

WHEREAS, the Buyer and the Seller have entered into that certain Accounts Receivable Purchase Agreement, of even date herewith (the **"Purchase Agreement"**), pursuant to which the Seller has agreed to sell, assign, transfer, and deliver to the Buyer, and the Buyer has agreed to purchase, acquire, and accept from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

NOW, THEREFORE, in consideration of the covenants and representations set forth herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.    _Defined Terms_.  Capitalized terms used but not otherwise defined in this Agreement shall have the meanings assigned to such terms in the Purchase Agreement.

2.    _Sale of Purchased Accounts; Assignment_.  The Seller hereby sells, assigns, transfers, and delivers to the Buyer, and the Buyer hereby purchases, acquires, and accepts from the Seller, all right, title, and interest of the Seller in and to the Purchased Accounts, free and clear of any Liens.

3.    _Further Assurances_.  Each of the Parties agrees, from time to time, at the request of the any other Party, to execute and deliver such other instruments of conveyance, power of attorney, sale, transfer, or assignment and take such other actions as such other Party may reasonably request in order to more effectively consummate the transactions contemplated by this Agreement.

4.    _Terms of the Purchase Agreement_.  This Agreement is intended to evidence the consummation of the transactions contemplated by the Purchase Agreement and is subject to the terms and conditions set forth in the Purchase Agreement.    The terms of the Purchase Agreement, including, but not limited to, the representations, warranties, covenants, agreements, and indemnities relating to the Purchased Accounts are incorporated herein by this reference.  The Parties acknowledge and agree that the representations, warranties, covenants, agreements, and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein.  In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

5.    _Counterparts_.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Agreement delivered by facsimile, electronic mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

*[Remainder of page intentionally left blank.]*

Accounts Receivable Purchase Agreement
Exhibit B – Bill of Sale

DocuSign Envelope ID: 393509D5-AE98-4893-8746-9663145687A1

Case 8:24-ap-01017-SC   Doc 10-1   Filed 03/28/24   Entered 03/28/24 13:37:36   Desc
Exhibit to Amended Complaint   Page 145 of 196

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**BUYER: The Litigation Practice Group P.C.**

By: _____
Name: Daniel S. March
Title: Managing Shareholder

**SELLER:**

**New Horizon Finance LLC**

By: _____
Name: Caleb Wickman
Title: Owner

Accounts Receivable Purchase Agreement

DocuSign Envelope ID: 393509D5-A5B8-4803-8746-9C63145687A1

Case 8:24-ap-01017-SC    Doc 10-1    Filed 03/28/24    Entered 03/28/24 13:37:36    Desc
Exhibit to Amended Complaint    Page 146 of 196

**Schedule 2.3**
**Wire Instructions**

**$22,975.41**

**Account Holder Name: New Horizon Finance LLC**

**Address: 8101 Biscayne Blvd, #506 Miami, FL 33138**

**Routing Number:** ████████

**Account Number:** ████████

# EXHIBIT K



*Legal Counsel.*

DINSMORE & SHOHL LLP
100 West Main Street, Suite 900
Lexington, Kentucky 40507
www.dinsmore.com

Tyler Powell
(859) 425-1046 (direct) ^ (859) 425-1099 (fax)
Tyler.powell@dinsmore.com

September 15, 2023

**CONFIDENTIAL SETTLEMENT COMMUNICATION
SUBJECT TO FEDERAL RULE OF EVIDENCE 408**

New Horizon Finance LLC
8101 Biscayne Blvd #506
Miami, FL 33138
gregcurtis619@gmail.com
cw.newhorizon@gmail.com

Re:    In re: The Litigation Practice Group, P.C.
       U.S. Bankruptcy Court, Central District of California, Case No. 8:23-bk-10571

Dear Sir/Madam:

This firm represents Richard A. Marshack, solely in his capacity as Chapter 11 Trustee ("Trustee") for the bankruptcy estate of The Litigation Practice Group, P.C. ("Debtor") in the above-referenced bankruptcy case. Pursuant to 11 U.S.C. § 1107 and his appointment as Trustee, the Trustee has the obligation to investigate and pursue claims, including avoidance actions.

After a review of the Debtor's books and records, the Trustee believes that he may have claims against you to avoid and recover certain payments. This letter is written in an attempt to settle such claims, and its contents may not be used for any other purpose.

Section 547 of the Bankruptcy Code permits a trustee or debtor-in-possession to avoid certain payments made to creditors within the 90-day period preceding the filing of a bankruptcy case. We have completed our preliminary investigation and have identified certain transfers from the Debtor(s) to you within the 90-day period prior to March 20, 2023, the date upon which the Debtor filed its bankruptcy case. These transfers are listed on the attached "Preference Transfer Schedule" showing the date and amount, according to the Debtor's books and records, of each transfer or other payment. The payments referenced on the "Preference Transfer Schedule" total $236,541.14. It appears that these transfers are preferential transfers which can be avoided by the Trustee and recovered from you pursuant to 11 U.S.C. §§ 547(b) and 550(a). This means that the Trustee can file suit in the bankruptcy court to recover these sums and object to payment of any claims you have against the Debtor until the suit is resolved.

Additionally, if you have filed a proof of claim against the Debtor, that claim may be disallowed pursuant to Section 502(d) of the Bankruptcy Code for failure to return an avoidable transfer. This means that if the preference claims against you are not resolved, then you may not

receive a distribution from the Debtor's bankruptcy estate. The Trustee reserves the right to object to any proof of claim that you have filed or may file in the debtors' bankruptcy cases.

If the payment proposal above is acceptable, please sign the original of this letter where indicated and return it with the appropriate payment no later than September 27, 2023.  Please make payment to the order of Richard A. Marshack, Chapter 11 Trustee.  All funds sent will be held in the Trustee's account for this case pending further orders of the Bankruptcy Court.

In the alternative, if you believe a valid defense to recovery exists for some or all of the transfers from the Debtor, please bring such defenses to our attention and we will assess any evidence you provide in support of a defense.  We have made efforts to analyze your reasonably known affirmative defenses to the avoidance of the preference payments. Based on our currently available information and given the nature of your relationship with the Debtor, we do not believe there are any potential defenses to reduce your liability for the preference payments.  There may be information or facts that we do not have to assess your potential defenses.  If you intend to assert a defense, please provide all documents evidencing any alleged defenses under 11 U.S.C. § 547(c), including, but not limited to, contracts, invoices and any other documentation showing the date, terms and amounts for the transfers received and any documents evidencing shipment dates as to goods and services provided by you to the Debtors.  To properly assert a defense, such information must show the date of receipt of the Debtors' payment and the amount, deposit date, and any proof of deposit for any or all of the transfers.  In addition, if you assert an ordinary course of business defense, please provide the previous information for the one year period immediately preceding March of 2023, or for the period that you actually did business with the Debtor, if less than one year.  Please make arrangements to provide any evidence in support of a defense to us as soon as possible.

If we have not received any reply to this letter by September 28, 2023, we will proceed to pursue recovery of the preferential transfers by filing suit against you in the bankruptcy court.  The Trustee also reserves all rights to bring additional claims against you as the investigation into your relationship with the Debtor continues and/or after discovery begins once a suit is filed.

Of course, we would be happy to discuss this matter with you or your counsel.

Very truly yours,

DINSMORE & SHOHL LLP

Tyler Powell, Partner of Counsel

2

**The payment proposal set forth above is understood, acknowledged and voluntarily agreed to.  In exchange for a waiver and release from all claims that could be asserted by the Trustee of The Litigation Practice Group, P.C. pursuant to 11 U.S.C. §§ 547 and 550, I am authorized to accept this proposal on behalf of Point Break Holdings, LLC.  The sum of $_____ is enclosed.  I understand I may amend my claim to include the amount paid as part of my unsecured claim**.

_____

**BY**: _____

**TITLE**: _____

**DATE**: _____

*Enclosure*

EXHIBIT K

**The Litigation Practice Group, P.C. Preference Transfer Schedule**

| Vendor Name | Payment Date | Payment Amount |
|---|---|---|
| New Horizon Finance LLC | 2/7/2023 | $177,586.78 |
| New Horizon Finance LLC | 1/24/2023 | $14,771.98 |
| New Horizon Finance LLC | 1/6/2023 | $13,725.19 |
| New Horizon Finance LLC | 12/30/2022 | $11,855.90 |
| New Horizon Finance LLC | 12/28/2022 | $18,601.29 |
| | | **Total: $236,541.14** |

# EXHIBIT L

EXHIBIT L
Page 172

# GreenspoonMarder LLP

Matthew Rapkowski, Esq.
IBM Building
590 Madison Avenue, Suite 1800
New York, NY 10022
Phone: 212.524.5000
Fax: 212.524.5050
Direct Phone: 212.524.4997
Email: matthew.rapkowski@gmlaw.com

October 25, 2023

***Via E-Mail and Federal Express***
Tyler.powell@dinsmore.com
Tyler Powell, Esq.
Dinsmore & Shohl LLP
100 West Main Street, Suite 900
Lexington, Kentucky 40507

    RE:  New Horizon Finance LLC
       September 15, 2023 Demand Letter
       RULE 408 CONFIDENTIAL SETTLEMENT COMMUNICATION
       Our file No. 74429.0003

Dear Mr. Powell,

  As you know, Greenspoon Marder LLP represents New Horizon Finance LLC ("New Horizon"). We write in response to your demand letter ("Demand Letter") sent in your capacity as counsel for Richard Marshack, Chapter 11 Trustee (the "Trustee") for the bankruptcy estate of The Litigation Practice Group, P.C. ("LPG"), U.S. Bankruptcy Court, Central District of California, Case No. 8:23-bk-10571. As we understand the Demand Letter, the Trustee is proposing a prelitigation settlement discussion concerning alleged preferential transfers from LPG to New Horizon. We welcome that discussion.

  As a preliminary matter, we would like to update you on the status of New Horizon. New Horizon has been winding down its business since approximately March of 2023. Since that time, New Horizon has ceased all business operations, has been terminating contracts with employees and other vendors, and has had no revenue whatsoever. New Horizon currently has very limited resources, both financial and human, and as a matter of fact, is, unsurprisingly, unable to pay the demand the Trustee has made.

  New Horizon did provide marketing services to LPG. New Horizon provided services which secured substantial business and income for LPG. Further, the Trustee has since monetized many if not all of the agreements that New Horizon helped secure for LPG. We understand that the Trustee has transferred the agreements to a law firm with the expectation of current and future payments to benefit the estate.

  Our client was surprised to learn that LPG declared bankruptcy earlier this year. At the time, New Horizon had already been considering winding down its operations. The loss of LPG,

Atlanta  Boca Raton  Chicago  Denver  Ft. Lauderdale  Las Vegas  Los Angeles  Miami
Newark  New York  Orlando  Scottsdale  Tallahassee  Tampa  West Palm Beach

EXHIBIT L
Page 173

Tyler Powell, Esq
October 25, 2023
Page No. 2

who was a major customer for New Horizon, accelerated that decision. New Horizon has spent the last seven months or so wrapping up its matters and is looking to finish closing up before the end of the calendar year.

At the time LPG went into bankruptcy, LPG still owed New Horizon close to, if not more than, a million dollars in overdue fees for the services New Horizon provided LPG - services which benefited LPG and the estate by providing the estate the assets it has recently sold. Our client strongly considered submitting a claim for the amount owed. Upon reflection, our client ultimately decided to forego submitting a claim and move forward with shutting down the business. Our client's decision not to submit a claim may benefit other unsecured creditors.

As it stands today, New Horizon has approximately $16,000 in cash and no other assets of value. A copy of New Horizon's only bank account showing the balance is attached.[1] This creates limitations both with respect to New Horizon's ability to settle any dispute, as well as to defend any prospective litigation.

In response to your Demand Letter, and consistent with their desire to move forward, New Horizon has directed us to see if an amicable resolution can be reached. New Horizon would prefer that path rather than expend its limited resources having our firm develop a litigation strategy. During the preference period New Horizon was providing value to LPG for which it was entitled to be paid; and LPG in fact paid New Horizons for the valuable services it provided during that period. And plainly, New Horizons produced business that LPG exploited for its own benefit, so LPG received value from New Horizon's services.

Please recognize that any litigation would rapidly exhaust New Horizon's coffers. Both the Trustee and New Horizons (within the context of its limited resources) should both be incentivized to settle. New Horizon's owners recognize that New Horizons, itself, cannot fund a meaningful settlement. Based on purely financial considerations, and with no admission or finding of any wrongdoing by New Horizon associated with any of the Trustee's allegations, New Horizon's owners are prepared to subsidize a settlement of this matter. ███████████████████████
████████████████ We welcome any further discussion you would like to have on this matter.

Very truly yours,

GREENSPOON MARDER LLP

Matthew Rapkowski

cc:    Richard Epstein, Esq.

---

[1] See Exhibit A.

EXHIBIT L
Page 174

# **EXHIBIT A**

EXHIBIT L
Page 175



EXHIBIT L
Page 176

# EXHIBIT M

In re: The Litigation Practice Group PC
Disbursement Details by Payee
4 Years Pre-Petition (03/20/2019 - 03/20/2023)

New Horizon Finance LLC

**GROBSTEIN TEEPLE**

| Bank Name | Account Name | Account Number | Statement Date | Transaction Date | Check Number | Debit/Charge | Memo |
|---|---|---|---|---|---|---|---|
| Chase | The Litigation Practice Group PC | | 9/30/2022 | 9/2/2022 | | 55,495.53 | Book Transfer Debit A/C: New Horizon Finance LLC Miami Beach FL 33141-4289 US Tm: 7203600245Jo |
| Chase | The Litigation Practice Group PC | | 9/30/2022 | 9/9/2022 | | 1,876.28 | Book Transfer Debit A/C: New Horizon Finance LLC Miami Beach FL 33141-4289 US Tm: 3438800252Jo |
| Chase | The Litigation Practice Group PC | | 9/30/2022 | 9/16/2022 | | 6,169.57 | Book Transfer Debit A/C: New Horizon Finance LLC Miami Beach FL 33141-4289 US Tm: 6656400259Jo |
| Chase | The Litigation Practice Group PC | | 9/30/2022 | 9/23/2022 | | 3,080.90 | Book Transfer Debit A/C: New Horizon Finance LLC Miami Beach FL 33141 -4289 US Tm: 3102900266Jo |
| Chase | The Litigation Practice Group PC | | 9/30/2022 | 9/30/2022 | | 3,864.74 | Book Transfer Debit A/C: New Horizon Finance LLC Miami Beach FL 33141 -4289 US Tm: 8679600273Jo |
| Chase | The Litigation Practice Group PC | | 10/31/2022 | 10/6/2022 | | 4,168.84 | Book Transfer Debit A/C: New Horizon Finance LLC Miami Beach FL 33141 -4289 US Ref: Weekly Disbursement Tm: 43091 00279Jo |
| Chase | The Litigation Practice Group PC | | 10/31/2022 | 10/7/2022 | | 151,121.53 | Book Transfer Debit A/C: New Horizon Finance LLC Miami Beach FL 33141 -4289 US Ref: File Purchase Tm: 641 9800280Jo |
| Chase | The Litigation Practice Group PC | | 10/31/2022 | 10/14/2022 | | 3,482.73 | Book Transfer Debit NC: New Horizon Finance LLC Miami Beach FL 33141-4289 US Tm: 6307000287Jo |
| Chase | The Litigation Practice Group PC | | 10/31/2022 | 10/21/2022 | | 4,347.01 | Book Transfer Debit NC: New Horizon Finance LLC Miami Beach FL 33141-4289 US Tm: 5051900294Jo |
| Chase | The Litigation Practice Group PC | | 10/31/2022 | 10/28/2022 | | 4,670.10 | Book Transfer Debit NC: New Horizon Finance LLC Miami Beach FL 33141-4289 US Tm: 739550030JJo |
| Chase | The Litigation Practice Group PC | | 11/30/2022 | 11/9/2022 | | 10,272.29 | Book Trnsfer Debit NC: New Horizon Finance LLC Miami Beech FL 33141-4289 US Tm: 41 7340031 3Jo |
| Chase | The Litigation Practice Group PC | | 11/30/2022 | 11/9/2022 | | 1,500.00 | Book Trnsfer Debit NC: New Horizon Finance LLC Miami Beach FL 33141-4289 US Tm: 3572100313J0 |
| Chase | The Litigation Practice Group PC | | 11/30/2022 | 11/9/2022 | | 217.47 | Book Trsnsfer Debh NC: New Horizon Finance LLC Miami Beach FL 33141-4289 US Tm: 41 7330031 3Jo |
| Chase | The Litigation Practice Group PC | | 11/30/2022 | 11/10/2022 | | 5,115.16 | BookTrensterDebit NC: New Horizon Finance LLC Miami Beach FL 33t41-4289 US Tm: 605850031 4Jo |
| Chase | The Litigation Practice Group PC | | 11/30/2022 | 11/15/2022 | | 209,436.35 | Book Transfer Debit NC: New Horizon Finance LLC Miami Beach FL 33141-4289 US Ref: File Purohae Tm: 511990031 9Jo |
| Chase | The Litigation Practice Group PC | | 11/30/2022 | 11/18/2022 | | 14,220.43 | Book Transfer Debit NC: New Horizon Finance LLC Miami Beach FL 33141-4289 US Tm: 5040600322Jo |
| Chase | The Litigation Practice Group PC | | 11/30/2022 | 11/25/2022 | | 17,828.26 | Book Transfer Debit NC: New Horizon Finance LLC Miami Beach FL 33t4i-4269 Us Tm. 4226600329Jo |
| Chase | The Litigation Practice Group PC | | 11/30/2022 | 11/25/2022 | | 104.84 | Book Transfer Debit NC: New Horizon Finance LLC Miami Beach FL 33141-4269 US Tm 4226500329Jo |
| Chase | The Litigation Practice Group PC | | 12/31/2022 | 12/6/2022 | | 21,572.95 | Book Transfer Debit NC: New Horizon Finance LLC Miami Beach FL 33141-4289 US Tm 6745100340Jo |
| Chase | The Litigation Practice Group PC | | 12/31/2022 | 12/9/2022 | | 13,931.83 | Book Transfer Debit NC: New Horizon Finance LLC Miami Beach FL 33141-4289 US Tm 6583500343Jo |
| Chase | The Litigation Practice Group PC | | 12/31/2022 | 12/19/2022 | | 15,843.80 | Book Transfer Debit NC: New Horizon Finance LLC Miami Beach FL 33141-4289 US Tm BD41300353J0 |
| Chase | The Litigation Practice Group PC | | 12/31/2022 | 12/28/2022 | | 18,601.29 | Book Transfer Debit NC: New Horizon Finance LLC Miami Beach FL 33141-4289 US Tm 7405900362Jo |
| Chase | The Litigation Practice Group PC | | 12/31/2022 | 12/30/2022 | | 11,855.90 | Book Transfer Debit NC: New Horizon Finance LLC Miami Beach FL 33141-4289 US Tm. 5570900364Jo |
| Chase | The Litigation Practice Group PC | | 1/31/2023 | 1/6/2023 | | 13,725.19 | Book Transfer Debit NC: New Horizon Finance LLC Miami Beach FL 33141-4289 US Tm. 4716400006Jo |
| Bank of America | Litigation Practice Group PC | | 1/31/2023 | 1/13/2023 | | 15,350.10 | WIRE TYPE:WIRE OUT DATE.2301 13 TIME:1 652 ET TRN:2023O1 1300499707 SERVICE REF:562125 BNF:NEW HORIZON FINANCE LLC ID:882608521 BNF BK:JP MORGAN CHASE BANK, N. ID:0002 PMT DET:421 50076801 .13.23 WEEKLY DISBURSEMENT |
| Chase | The Litigation Practice Group PC | | 1/31/2023 | 1/24/2023 | | 14,771.98 | Book Transfer Debit A/C: New Horizon Finance LLC Miami Beach FL 33141-4289 US Tm: 5652800024J0 |
| Chase | The Litigation Practice Group PC | | 2/28/2023 | 2/7/2023 | | 21,384.83 | Book Transfer Debit NC: New Horizon Finance LLC Miami Beach FL 33141-4289 US Tm: 6648600038Jo |
| Bank of America | Litigation Practice Group PC | | 2/28/2023 | 2/7/2023 | 1178 | 177,586.78 | |
| Bank of America | Litigation Practice Group PC | | 2/28/2023 | 2/8/2023 | | 11,600.59 | WIRE TYPE:WIRE OUT DATE.230208 TIME:1 755 ET TRN2023O2080O471 464 SERVICE REF:470946 BNF:NEW HORIZON FINANCE LLC ID:882608521 BNF BKJP MORGAN CHASE BANK, N. ID:0002 PMT DET:424976776 WE EKLY DISBURSEMENT |
| | | | | | | 833,197.27 | |

DRAFT FORM - SUBJECT TO CHANGE

**EXHIBIT M**
Page 178

# CHASE ⬡

September 01, 2022 through September 30, 2022

Account Number: ████████████

## ELECTRONIC WITHDRAWALS *(continued)*

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 09/02 | Book Transfer Debit A/C: New Horizon Finance LLC Miami Beach FL 33141-4289 US Trn: 7203600245Jo | 55,495.53 |

EXHIBIT M

Page 179





**CHASE** ⬡

September 01, 2022 through September 30, 2022

Account Number: ▮▮▮▮▮▮▮▮▮▮

## ELECTRONIC WITHDRAWALS *(continued)*

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 09/09 | Book Transfer Debit A/C: New Horizon Finance LLC Miami Beach FL 33141-4289 US Trn: 3438800252Jo | 1,876.28 |

EXHIBIT M

Page 180

**CHASE** ⬡

September 01, 2022 through September 30, 2022

Account Number: ███████████

## ELECTRONIC WITHDRAWALS *(continued)*

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 09/16 | Book Transfer Debit A/C: New Horizon Finance LLC Miami Beach FL 33141-4289 US Trn: 6656400259Jo | 6,169.57 |



EXHIBIT M

Page 181



September 01, 2022 through September 30, 2022

Account Number: ███████████

## ELECTRONIC WITHDRAWALS *(continued)*

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| | | |
| 09/23 | Book Transfer Debit A/C: New Horizon Finance LLC Miami Beach FL 33141-4289 US Trn: 3102900266Jo | 3,080.90 |



EXHIBIT M

Page 182



**CHASE ⬡**

September 01, 2022 through September 30, 2022

Account Number: ███████████

## ELECTRONIC WITHDRAWALS *(continued)*

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|



| 09/30 | Book Transfer Debit A/C: New Horizon Finance LLC Miami Beach FL 33141-4289 US Tm: 8679600273Jo | 3,864.74 |

EXHIBIT M

Page 183





## CHASE ⬡

October 01, 2022 through October 31, 2022

Account Number: █████████████

## ELECTRONIC WITHDRAWALS (continued)

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 10/06 | Book Transfer Debit A/C: New Horizon Finance LLC Miami Beach FL 33141-4289 US Ref: Weekly Disbursement Trn: 4309100279Jo | 4,168.84 |

EXHIBIT M

Page 184

# CHASE ⬡

October 01, 2022 through October 31, 2022

Account Number: ▊▊▊▊▊▊▊▊

## ELECTRONIC WITHDRAWALS *(continued)*

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 10/07 | Book Transfer Debit A/C: New Horizon Finance LLC Miami Beach FL 33141-4289 US Ref: File Purchase Trn: 6419800280Jo | 151,121.53 |

EXHIBIT M

Page 185

# CHASE ●

October 01, 2022 through October 31, 2022

Account Number: ████████

## ELECTRONIC WITHDRAWALS *(continued)*

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 10/14 | Book Transfer Debit A/C: New Horizon Finance LLC Miami Beach FL 33141-4289 US Trn: 6307000287Jo | 3,482.73 |

EXHIBIT M
Page 186

**CHASE** 

October 01, 2022 through October 31, 2022

Account Number: ▮▮▮▮▮▮▮▮

## ELECTRONIC WITHDRAWALS *(continued)*

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 10/21 | Book Transfer Debit A/C: New Horizon Finance LLC Miami Beach FL 33141-4289 US Trn: 5051900294Jo | 4,347.01 |



# CHASE ⬡

October 01, 2022 through October 31, 2022

Account Number: ▮▮▮▮▮▮▮▮

## ELECTRONIC WITHDRAWALS *(continued)*

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 10/28 | Book Transfer Debit A/C: New Horizon Finance LLC Miami Beach FL 33141-4289 US Tm: 7395500301Jo | 4,670.10 |



EXHIBIT M

Page 188

CHASE

November 01, 2022 through November 30, 2022
Account Number:

## ELECTRONIC WITHDRAWALS (continued)

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 11/09 | Book Transfer Debit A/C: New Horizon Finance LLC Miami Beach FL 33141-4289 US Trn: 4173400313Jo | 10,272.29 |

**SB1482946-F1**



November 01, 2022 through November 30, 2022
Account Number: ████████████

## ELECTRONIC WITHDRAWALS *(continued)*

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 11/09 | Book Transfer Debit A/C: New Horizon Finance LLC Miami Beach FL 33141-4289 US Trn: 3872100313Jo | 1,500.00 |

Page 4 of 26

**CHASE** ◻

November 01, 2022 through November 30, 2022
Account Number: ███████████

**ELECTRONIC WITHDRAWALS** *(continued)*

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|



| 11/09 | Book Transfer Debit A/C: New Horizon Finance LLC Miami Beach FL 33141-4289 US Trn: 4173300313Jo | 217.47 |

**CHASE**

November 01, 2022 through November 30, 2022
Account Number: █████████

## ELECTRONIC WITHDRAWALS *(continued)*

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|



| 11/10 | Book Transfer Debit A/C: New Horizon Finance LLC Miami Beach FL 33141-4289 US Trn: 8058500314Jo | 5,115.16 |

Page 11 of 26

**CHASE** ⬡

November 01, 2022 through November 30, 2022
Account Number: �†▌▌▌▌▌▌▌

## ELECTRONIC WITHDRAWALS *(continued)*

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 11/15 | Book Transfer Debit A/C: New Horizon Finance LLC Miami Beach FL 33141-4289 US Ref: File Purchase Tm: 5119900319Jo | 209,436.35 |

Page 14 of 26



November 01, 2022 through November 30, 2022
Account Number:



## ELECTRONIC WITHDRAWALS *(continued)*

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 11/18 | Book Transfer Debit A/C: New Horizon Finance LLC Miami Beach FL 33141-4289 US Trn: 5040600322Jo | 14,220.43 |



CHASE

November 01, 2022 through November 30, 2022
Account Number:

## ELECTRONIC WITHDRAWALS *(continued)*

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|





| 11/25 | Book Transfer Debit A/C: New Horizon Finance LLC Miami Beach FL 33141-4289 US Trn: 4226600329Jo | 17,828.26 |



Page 19 of 26



November 01, 2022 through November 30, 2022
Account Number: [redacted]



## ELECTRONIC WITHDRAWALS *(continued)*

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 11/25 | Book Transfer Debit A/C: New Horizon Finance LLC Miami Beach FL 33141-4289 US Trn: 4226500329.lo | 104.84 |



Page 23 of 26

**CHASE** ◻

December 01, 2022 through December 30, 2022
Account Number: ▮▮▮▮▮▮▮▮

## ELECTRONIC WITHDRAWALS *(continued)*

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| | | |


| 12/06 | Book Transfer Debit A/C: New Horizon Finance LLC Miami Beach FL 33141-4289 US Trn: 6745100340Jo | 21,572.95 |

5420100343Jo

| 12/09 | Book Transfer Debit A/C: New Horizon Finance LLC Miami Beach FL 33141-4289 US Trn: 6583500343Jo | 13,931.83 |

Page 8 of 28

**CHASE** ⬡

December 01, 2022 through December 30, 2022
Account Number: ███████████

## ELECTRONIC WITHDRAWALS *(continued)*

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 12/19 | Book Transfer Debit A/C: New Horizon Finance LLC Miami Beach FL 33141-4289 US Trn: 8041300353Jo | 15,843.80 |

Page 12 of 28

**CHASE** ⬡

December 01, 2022 through December 30, 2022
Account Number: ▇▇▇▇▇▇▇

## ELECTRONIC WITHDRAWALS *(continued)*

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 12/28 | Book Transfer Debit A/C: New Horizon Finance LLC Miami Beach FL 33141-4289 US Trn: 7405900362Jo | 18,601.29 |

**SB1411260-F1**

EXHIBIT M
Page 199

278



CHASE

December 01, 2022 through December 30, 2022
Account Number:

## ELECTRONIC WITHDRAWALS *(continued)*

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 12/30 | Book Transfer Debit A/C: New Horizon Finance LLC Miami Beach FL 33141-4289 US Trn: 5570900364Jo | 11,855.90 |



Page 21 of 28

**SB1411260-F1**

EXHIBIT M
Page 200

279



**CHASE** 

December 31, 2022 through January 31, 2023
Account Number: █████████

## DEPOSITS AND ADDITIONS | *(continued)*

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|

## ELECTRONIC WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 01/06 | Book Transfer Debit A/C: New Horizon Finance LLC Miami Beach FL 33141-4289 US Trn: 4716400006Jo | 13,725.19 |



Page 2 of 14



**Your checking account**

**LITIGATION PRACTICE GROUP PC   |   Account #** ███████████   **|   January 1, 2023 to January 31, 2023**

# Withdrawals and other debits - continued

| Date | Description | Amount |
|------|-------------|--------|

| 01/13/23 | WIRE TYPE:WIRE OUT DATE:230113 TIME:1652 ET TRN:2023011300499707 SERVICE REF:562125 BNF:NEW HORIZON FINANCE LLC ID:882608521 BNF BK:JP MORGAN CHASE BANK, N. ID:0002 PMT DET:421500768 01 .13.23 WEEKLY DISBURSEMENT | -15,350.10 |

*continued on the next page*

EXHIBIT M



**CHASE ◻**

December 31, 2022 through January 31, 2023
Account Number:

## ELECTRONIC WITHDRAWALS *(continued)*

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 01/24 | Book Transfer Debit A/C: New Horizon Finance LLC Miami Beach FL 33141-4289 US Trn: 5652800024Jo | 14,771.98 |

Page 8 of 14

**CHASE** ⬡

February 01, 2023 through February 28, 2023
Account Number

## ELECTRONIC WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 02/07 | Book Transfer Debit A/C: New Horizon Finance LLC Miami Beach FL 33141-4289 US Trn: 6648600038Jo | 21,384.83 |

Page 2 of 8



 **BANK OF AMERICA**

LITIGATION PRACTICE GROUP PC   |   Account #▉▉▉▉▉▉   |   February 1, 2023 to February 28, 2023

## Check images

**Account number:** ▉▉▉▉▉▉



Check number: 1178   |   Amount: $177,586.78





LITIGATION PRACTICE GROUP PC   |   Account Number:               |   February 1, 2023 to February 28, 2023

## Withdrawals and other debits - continued

| Date | Description | Amount |
|------|-------------|--------|
| | | |

| Date | Description | Amount |
|------|-------------|--------|
| 02/08/23 | WIRE TYPE:WIRE OUT DATE:230208 TIME:1755 ET TRN:2023020800471464 SERVICE REF:470946 BNF:NEW HORIZON FINANCE LLC ID:882608521 BNF BK:JP MORGAN CHASE BANK, N. ID:0002 PMT DET:424976776 WE EKLY DISBURSEMENT | -11,600.59 |

*continued on the next page*

EXHIBIT M

# EXHIBIT N

In re: The Litigation Practice Group PC
Disbursement Details by Payee
90 Days Pre-Petition (12/20/2022 - 03/20/2023)

New Horizon Finance LLC

| Bank Name | Account Name | Account Number | Statement Date | Transaction Date | Check Number | Debit/Charge | Memo |
|---|---|---|---|---|---|---|---|
| Chase | The Litigation Practice Group PC | | 12/31/2022 | 12/28/2022 | | 18,601.29 | Book Transfer Debit NC: New Horizon Finence LLC Miami Beech FL 33141-4289 US Tm 7405900362Jo |
| Chase | The Litigation Practice Group PC | | 12/31/2022 | 12/30/2022 | | 11,855.90 | Book Transfer Debit NC: New Horizon Finance LLC Miami Beach FL 33141-4289 US Tm. 5570900364Jo |
| Chase | The Litigation Practice Group PC | | 1/31/2023 | 1/6/2023 | | 13,725.19 | Book Transfer Debit NC: New Horizon Finance LLC Miami Beach FL 33141-4289 US Tm. 4716400006Jo |
| Bank of America | Litigation Practice Group PC | | 1/31/2023 | 1/13/2023 | | 15,350.10 | WIRE TYPE:WIRE OUT DATE.2301 13 TIME:1 652 ET TRN:202301 1300499707 SERVICE REF:562125 BNF:NEW HORIZON FINANCE LLC ID:882608521 BNF BK:JP MORGAN CHASE BANK, N. ID:0002 PMT DET:421 50076801 .13.23 WEEKLY DISBURSEMENT |
| Chase | The Litigation Practice Group PC | | 1/31/2023 | 1/24/2023 | | 14,771.98 | Book Transfer Debit NC: New Horizon Finance LLC Miami Beach FL 33141 -4289 US Tm: 5652800024J0 |
| Chase | The Litigation Practice Group PC | | 2/28/2023 | 2/7/2023 | | 21,384.83 | Book Transfer Debit A/C: New Horizon Finance LLC Miami Beach FL 33141-4289 US Trn: 6648600038Jo |
| Bank of America | Litigation Practice Group PC | | 2/28/2023 | 2/7/2023 | 1178 | 177,586.78 | |
| Bank of America | Litigation Practice Group PC | | 2/28/2023 | 2/8/2023 | | 11,600.59 | WIRE TYPE:WIRE OUT DATE.230208 TIME:1 755 ET TRN2023020800471 464 SERVICE REF:470946 BNF:NEW HORIZON FINANCE LLC ID:882608521 BNF BKJP MORGAN CHASE BANK, N. ID:0002 PMT DET:424976776 WE EKLY DISBURSEMENT |
| | | | | | | 284,876.66 | |

DRAFT FORM - SUBJECT TO CHANGE

EXHIBIT N
Page 208

**CHASE** ⬡

December 01, 2022 through December 30, 2022
Account Number: ▮▮▮▮▮▮▮

### ELECTRONIC WITHDRAWALS *(continued)*

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 12/28 | Book Transfer Debit A/C: New Horizon Finance LLC Miami Beach FL 33141-4289 US Trn: 7405900362Jo | 18,601.29 |

Page 20 of 28

**SB1411260-F1**

**CHASE** ⬡

December 01, 2022 through December 30, 2022
Account Number: ▉▉▉▉▉▉▉▉

## ELECTRONIC WITHDRAWALS  *(continued)*

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|



| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 12/30 | Book Transfer Debit A/C: New Horizon Finance LLC Miami Beach FL 33141-4289 US Trn: 5570900364Jo | 11,855.90 |

**SB1411260-F1**

EXHIBIT N
Page 210

**279**



CHASE ✦

December 31, 2022 through January 31, 2023
Account Number: ▋▋▋▋▋▋▋▋

## DEPOSITS AND ADDITIONS    *(continued)*

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|



## ELECTRONIC WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 01/06 | Book Transfer Debit A/C: New Horizon Finance LLC Miami Beach FL 33141-4289 US Trn: 4716400006Jo | 13,725.19 |

Page 2 of 14

# BANK OF AMERICA

**Your checking account**

LITIGATION PRACTICE GROUP PC   |   Account #   ▮▮▮▮▮▮▮▮   |   **January 1, 2023 to January 31, 2023**

## Withdrawals and other debits - continued

| Date | Description | Amount |
|------|-------------|--------|

| 01/13/23 | WIRE TYPE:WIRE OUT DATE:230113 TIME:1652 ET TRN:2023011300499707 SERVICE REF:562125 BNF:NEW HORIZON FINANCE LLC ID:882608521 BNF BK:JP MORGAN CHASE BANK, N. ID:0002 PMT DET:421500768 01 .13.23 WEEKLY DISBURSEMENT | -15,350.10 |

*continued on the next page*

EXHIBIT N

CHASE 

December 31, 2022 through January 31, 2023
Account Number: ████████████

**ELECTRONIC WITHDRAWALS** *(continued)*

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 01/24 | Book Transfer Debit A/C: New Horizon Finance LLC Miami Beach FL 33141-4289 US Trn: 5652800024Jo | 14,771.98 |

Page 8 of 14

**CHASE** 

February 01, 2023 through February 28, 2023
Account Number: ▇▇▇▇▇▇▇

## ELECTRONIC WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 02/07 | Book Transfer Debit A/C: New Horizon Finance LLC Miami Beach FL 33141-4289 US Trn: 6648600038Jo | 21,384.83 |

Page 2 of 8



**BANK OF AMERICA**

LITIGATION PRACTICE GROUP PC   |   Account #⬛   |   February 1, 2023 to February 28, 2023

## Check images

**Account number:** ⬛



Check number: 1178   |   Amount: $177,586.78





LITIGATION PRACTICE GROUP PC    |    Account #          |    February 1, 2023 to February 28, 2023    Page 16

# Withdrawals and other debits - continued

| Date | Description | Amount |
|------|-------------|--------|
| | | |
| 02/08/23 | WIRE TYPE:WIRE OUT DATE:230208 TIME:1755 ET TRN:2023020800471464 SERVICE REF:470946 BNF:NEW HORIZON FINANCE LLC ID:882608521 BNF BK:JP MORGAN CHASE BANK, N. ID:0002 PMT DET:424976776 WE EKLY DISBURSEMENT | -11,600.59 |

*continued on the next page*

EXHIBIT N